**No. 25-11320**

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**DONNA CURLING, *et al.*,**

*Plaintiffs-Appellants,*

v.

**DAVID WORLEY, *et al.*,**

*Defendants-Appellees.*

---

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:17-CV-2989 — Amy Totenberg, Judge

---

## OPENING BRIEF OF APPELLANTS DONNA CURLING, JEFFREY SCHOENBERG, AND DONNA PRICE

---

Adam M. Sparks (GA Bar No. 341578)
Jessica G. Cino (GA Bar No. 577837)
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3500
Atlanta, GA 30309
Tel.: (404) 888-9700
Fax: (404) 888-9577
sparks@khlawfirm.com
cino@khlaw.com

Christian G. Andreu-von Euw
THE BUSINESS LITIGATION GROUP, PC
150 Spear Street
San Francisco, CA 94105
Tel.: (415) 765-6633
christian@blgrp.com

Brian T. Burgess
David D. Cross
GOODWIN PROCTER LLP
1900 N St., NW
Washington, D.C. 20036
(202) 346-4000
bburgess@goodwinlaw.com
dcross@goodwinlaw.com

Christopher J.C. Herbert
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
cherbert@goodwinlaw.com

*Counsel for Appellants Donna Curling, Donna Price, and Jeffrey Schoenberg*

No. 25-11320
*Curling v. Worley*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Eleventh Circuit Rules 26.1-1 through 26.1-3, counsel for Plaintiffs-Appellants Donna Curling, Donna Price, and Jeffrey Schoenberg hereby certify that the below is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal.

1. Abney, Russell T.: Counsel for Amicus Electronic Privacy Information Center.

2. Abrams for Governor: Objector in the underlying case.

3. Adams, Kimberly M. Esmond: Fulton Superior Court, Judge.

4. Alan Butler: Counsel for Amicus Electronic Privacy Information Center.

5. Altshuler Berzon, LLP: Counsel for Amici Common Cause and Protect Democracy.

6. American Civil Liberties Union: Former counsel for Plaintiffs-Appellants, terminated on 1/08/2021.

7. Anderson, Kimberly K.: Former counsel for Defendants-Appellees, terminated on 12/6/2019.

8. Andreu-von Euw, Christian Gabriel: Counsel for Plaintiffs-Appellants.

No. 25-11320
*Curling v. Worley*

9.    Aiken, Fred: Former defendant in the underlying case, terminated on 6/13/2018.

10.   Ardoin, R. Kyle: Former Movant in the underlying case in his official capacity as Louisiana Secretary of State, terminated on 1/10/2022.

11.   Ascarrunz, Veronica: Former counsel for Plaintiffs-Appellants, terminated on 12/1/2022.

12.   Babcock, Charles L.: Former counsel for former intervenor Fox News Network, LLC, terminated on 7/5/2022.

13.   Baconton Missionary Baptist Church, Inc.: Objector in the underlying case.

14.   Balli, James A.: Former counsel for Defendants-Appellees, terminated on 11/17/2022.

15.   Balli-Law LLC: Former counsel for Defendants-Appellees, terminated on 11/17/2022.

16.   Barnes: Roy E.: Former counsel for former defendant Secretary of State, Brian P. Kemp, and State Election Board Members, terminated on 2/15/2019.

17.   Barron, Richard: Defendant in underlying case in his individual capacity and his official capacity as Director of the Fulton County

Board of Registration and Elections.

18. Bedard, Edward: Counsel for Defendants-Appellees.

19. Belinfante, Joshua Barrett: Counsel for Defendants-Appellees.

20. Bentrott, Jane P.: Former counsel for Plaintiffs-Appellants, terminated on 8/28/2020.

21. Berzon, Stephen P.: Former counsel for Amicus Common Cause, terminated on 10/01/2020.

22. Blitch IV, Pierce Groover: Counsel for Movant in the underlying case Hancock County Board of Elections and Registration.

23. Boyle, Donald P., Jr.: Counsel for Defendants-Appellees.

24. Brady, Robert: Objector in the underlying case.

25. Bridges, Agnes: Objector in the underlying case.

26. Brimer, Marcie: Former counsel for Plaintiffs-Appellants, terminated on 8/28/2020.

27. Brody, David R.: Former counsel for Plaintiffs-Appellants, terminated on 1/8/2021.

28. Brogan, Eileen M.: Former counsel for Plaintiffs-Appellants, terminated on 7/9/2021.

29. Brooks, Jessica: Former defendant in underlying case, terminated on 6/13/2018.

30. Brown, Bruce P.: Counsel for Laura Digges, William Digges III, and Megan Missett.

31. Bruce P. Brown Law: Counsel for Laura Digges, William Digges III, and Megan Missett.

32. Bryan, Bennett Davis: Former counsel for former defendant in underlying case, DeKalb County, terminated on 6/28/2018.

33. Burge, David J.: Former defendant in underlying case.

34. Burton, Robert Dalrymple: Former counsel for Defendants-Appellees, terminated on 1/18/2022.

35. Burwell, Kaye Woodard: Counsel for former defendant Fulton County in underlying case.

36. Butler, Alan Jay: Counsel for Amicus Electronic Privacy Information Center.

37. Caldwell, Joe Robert, Jr.: Former counsel for Plaintiffs-Appellants, terminated on 1/18/2018.

38. Campbell, Benjamin E: Counsel for Plaintiffs-Appellants.

39. Capriola, Richard John: Counsel to Paul V. Maggio.

40. Care in Action, Inc.: Objector in the underlying case.

41. Carlin, John P.: Former counsel for Plaintiffs-Appellants, terminated on 1/11/2021.

No. 25-11320
*Curling v. Worley*

42. Chalmers, Adams, Backer & Kaufman LLC: Counsel for former intervenor My Pillow, Inc. and Michael J. Lindell.

43. Chapple, Catherine L.: Former counsel for Plaintiffs-Appellants, terminated on 8/28/2020.

44. Cheeley Law Group, LLC: Former counsel to Movant in the underlying case Cathleen Alston Latham, terminated on 9/5/2023.

45. Cheeley, Robert David: Former counsel to Movant in the underlying case Cathleen Alston Latham, terminated on 9/5/2023.

46. Cino, Jessica Gabel: Counsel for Curling Plaintiffs-Appellants.

47. Clark, Bryan: Counsel for former intervenor Herring Networks, Inc.

48. Clark Hill PLC: Counsel for Defendants-Appellees

49. Coalition for Good Governance: Plaintiff-Appellants.

50. Cobb County Attorney's Office: Former counsel for former defendants Cobb County in underlying case, terminated on 11/3/2017.

51. Coffee County Board of Elections: Interested third party appearing below seeking to quash discovery requests.

52. Coleman, Eric B.: Counsel to Paul V. Maggio.

53. Common Cause: Amicus in the underlying case.

54. Conarck, Jacob Paul: Former counsel for Plaintiffs-Appellants, terminated on 1/8/2021.

55. Cooney, Mary Carole: Former defendant in the underlying case.

56. Correia, Cristina: Former counsel for former defendant Brain P. Kemp and State Election Board Members, terminated on 11/3/2017.

57. Coveny, Michael P.: Former defendant in the underlying case, terminated on 6/13/2018.

58. Crumly, Jonathan Dean, Sr.: Former counsel for Defendants-Appellees, terminated on 11/17/2022.

59. Curling, Donna: Plaintiff-Appellant.

60. Cross, David D.: Counsel for Plaintiffs-Appellants.

61. Daniell, Phil: Former defendant in the underlying case, terminated on 6/13/2018.

62. Daniels, Douglas A.: Former counsel for former intervenor Michael J. Lindell, terminated on 3/30/2022.

63. Daniels, Maxine: Former defendant in the underlying case, terminated on 6/13/2018.

64. Daniels & Tredennick PLLC: Former counsel for former intervenor Michael J. Lindell, terminated on 3/30/2022.

65.   Davis, Deberah J.: Former pro se movant in the underlying case, terminated on 12/20/2023

66.   Davis, Ricardo: Plaintiff.

67.   Denton, Alexander Fraser: Counsel for Defendants-Appellees.

68.   DeKalb County District Attorney's Office: Former counsel for former defendant DeKalb County.

69.   Digges, Laura: Plaintiff-Appellant.

70.   Digges, William, III: Plaintiff-Appellant.

71.   Duane Morris LLP: Counsel for former intervenor Newsmax, Inc.

72.   Ebenezer Baptist Church of Atlanta, Georgia, Inc.: Objector in the underlying case.

73.   Edmondson, Anna Nicole: Counsel for Defendants-Appellees.

74.   Electronic Privacy Information Center: Amicus in the underlying case.

75.   Elson, Hannah Rose: Former counsel for Plaintiffs-Appellants, terminated on 11/27/2023.

76.   Eveler, Janine: Former defendant and Director of the Cobb County Board of Elections and Registration, terminated on 6/13/2018.

77.   Fair Fight Action, Inc.: Objector in the underlying case.

78.   Fisher, Ramsey W.: Former counsel for Plaintiffs-Appellants,

terminated on 10/23/2024

79.   Flores, Rommy L.: Former counsel for Plaintiffs-Appellants, terminated on 12/10/2021

80.   Fortalice Solutions, LLC: Respondent

81.   Fox News Network, LLC: Former intervenor, terminated on 8/11/2022.

82.   Fuchs, Zachary D.: Former Counsel for Plaintiffs-Appellants, terminated on 6/21/2022.

83.   Georgia Department of Law: Counsel for former Secretary of State, defendant Brain P. Kemp and State Election Board Members, terminated on 11/3/2017.

84.   Glover, Joel Robert: Former counsel for former intervenor Fox News Network, LLC, terminated on 7/5/2022.

85.   Goodwin Procter, LLP: Counsel for Plaintiffs-Appellants.

86.   Gwinnett County Department of Law: Counsel for Kristi L. Royston, Objector in the underlying case.

87.   Hancock County Board of Elections and Registration: Movant in underlying case.

88.   Handel, Karen C.: Former defendant in underlying case, terminated on 9/28/2017.

89.  Harding Law Firm, LLC: Former counsel for Plaintiff Ricardo Davis, terminated on 12/7/2023.

90.  Harding, Todd Andrew: Former counsel for Plaintiff Ricardo Davis, terminated on 12/7/2023.

91.  Harp, Seth: Former Member of the Georgia State Election Board.

92.  Havian, Eric R.: Counsel for Plaintiffs-Appellants.

93.  Haynie, Litchfield & White PC: Former counsel for former defendant in underlying case, DeKalb County.

94.  Hedgecock, Lyle F.: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

95.  Heidt, Josiah Benjamin: Former counsel for former Secretary of State, Brain P. Kemp and State Election Board Members, terminated on 11/3/2017.

96.  Hendrix, Barclay: Former counsel for former defendant in the underlying case, Karen C. Handel.

97.  Hernandez, Danielle Maria: Counsel for Defendants-Appellees.

98.  Herring Networks, Inc.: Former intervenor, terminated on 8/11/2022.

99.  Highsmith, Robert S.: Counsel for former defendant in the underlying case, Merle King.

No. 25-11320
*Curling v. Worley*

100. Hilbert, Kurt Robert: Counsel for former intervenor My Pillow, Inc. and Michael J. Lindell.

101. Holcomb + Ward, LLP: Former counsel for Plaintiffs-Appellants, terminated on 2/5/2018.

102. Holden, Deirde: Objector in the underlying case.

103. Holland & Knight LLP: Former counsel for former defendant in the underlying case, Merle King.

104. Ichter, Cary: Counsel for Plaintiffs-Appellants.

105. Ichter Davis, LLC: Counsel for Plaintiffs-Appellants.

106. Jackson-Fannin, Julian Antony: Counsel for former intervenor Newsmax, Inc.

107. Jackson Walker, L.L.P.: Former Counsel for former intervenor Fox News Network, LLC, terminated on 7/5/2022.

108. Jacoutot, Bryan Francis: Counsel for Defendants-Appellees.

109. Jarrard & Davis, LLP: Counsel for Ameika Pitts, Objector in the underlying case.

110. Jihadi, Wail: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

111. Johnson, Aaron: Former defendant in underlying case, terminated on 11/10/2023.

112. Johnson, Laura K.: Former counsel for former defendant DeKalb County, terminated on 6/28/2018.

113. Johnson, Melanie Leigh: Counsel for Defendants-Appellees.

114. Jon L. Schwartz, Attorney at Law, P.C.: Former Counsel for Amicus Common Cause, terminated 10/01/2020 and counsel for Amicus National Election Defense Coalition and Protect Democracy.

115. Jones Walker, LLP-ATL: Counsel to former movant in the underlying case R. Kyle Ardoin in his official capacity as Louisiana Secretary of State.

116. Joseph, Oluwasegun: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

117. Kaiser, Mary G.: Counsel for Plaintiffs-Appellants.

118. Kastorf, Kurt G.: Counsel for Objectors Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Fair Fight Action, Inc.; Sixth Episcopal District Inc.; Virginia Highland Church, Inc.; Abrams for Governor; and Baconton Missionary Baptist Church, Inc.

119. Keller, Scott Allen: Counsel for former intervenor Fox News Network, LLC.

120. Kemp, Brian P.: Former Secretary of State and defendant in the

underlying case, terminated on 4/9/2019.

121.   Kidd, Milton: Objector in the underlying case in his official capacity as Director of Elections for the Douglas County Board of Elections and Registration.

122.   Kimrey, Blaine C.: Counsel for former intervenor Herring Networks, Inc.

123.   King, Merle: Executive Director of the Center for Election Systems at Kennesaw State-former defendant in the underlying case, terminated on 6/13/2018.

124.   Kinsley, Nicholas Andrew: Counsel for Coffee County Board of Elections.

125.   Kirk, Joseph: Objector in the underlying case.

126.   Knapp, Halsey G., Jr.: Counsel for Plaintiffs-Appellants in proceedings below.

127.   Koechley, Julia L.: Counsel for former intervenor Herring Networks, Inc.

128.   Krevolin & Horst, LLC: Counsel for Plaintiffs-Appellants.

129.   Lake, Brian Edward: Former counsel for Defendants-Appellees, terminated on 4/25/2023.

130.   LaRoss, Diane Festin: Counsel for Defendants-Appellees.

131. Latham, Cathleen Alston: Movant in the underlying case.

132. Lawyers' Committee for Civil Rights Under Law: Former counsel for Plaintiffs-Appellants, terminated on 1/8/2021.

133. Lehotsky Keller Cohn LLP: Counsel for former intervenor Fox News Network, LLC.

134. Lewis, Anne Ware: Counsel for former defendant Karen C. Handel.

135. Lewis, Anthony: Former defendant in the underlying case, terminated on 6/13/2018.

136. Le, Anh: Member of the Georgia State Election Board and Defendant-Appellee.

137. Leyton, Stacey M.: Former counsel for Amicus Common Cause, terminated on 10/01/2020.

138. Lim, Marvin: Former counsel for Plaintiffs-Appellants, terminated on 12/21/2017.

139. Lindell, Michael J.: Former intervenor, terminated on 8/11/2022.

140. Lindenbaum, Dara: Counsel for Objectors Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Fair Fight Action, Inc.; Sixth Episcopal District Inc.; Virginia Highland Church, Inc.; Abrams for Governor; and Baconton Missionary Baptist Church, Inc.

141. Lowman, David R.: Counsel for defendants Fulton County Board of Registration and Elections; Director Richard Barron; and Fulton County Board of Registration Members in underlying case.

142. Maggio, Paul V.: Interested third party appearing below seeking to quash discovery requests.  .

143. Maguire, Joseph Matthew, Jr.: Counsel for Respondent U.S. Dominion, Inc.

144. Manoso, Robert W.: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

145. Martino-Weinhardt, Matthaeus H.: Former counsel for Plaintiffs-Appellants, terminated on 3/18/2024.

146. Mashburn, Matthew: Defendant-Appellee.

147. Matarazzo, Stan: Former defendant in underlying case, terminated 09/15/2017.

148. McGuire III, Robert Alexander: Counsel for Plaintiffs-Appellants.

149. Middleton, Caroline L.: Former counsel for Plaintiffs- Appellants, terminated on 11/27/2023

150. Miller, Carey Allen: Counsel for Defendants-Appellees.

151. Miller, J. Britten, Jr.: Pro Se Amicus.

152. Missett, Megan: Plaintiff.

153.  Monyak, Elizabeth Ahern: Former counsel for former defendant Brian P. Kemp; defendants David J. Worley, Rebecca N. Sullivan, Ralph F. Simpson, Seth Harp, and the State Election Board; and objector Janine Eveler, terminated on 11/3/2017.

154.  Morrison & Foerster, LLP-DC: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

155.  Murray, Matthew J.: Former counsel for Amicus Common Cause, terminated on 10/1/2020.

156.  My Pillow Inc.: Former intervenor, terminated on 8/11/2022.

157.  Nally, Paul L.: Pro Se Amicus Curiae.

158.  National Election Defense Coalition: Amicus in the underlying case.

159.  Newsmax, Inc.: Former Intervenor, terminated on 8/11/2022.

160.  Ney Rhein Williams, LLC: Counsel for Plaintiffs-Appellants.

161.  Ney, William Brent: Counsel for Plaintiffs-Appellants.

162.  Novosad, Heath A.: Former counsel for former intervenor Michael J. Lindell, terminated on 3/30/2022.

163.  Nuriddin, Vernetta: Former defendant in the underlying case, terminated on 11/10/2023.

164.  Office of Fulton County Attorney: Counsel for Defendant-Appellees

in underlying case.

165. Oles, David Edward, Sr.: Counsel for Plaintiff Ricardo Davis.

166. Ossoff, Thomas Jonathan: Former interested party in underlying case, terminated 09/28/2017.

167. Paradise, Loree Anne: Former counsel for Defendants-Appellees, terminated on 10/3/2022.

168. Park, Jeanah: Counsel for former intervenor Herring Networks, Inc.

169. Parker, Andrew D.: Counsel for former intervenors My Pillow, Inc. and Michael J. Lindell.

170. Parker Daniels Kibort, LLC: Counsel for former intervenor My Pillow, Inc. and Michael J. Lindell.

171. Parker, Hudson, Rainer & Dobbs LLP: Former counsel for Defendants, terminated on 8/27/2024.

172. Parker Poe Adams & Bernstein, LLP-GA: Former counsel for former Defendants-Appellees, terminated on 6/28/2018.

173. Parks Chesin & Walbert, P.C.: Counsel for U.S. Dominion, Inc.

174. Peeler, Charles E.: Counsel for former intervenor Fox News Network, LLC.

175. Perry, Leona: Former defendant in underlying case, terminated on

6/13/2018.

176.  Pettit, Joe: Former defendant in underlying case, terminated on 6/13/2018.

177.  Phillips, James Jayson: Counsel for Objectors Joseph Kirk and Deidre Holden.

178.  Phillips, Terry G.: Former counsel for former defendants Maxine Daniels, Michael P. Coveny, Anthony Lewis, Leona Perry, Samuel Tillman, Baoky N. Vu, and the Dekalb County Board of Registrations and Elections in underlying case, terminated on 6/28/2018.

179.  Pierson, Holly Anne: Former counsel to Movant in the underlying case Cathleen Alston Latham, terminated on 8/31/2023.

180.  Pierson Law LLC: Former counsel to Movant in the underlying case Cathleen Alston Latham, terminated on 8/31/2023.

181.  Pico-Pratts, Javier: Counsel for Defendants-Appellees.

182.  Pitts, Ameika: Objector in the underlying case.

183.  Porter, Reiley Jo: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

184.  Powers, John Michael: Former counsel for Plaintiffs-Appellants, terminated on 1/8/2021.

185. Price, Donna: Plaintiff-Appellant.

186. Protect Democracy: Amicus in the underlying case.

187. Pull, Joseph A.: Counsel for former intervenor My Pillow, Inc. and Michael J. Lindell.

188. Raffensperger, Brad: Secretary of State and Defendant-Appellee.

189. Ringer, Cheryl: Counsel for Defendants-Appellees in underlying case.

190. Robbins Ross Alloy Belinfante Littlefield LLC: Counsel for Defendants-Appellees.

191. Robert McGuire Law Firm: Counsel for Plaintiffs-Appellants.

192. Robin, Kenneth Paul: Counsel for Ameika Pitts, objector in the underlying case.

193. Rockdale County Board of Elections and Registration: Objector in the underlying case.

194. Rosenberg, Ezra David: Former counsel for Plaintiffs-Appellants, terminated on 1/8/2021.

195. Rowan, Nancy Ladson: Former counsel for Defendants-Appellees in underlying case, terminated on 9/13/2023.

196. Royston, Kristi L.: Objector in the underlying case.

197. Russo, Vincent Robert, Jr.: Counsel for Defendants-Appellees.

198. Ruth, Kathleen D.: Former defendant in the underlying case, terminated on 11/10/2023.

199. Salter, John Frank, Jr.: Former counsel for former Secretary of State, Brain P. Kemp and State Election Board Members, terminated on 2/15/2019.

200. Sandler Reiff Lamb Rosenstein & Birkenstock, P.C.: Counsel for Objectors Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Fair Fight Action, Inc.; Sixth Episcopal District Inc.; Virginia Highland Church, Inc.; Abrams for Governor; and Baconton Missionary Baptist Church, Inc.

201. Scheinman, Aaron Heath: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

202. Schnell, Grant Edward: Counsel for former defendant in the underlying case, Merle King.

203. Schoenberg, Jeffrey: Plaintiff-Appellant.

204. Schwartz, Edward Bruce: Former counsel for Plaintiffs- Appellants, terminated on 1/18/2018.

205. Schwartz, Jonathan Lee: Former Counsel for Amicus Common Cause, terminated 10/01/2020, and counsel for Amicus National Election Defense Coalition and Protect Democracy.

206. Simpson, Ralph F.: Former Member of the Georgia State Election Board and Defendant-Appellee.

207. Sixth Episcopal District, Inc.: Objector in the underlying case.

208. Smith, Gambrell & Russell, LLP: Counsel for former intervenor Fox News Network, LLC.

209. Sparks, Adam Martin: Counsel for Plaintiffs-Appellants.

210. Squire Patton Boggs: Former counsel for defendant Richard Barron in underlying case, terminated on 9/13/2023.

211. Steptoe & Johnson-DC: Former counsel for Appellant-Plaintiff, Donna Curling and Coalition for Good Governance, terminated on 11/29/2017 and 1/18/2018.

212. Stillman Welch, LLC: Counsel for former intervenor Herring Networks, Inc.

213. Strickland Brockington Lewis, LLP: Former counsel for former defendant Karen C. Handel.

214. Strickland, Frank B.: Counsel for former defendant Karen C. Handel.

215. Sugarman, F. Skip: Counsel for Amicus Common Cause.

216. Sugarman Law LLP: Counsel for Amicus Common Cause.

217. Sullivan, Rebecca N.: Member of the Georgia State Election Board

and Defendant-Appellee.

218. Swanbeck, Sonja N.: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

219. Talley Richardson & Cable, P.A.: Counsel for Objector Joseph Kirk.

220. Talmor, Kate: Counsel for United States Cybersecurity and Infrastructure Security Agency.

221. Taylor English Duma LLP: Counsel for Defendants-Appellees.

222. Tepfer, Cameron A.: Former counsel for Plaintiffs-Appellants, terminated on 9/3/2019.

223. Terry, Edward Curtis: Former pro se plaintiff in the underlying case, terminated on 3/20/2018.

224. The Barnes Law Group, LLC: Former counsel for former Secretary of State, Brain P. Kemp and State Election Board Members, terminated on 2/15/2019.

225. The Center for Election Systems at Kennesaw State University: Former defendant in the underlying case, terminated on 9/15/2017.

226. The Cobb County Board of Elections and Registration: Former defendant in the underlying case, terminated on 6/13/2018.

227. The Dekalb County Board of Registrations and Elections: Former

defendants in the underlying case, terminated on 6/13/2018.

228. The Fulton County Board of Registration and Elections: former defendant in the underlying case.

229. The Nelson Law Group: Counsel for Movant in the underlying case Hancock County Board of Elections and Registration.

230. The State Election Board: Defendant-Appellee in the underlying case.

231. Theriot, Chad V.: Counsel to former movant in the underlying case R. Kyle Ardoin in his official capacity as Louisiana Secretary of State.

232. Tillman, Samuel E.: Former defendant in the underlying case, terminated on 6/13/2018.

233. Totenberg, Hon. Amy: Judge in underlying case, United States District Court for the Northern District of Georgia.

234. Troutman Pepper Locke LLP: Counsel for former intervenor Fox News Network, LLC.

235. Tyson, Bryan P.: Counsel for Defendants-Appellees.

236. U.S. Dominion, Inc.: Respondent in underlying case.

237. Vallotton, Barclay: Counsel for former defendant Karen C. Handel.

238. Vedder Price, P.C.: Counsel for former intervenor Herring

Networks, Inc.

239. Virginia-Highland Church, Inc.: Objector in the underlying case.

240. Vu, Baoky N.: Former defendant in the underlying case, terminated on 6/13/2018.

241. Waldon Adelman Castilla Hiestand & Prout: Counsel for former interested party Thomas Jonathan Ossoff.

242. Waldon, Russell Dunn: Counsel for former interested party Thomas Jonathan Ossoff.

243. Ward, Bryan Myerson: Former counsel for Plaintiffs-Appellants, terminated on 2/5/2018.

244. Webb, Wheaton: Counsel for former intervenor Fox News Network, LLC.

245. Weigel, Daniel H.: Former counsel for Defendants-Appellees, terminated on 8/27/2024.

246. Welch, T. Brandon: Counsel for former intervenor Herring Networks, Inc.

247. White, Daniel Walter: Former counsel for former defendant in underlying case, DeKalb County.

248. White-Davis, Angela: Objector in the underlying case.

249. Wilson, Darryl O.: Former defendant in the underlying case,

terminated on 6/13/2018.

250. Wilson Elser Moskowitz Edelman & Dicker LLP: Former counsel for Defendants-Appellees, terminated on 1/18/2022.

251. Wilson, Melanie Felicia: Counsel for Kristi L. Royston, objector in the underlying case.

252. Wingate, Mark: Former defendant in the underlying case, terminated on 11/10/2023.

253. Winter Capriola Zenner, LLC: Counsel to Paul V. Maggio.

254. Whistleblower Partners LLP: Counsel for Plaintiffs-Appellants.

255. Wiesebron, Tamara Raquel: Former counsel for Plaintiffs-Appellants, terminated on 10/23/2024.

256. Worley, David J.: Former Member of the Georgia State Election Board and Defendant-Appellee.

257. Wright, Aaron: Former counsel for Plaintiffs-Appellants, terminated on 12/21/2017.

No. 25-11320
*Curling v. Worley*

## CORPORATE DISCLOSURE STATEMENT

Counsel for Plaintiffs-Appellants Donna Curling, Donna Price, and Jeffrey Schoenberg certify that Plaintiffs-Appellants are individuals, suing in their individual capacities.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is necessary because the district court's decision dismissing the claims in this case on Article III grounds for lack of a legally protected interest is incorrect, raises novel issues of law, and will limit voters' ability to vindicate violations of their fundamentally important voting rights.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. C1

CORPORATE DISCLOSURE STATEMENT ............................................C25

STATEMENT REGARDING ORAL ARGUMENT.........................................i

TABLE OF CONTENTS ...............................................................................ii

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 5

STATEMENT OF THE ISSUES.................................................................... 5

STATEMENT OF THE CASE ....................................................................... 6

   I.   The operative claims at trial and their evolution.................................. 6

      A.  The evolution of Georgia's voting system, the district court's
         rulings, and their impact on the claims at trial..............................8

      B.  Georgia's shift to the BMD system and Plaintiffs' challenges........11

      C.  The district court largely denies Defendants summary judgment
         on Plaintiffs' BMD claims. ......................................................... 14

   II.   The evidence at trial....................................................................17

   III.  After trial, the district court dismisses Plaintiffs' claims on standing
       grounds. ..................................................................................... 22

SUMMARY OF THE ARGUMENT............................................................. 24

STANDARDS OF REVIEW ....................................................................... 28

ARGUMENT............................................................................................... 28

   I.   The Curling Plaintiffs have Article III standing................................. 28

      A.  The district court erred in finding that the Curling Plaintiffs had
         not identified a legally protected interest. ................................... 29

      B.  Plaintiffs proved sufficiently concrete and particularized injuries
         that are fairly traceable to and redressable by Defendants...........39

II.   There is no basis for this Court to decide in the first instance the merits of the Curling Plaintiffs' claims, which are amply supported in the record....................................................................................46

    A.  This Court should follow its general rule and decline to address issues that the district court did not reach....................................47

    B.  The Curling Plaintiffs should prevail on the merits under the *Anderson-Burdick* framework.....................................................49

CONCLUSION..........................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983)...................................................................16

*Bell v. Hood,*
    327 U.S. 678 (1946) ........................................................... 33, 37

*Burdick v. Takushi,*
    504 U.S. 428 (1992)...................................................................16

*Bush v. Gore,*
    531 U.S. 98 (2000) ................................................................. 36

*Cawthorn v. Amalfi,*
    35 F.4th 245 (4th Cir. 2022)..................................................... 43

*Charles H. Wesley Educ. Found., Inc. v. Cox,*
    408 F.3d 1349 (11th Cir. 2005)........................................... 34, 45

*CHKRS, LLC v. City of Dublin,*
    984 F.3d 483 (6th Cir. 2021).....................................................31

*Common Cause/Georgia v. Billups,*
    554 F.3d 1340 (11th Cir. 2009)................................................. 43

*Compulife Software, Inc. v. Newman,*
    111 F.4th 1147 (11th Cir. 2024)........................................... 28, 47

*Cottrell v. Alcon Lab'ys,*
    874 F.3d 154 (3d Cir. 2017) ..................................................... 29

*Cowen v. Georgia Sec'y of State,*
    960 F.3d 1339 (11th Cir. 2020).................................................48

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) (plurality opinion) ...................................51

*Culverhouse v. Paulson & Co.,*
    813 F.3d 991 (11th Cir. 2016)...................................................30

iv

*Curling v. Raffensperger*,
    50 F.4th 1114 (11th Cir. 2022) ................................................................. 14

*Curling v. Sec'y of Georgia*,
    761 F. App'x 927 (11th Cir. 2019) ......................................................... 10

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ......................................................... *passim*

*Duke v. Smith*,
    13 F.3d 388 (11th Cir. 1994) ................................................................. 56

*Gill v. Whitford*,
    585 U.S. 48 (2018) ................................................................................ 42

*Gray v. Sanders*,
    372 U.S. 368 (1963) ........................................................................ 35, 36

*Green Party of Tennessee v. Hargett*,
    767 F.3d 533 (6th Cir. 2014) ................................................................ 47

*Initiative & Referendum Inst. v. Walker*,
    450 F.3d 1082 (10th Cir. 2006) ....................................................... 30, 31

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ............................................................ 51

*Libertarian Party of Ohio v. Blackwell*,
    462 F.3d 579 (6th Cir. 2006) ................................................................ 48

*MacPhee v. MiMedx Grp., Inc.*,
    73 F.4th 1220 (11th Cir. 2023) ............................................................ 44

*Maron v. Chief Fin. Officer of Fla.*,
    136 F.4th 1322 (11th Cir. 2025) ................................................. 40, 43, 45

*Obadiah v. United States*,
    No. 23-10817, 2024 WL 1928370 (11th Cir. May 2, 2024) ..................... 47

*Polelle v. Fla. Sec'y of State*,
    131 F.4th 1201 (11th Cir. 2025) ..................................................... *passim*

*Reynolds v. Sims*,
    377 U.S. 533 (1964) .............................................................................. 35

*Schuchardt v. President of the United States*,
    839 F.3d 336 (3d Cir. 2016) .................................................................. 43

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)........................................................................ 28, 42

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ........................................................................ 33, 37

*Stein v. Alabama Sec'y of State*,
    774 F.3d 689 (11th Cir. 2014) .............................................................. 50

*Stewart v. Blackwell*,
    444 F.3d 843 (6th Cir. 2006) ............................................................... 54

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997)............................................................................. 50

*Touchston v. McDermott*,
    234 F.3d 1133 (11th Cir. 2000) ........................................................... 35

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................................................. 41

*Wexler v. Anderson*,
    452 F.3d 1226 (11th Cir. 2006) ........................................................... 36

**Statutes**

28 U.S.C. § 1291.......................................................................................... 5

28 U.S.C. § 1331........................................................................................... 5

O.C.G.A. § 21-2-300 .......................................................................... 44, 45, 46

**<u>INTRODUCTION</u>**

Following almost a decade of litigation, this appeal arises after a bench trial challenging Georgia's ballot marking device (BMD) voting system as unconstitutional.  At trial, Plaintiffs Donna Curling, Donna Price, and Jeffrey Schoenberg (the Curling Plaintiffs), together with a number of other individual voters and the Coalition for Good Governance (CGG), put forward evidence that the BMD system unconstitutionally burdens their voting rights by, among other things, tabulating an unreadable bar (or QR) code that appears on a voter's BMD-generated printed paper ballot as the purported record of that voter's selections.  As a result, voters cannot verify that the only portion of their ballot actually tabulated in the ordinary course correctly reflects their individual votes.   Plaintiffs' concern about the system's reliability is well-founded:   the trial evidence showed that—as the U.S. Cybersecurity and Infrastructure Agency (CISA) found for this particular voting system—there are readily exploitable security vulnerabilities with the BMD system that allow the official vote data appearing in the QR code to be manipulated without detection.  The trial evidence also showed that partisan actors secretly compromised Georgia's voting system in January 2021.

But rather than reach the merits, the district court inexplicably concluded that Plaintiffs lacked standing to pursue their voting-rights

claims, despite having previously rejected the same challenges to standing at every step along the way of this multi-year litigation. That decision was not the result of any failure of proof: the Curling Plaintiffs came forward with extensive evidence to corroborate the individualized injury claims they pressed throughout the litigation, establishing the vulnerabilities and unprecedented compromise of the BMD system and the burdens imposed by its reliance on votes recorded in QR codes that no person can read. Instead, the district court suddenly concluded that Plaintiffs had not identified a "legally protected interest" impacted by the BMD voting system because they could not prove it would result in their disenfranchisement and no precedent directly establishes a voter's right to know what votes are recorded on her ballot to be tabulated as her individual votes. That decision misconstrues precedent and imposes an improperly elevated burden for identifying a "legally protected interest." The district court's judgment is wrong and should be vacated.

Under this Court's precedent, dismissal on standing grounds for lack of a "legally protected interest" should be a rare occurrence—reserved for those cases where the existence of the claimed interest is wholly insubstantial and frivolous. As this Court recently reiterated, all a plaintiff needs to do to satisfy this aspect of standing is to identify a "colorable" or "arguable"

constitutional interest. *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1212 (11th Cir. 2025). This inquiry is distinct from the merits.

The district court did not adhere to these principles. Instead of asking whether the interest the Curling Plaintiffs identify—knowing what is on their ballots to be tabulated as their individual votes—is at least arguably protected by the Constitution, the court shut down their claim by concluding that they did not rely on a right that is already clearly established. Because that method of analysis is incorrect, and the Curling Plaintiffs prevail under the right one, the district court's decision should be vacated.

Aside from its mistaken approach to the "legally protected interest" inquiry, the district court identified no other standing impediments to reaching the merits. And there are none. The Curling Plaintiffs' injuries are imminent, concrete, and particularized. The trial evidence showed that the Curling Plaintiffs will be burdened each and every time they are required to vote using the BMD system, which Georgia mandates for in-person voting statewide. Those real injuries are also traceable to the Defendants that remain in this case, since those State officials bear the ultimate responsibility for selecting and implementing Georgia's voting systems. And they are redressable by court order, since enjoining the BMD system would free the Curling Plaintiffs of the burdens that it causes.

All that remains to decide is the merits. Yet because the district court took an erroneous view of the "legally protected interest" requirement, it did not address, and made no factual findings about, the merits of the Curling Plaintiffs' claims. Under those circumstances, the Court's rule is to remand for the district court to address the merits. There is no reason for the Court to depart from that rule in this case—especially where the district court previously found that disputes of material fact prevented it from deciding the merits of Plaintiffs' claims at summary judgment. The district court's post-trial decision never resolved those material factual disputes, and this Court should not resolve them in the first instance.

Although the Court should not proceed on its own without a merits decision and associated findings from the district court, it bears noting that the record strongly supports the Curling Plaintiffs' claims. As Plaintiffs demonstrated at trial, the burden the BMD system places on their voting rights is severe, preventing them from knowing whether the unreadable code that will be recorded as their vote accurately captures their selections. Nor is that burden justifiable by any compelling or even important interest of the State. The BMD system undercuts, rather than serves, the interests Defendants have asserted in this case. The BMD system thus cannot survive under any level of scrutiny.

The Court should vacate the decision below dismissing the Curling Plaintiffs' challenge for lack of standing. The Court should remand for the district court to decide the merits in the first instance.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. It entered final judgment on March 31, 2025. Dkts. 1868, 1870. The Curling Plaintiffs timely appealed the final judgment on April 14, 2025. Dkt. 1871. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the Court should vacate the district court's decision finding that the Curling Plaintiffs lack standing because (a) the Curling Plaintiffs sufficiently identified a legally protected interest for Article III purposes and (b) meet the remaining Article III standing requirements?

## STATEMENT OF THE CASE

## I.    The operative claims at trial and their evolution.

Plaintiffs are individual Georgia voters and the voting-rights organization CGG.  At trial, all Plaintiffs challenged Georgia's use of what is known as the "BMD" voting system (for ballot marking device).  Dkt. 1705, at 27.[1]

Under this system, "[t]he voter inserts [an] access card into" a "BMD [device] which pulls up the ballot style assigned to the voter encoded on the access card and displays voting options on the BMD touchscreen." Dkt. 1705, at 30.  Once a "voter makes her selections on the touchscreen, the BMD prints a paper 'ballot' containing a [QR code] encoded with the selections and a human readable text summary of the voter's selection."  *Id.*  Voters are instructed to then "review the human readable summary on the paper ballot printout to confirm that it correctly reflects the choices made on the touchscreen before casting [their] ballot by inserting it into a separate ballot scanner." *Id.* at 31.  That "summary indicates the candidates for whom a vote was cast, but not the other candidates identified in each race." *Id.*  That summary also does not count as the voter's votes—instead, "the scanners

---

[1] Per this Court's rules, all record citations refer to the CM/ECF document number in the district court.  Pinpoint citations are to the blue ECF pagination at the top of each page.

count in-person votes based on the selections contained within the QR codes on the printouts." *Id.*

Plaintiffs Donna Curling, Donna Price, and Jeffrey Schoenberg, referred to here and below as the "Curling Plaintiffs," challenge the BMD system as unconstitutionally abridging their fundamental right to vote under the Fourteenth Amendment's Due Process Clause and Equal Protection Clause. Dkt. 1868, at 12. They seek permanent injunctive relief enjoining Defendants from requiring or allowing use of the BMD system in any future Georgia elections. Dkt. 1822, at 163 ¶ 1.

The Curling Plaintiffs assert two injuries to their voting rights stemming from the BMD system. First, they are "harmed by their inability to review the contents of the QR code on their printed BMD ballots"—the only portion of their ballot counted as their vote—"which makes it impossible to verify that their votes will be 'counted as cast.'" Dkt. 1868, at 13. Put differently, as Georgia voters, Plaintiffs have no way of knowing whether the QR code they are submitting as their vote actually reflects the "voter's selections made on the [BMD] touchscreen." *Id.* at 13-14. This inability to verify vote accuracy for tabulation purposes is particularly harmful due to serious security vulnerabilities that plague the BMD system. *See id.* at 14. For example, and as explained further below, the BMD system is uniquely

7

susceptible to "outside manipulation" and does not sufficiently protect against the risk that outside sources can "alter ballot QR codes to modify voter selections." *Id.* at 9; pp. 19-22, *infra*. Despite that risk, however, voters "have no practical way to confirm that the QR codes match their intent." Dkt. 1868, at 9.

Second, the Curling Plaintiffs are injured by having to undertake an unnecessarily burdensome, and ultimately futile, two-step review process. Dkt. 1868, at 14-15. In the first instance, the Curling Plaintiffs are required to review their BMD ballots twice—once on the BMD touchscreen and again in its printed form. *Id.* at 14. The second-step paper-review process is particularly burdensome, since the written text is small and shows only the selection purportedly made for each of many races on the ballot, both of which hinder voters' ability to engage in meaningful review of their printed ballots. *Id.*; Dkt. 1822, at 51 ¶ 77, 62 ¶ 94(c). The second-step of the process is also ineffective since only the unreviewable QR code, and not the reviewable written text, counts as a voter's votes. Dkt. 1822, at 47 ¶ 76(a).

### A. The evolution of Georgia's voting system, the district court's rulings, and their impact on the claims at trial.

This case first came to federal court in 2017 as a challenge to a now-defunct system of voting in Georgia known as the "DRE" system. Dkt. 1705, at 17. Under that system, voters voted directly on touchscreen computers.

Dkt. 309, at 4-5.  Votes were supposed to be recorded electronically on a removable memory card, which was then fed into a separate server to tabulate the votes at the close of election day.  *Id.* at 5.

Plaintiffs challenged this method of voting, alleging that it was "was compromised, had not been properly examined and tested prior to the election as required by state law, and was vulnerable to outside manipulation."  *See* Dkt. 1705, at 17.  They explained that "the State's continued use of the DRE system unconstitutionally burdened their fundamental right to vote and denied them equal protection of the laws as compared to voters using paper ballots."  *Id.* at 17-18.

Defendants moved to dismiss Plaintiffs' DRE challenges, while Plaintiffs sought to preliminarily enjoin use of the DRE system.  Dkt. 1705, at 18; Dkt. 309, at 2.  In support of their motion, the Curling Plaintiffs argued that the DRE system unconstitutionally burdened their voting rights because it did not provide them with "any ... means by which to independently verify or audit the recording of *each* elector's vote"—that is, "the actual ballot selections made by the elector"—for the voter's review.  *See* Dkt. 309, at 5.  That was particularly problematic, they continued, because the DRE system could be manipulated to "alter the votes cast," and voters had no way to check

against that possibility since the only record of votes resided electronically on a memory card.  *See id.*

In 2018, the district court agreed with Plaintiffs, finding that they had "shown that the DRE system 'pose[d] a concrete risk of alteration of ballot counts that would impact their own votes.'"  Dkt. 1705, at 20; Dkt. 309, at 40-41.  But the court largely declined to grant injunctive relief because it was too close to election day.  Dkt. 309, at 41-44.  At the same time, the district court mostly denied Defendants' motions to dismiss, concluding that Plaintiffs had standing to assert their claims.  Dkt. 309, at 16-29, 31.[2]

In 2019, Plaintiffs renewed their request to preliminarily enjoin use of the DRE system, which the district court granted in part.  Dkt. 1705, at 21; Dkt. 579, at 4.  It found, as relevant here, that Plaintiffs had shown evidence of "a catalogue of pervasive voting problems" with the DRE system, including that "[n]o voters could verify whether their intended votes for particular candidates were actually cast," a shortcoming that was "particularly concerning because of the risk of undetectable cyberattacks on the DREs." Dkt. 1705, at 21-22; Dkt. 579, at 90-112.  That evidence, the court determined,

---

[2] Defendants appealed the denial of their motions to dismiss to this Court. *See* Dkt. 579, at 4 & n.1.  The Court affirmed in part, and it dismissed for want of appellate jurisdiction Defendants' challenges to Plaintiffs' standing.  *See Curling v. Sec'y of Georgia*, 761 F. App'x 927, 935 (11th Cir. 2019).

"demonstrated that Georgia's election system burdened the Plaintiffs' right to cast secure, reliable ballots that were accurately counted." Dkt. 1705, at 21. The district court thus enjoined use of the DRE system for all elections after 2019. Dkt. 579, at 152.

## B. Georgia's shift to the BMD system and Plaintiffs' challenges.

After the 2019 preliminary injunction order, Georgia implemented the BMD system described above. Dkt. 1705, at 27; pp. 6-7, *supra*. Because the BMD system is plagued with problems similar to those inherent in the DRE system, Plaintiffs amended their complaints to challenge it. Dkt. 751, at 8, 31-32. As Plaintiffs outlined, the BMD system "lacks a voter-verifiable paper record," since voters cannot know what the QR code being recorded as their vote actually says, and is just as "susceptible to cybersecurity risks and manipulation" as the DRE system. *Id.* at 8, 11. And even if the human readable selections were altered on the ballot along with the QR code—which need not occur—it is unlikely that voters will be able to catch discrepancies between the selections they made on the BMD touchscreen and those that appear on the printed ballot, as Defendants' own experts acknowledged. *See id.* at 11-13.

In 2019, Defendants again moved to dismiss on standing grounds, arguing in part that Plaintiffs' BMD claims did not assert any non-speculative

injury in fact. Dkt. 751, at 34. The district court again disagreed. As most relevant here, the court found that the Curling Plaintiffs had standing based on their allegations that, under the BMD system, they "will be required to cast a ballot that cannot be read or verified as reflecting their actual choices." *Id.* at 38, 40. The district court acknowledged that the "fundamental basis of Plaintiffs' claims" is that the BMD "ballot scanner only tabulates votes from the encrypted barcode that is indecipherable to the human eye." *Id.* at 39. The BMD system does not "provide a means by which completed ballots can be accurately counted, tested, or verified"—meaning "voters cannot verify that the votes they cast were the votes that were counted"—thereby "depriving or burdening their voting franchise rights." *Id.* at 39-40. Those allegations were "sufficient" to "establish injury to [Plaintiffs'] constitutional rights" that was certainly impending, since "Plaintiffs intend to vote in person in each upcoming election in Georgia." *Id.* at 38, 41.

In 2020, Plaintiffs moved to preliminarily enjoin Georgia's use of the BMD system. "Because the BMD system [i]s not secure, reliable, or voter verifiable," Plaintiffs explained, "it unconstitutionally burden[s] their right to cast effective votes that would be accurately counted," in particular due to "concerns regarding *inter alia* the QR codes vulnerability to alteration or manipulation." Dkt. 1705, at 34-37; Dkt. 964, at 3-4.

To substantiate these claims, the Curling Plaintiffs relied in part on declarations and testimony from their expert, Dr. J. Alex Halderman, who performed tests on a Georgia BMD.  Dkt. 964, at 24-25.  Dr. Halderman "explained the many ways a BMD could be maliciously programed or otherwise malfunction such that the ballot printed by the BMD does not match the voter's intended selections."  *Id.* at 67.  As recounted by the court, his "testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode."  *Id.* at 25.  Such cyber-attacks can occur "through a variety of routes," including physical or remote access to a BMD, and work by injecting malware that "generate[s] fraudulent codes and data."  *Id.* at 25-26.  These risks "take on greater significance because the [BMD] system ... relies on the QR code for vote tabulation and that code itself cannot be read and verified by the voter."  *Id.* at 26.

Despite finding that Plaintiffs' evidence showed "serious system security vulnerability and operational issues" that adversely affect Plaintiffs' "fundamental right to cast an effective vote," Dkt. 964, at 143, the court

denied the Curling Plaintiffs injunctive relief because there was once again a "fast-approaching" election, Dkt. 1705, at 38.[3]

### C.    The district court largely denies Defendants summary judgment on Plaintiffs' BMD claims.

In 2023, Defendants moved for summary judgment, again arguing that Plaintiffs lacked standing and also attacking the merits of Plaintiffs' BMD claims.  Dkt. 1705, at 70.  The district court largely rejected Defendants' BMD-focused contentions.  *Id.* at 134.

On standing, the court again disagreed with Defendants that CGG lacked organizational standing to sue in its own right.  Dkt. 1705, at 83-84. The court had no occasion to separately address the Curling Plaintiffs' standing, finding that they could pursue their claims based on the one-plaintiff rule.  But the court explained that voters have a right "to have their votes counted as cast."  *Id.* at 86-87, 94.  "[A]n injury to [the] right to have [one's] votes counted as cast," the court reasoned, "is a concrete, legally cognizable Article III injury."  *Id.* at 86.

---

[3] The district court granted in part CGG's motion, and had earlier granted a separate CGG motion seeking preliminary injunctive relief.  *See* Dkt. 964, at 147; *see generally* Dkt. 918.  Defendants appealed both orders, which this Court addressed together.  *See Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022).  The Court vacated in part, yet determined that CGG had standing to pursue its claims; the Court did not address the Curling Plaintiffs' standing.  *See id.* at 1121.

The district court also concluded that such an injury was sufficiently imminent, pointing to "Dr. Halderman's [preliminary injunction] testimony" concerning the BMD's security vulnerabilities, as well as "significant evidence that ... Georgia elections are targets" for those looking to exploit them. Dkt. 1705, at 87-89. Additional evidence at summary judgment further confirmed the imminent risks posed by the BMD system. *Id.* at 90.

As the court noted, Dr. Halderman explained "how a malicious actor could insert malware in a BMD device [and] change votes by manipulating the QR codes containing a voters' selections." Dkt. 1705, at 90. CISA corroborated "many of th[ose] vulnerabilities" and recommended that they be "mitigated as soon as possible," which Defendants refused to do. *Id.* at 91. And, the court continued, it had since come to light that Georgia's election system had suffered a serious breach in early 2021 in Coffee County, Georgia, resulting in "the copying and sharing of election system software and voting data to actors and entities inside and outside of the state, as well as through the internet." *Id.* at 2, 92-94. Self-identified computer scientists spent hours and days infiltrating the election management server that serves as the backbone for the BMD system, including changing key settings. *Id.* at 52-60. That disclosure, Dr. Halderman explained, "materially increases the risk that future Georgia elections will be attacked." *Id.* at 93.

15

The district court also rejected Defendants' contention that the above-described harms are not traceable to Defendants or redressable by court order. Traceability was satisfied, the court explained, because Defendants are "responsible for selecting the voting system, maintaining its functionality, and for the overall responsibility for management and mitigation of any system cybersecurity vulnerabilities." Dkt. 1705, at 96-98. Likewise, it was "feasible to provide meaningful relief to redress the challenged State conduct, practices, and associated harms at issue" through injunctive relief without "invading the legislature's sphere." *Id.* at 102.

On the merits, the district court "underst[ood] the claimed constitutional burden to be the risk of harm that the current election system's security vulnerabilities and operational issues imposes on Plaintiffs' right to cast an effective, accurately counted vote." Dkt. 1705, at 112. Applying the framework set out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992)—the "*Anderson-Burdick* framework"—the court assessed the severity of the burdens that the BMD system places on that right, as compared to Defendants' interests in maintaining the system. On the burden side, the district court concluded that "there is a sufficient question of fact as to the burden imposed by Georgia's BMD voting system for this case to proceed past summary

16

judgment." Dkt. 1705, at 120. The court accordingly denied summary judgment and the case proceeded to trial.

## II. The evidence at trial.

At trial, the Curling Plaintiffs presented testimonial and other evidence confirming the existence of their individual injuries and the extent of the substantial burdens that Georgia's BMD system needlessly imposes on them.

First, each Curling Plaintiff testified to having voted using the BMD system in past elections and to the fact that they were unable to verify that the QR code to be tabulated accurately reflected any of their selections. Dkt. 1832, at 73:2-25 (Schoenberg); Dkt. 1833, at 13:12-15, 17:21-20:23, 35:4-21 (Price); Dkt. 1836, at 9:19-10:24, 13:12-23 (Curling). For example, Plaintiff Schoenberg testified that because the QR code is what is used for tabulation and because humans cannot read the QR code, he could not verify that his ballot reflected his true selections for tabulation. Dkt. 1832, at 73:16-25. Plaintiff Price similarly testified that "the ballots are not voter verified because they have a QR code" that is used for tabulation, which humans cannot read. Dkt. 1833, at 18:3-7. And Plaintiff Curling explained that, when voting, she had "no idea whether that QR code reflect[ed] [her] selection or not." Dkt. 1836, at 13:14-20. Each also testified that they intend to vote in future Georgia elections, and would like to do so in person. Dkt. 1832, at

69:19-22, 71:6-8 (Schoenberg); Dkt. 1833, at 28:4-7, 43:8-11 (Price); Dkt. 1836, at 9:2-18 (Curling).

Second, the Curling Plaintiffs testified to the burdens imposed by the BMD system's ballot-review procedures. The BMD system requires voters to review their ballot selections twice: once on the BMD screen and again on the printed paper ballot. Dkt. 1822, at 51 ¶ 77; *see* Dkt. 1833, at 51:9-15, 57:4-58:2. The second stage of that two-prong approach is particularly burdensome, Plaintiffs showed, because it requires them to review a "truncated, incomplete summary of each race." Dkt. 1822, at 62 ¶ 94(b); *see* Dkt. 1833, at 35:6-21, 51:9-15; Dkt. 1840, at 137:11-138:18, 139:7-14. Specifically, the printed ballot does not show the different options voters chose from on the BMD for each of the many races and other questions being voted upon. Dkt. 1839, at 155:10-156:14. That makes it "challenging and even impossible for Plaintiffs to ensure the text summary on the ballot of record accurately reflects their selections (i.e., their individual votes)." Dkt. 1822, at 62 ¶ 94(b); *see* Dkt. 1840, at 139:7-14. This is particularly challenging for important ballot questions in an election where all that a BMD-generated ballot reflects is a generic question number and a simple "yes" or "no" response. Dkt. 1839, at 155:8-156:14.

18

Plaintiffs also explained how voting absentee is not a viable alternative. They testified that the procedural burdens of voting absentee are themselves significant. Dkt. 1836, at 11: at 10:2-14. For one, voters "have to go through a bunch of hoops" and do "a lot of planning" to make that system work, including ensuring they have access to all the necessary "equipment," like printers. Dkt. 1832, at 74:9-21. In addition, to make sure that mailed-in absentee ballots are counted, voters must submit their votes well before election day, meaning they lose the ability vote on the basis of any last-minute information that may come to light. *See* Dkt. 1832, at 149:18-150:6. Once submitting their ballots, moreover, there is no guarantee that absentee voters will avoid the BMD system, since absentee ballots may be converted to BMD-printed ballots with a QR code. Dkt. 1832, at 91:20-92:6; *id.* at 172:21-174:22; Dkt. 1842, at 198:17-21; Dkt. 1844, at 53:2-54:10. The evidence also showed Georgia's absentee system to be unreliable. Plaintiff Price testified to an instance in which she did not receive a requested absentee ballot at all, and both she and Plaintiff Curling recounted occasions in which their submitted absentee ballots were not counted. Dkt. 1833, at 25:18-27:11; Dkt. 1836, at 11:13-12:5.

Next, Plaintiffs again explained the serious security vulnerabilities with the BMD system—confirmed by CISA—which exacerbate the problem

19

of being unable to verify their ballots for tabulation.  Dr. Haldeman showed how unauthorized actors could gain unrestricted access to a BMD through physical means, like using a ballpoint pen to put a device into "safe mode," which then allows the actor "to modify, or to change any of the data or software that is installed on the device," including the QR code and the readable text on a particular ballot.  Dkt. 1838, at 149:18-20; *see id*. at 142:11-173:22.  Dr. Halderman demonstrated this very simple hack of a Georgia BMD in the courtroom at trial in mere minutes, including showing how typical voter privacy screens and BMD positioning in Georgia polling places readily conceal this hack from view.  *See id*. at 141:11-152:4.

Dr. Halderman also demonstrated the many ways in which BMDs are susceptible to malware attacks, through, for example, inserting a simple USB device into the physical machine or by launching a more sophisticated remote attack.  Dkt. 1838, at 174:17-175:18, 178:4-188:25, 195:18-201:10, 202:24-212:10.  Dr. Halderman showed how malware inserted into a BMD can be programmed to alter solely a ballot's QR code without affecting its readable text.  *Id*. at 187:12-188:22.  Those malware attacks, Dr. Halderman testified, can be formulated to avoid detection, both in their initiation and after the fact in tabulating votes.  *Id*. at 192:17-193:14, 201:11-202:20.  These are among the same serious vulnerabilities with Georgia's BMD voting

system that CISA confirmed and directed the State to promptly remediate, but which Defendants refused to do. Dkt. 1874-15; *see* Dkt. 1822, at 68-73 ¶ 105; Dkt. 1822, at 117 ¶ 160; *see also* Dkt. 1839, at 116:10-119:25.

Finally, the Curling Plaintiffs showed that unauthorized access to Georgia's voting system was neither impossible nor speculative, as Defendants claimed—to the contrary, it already had occurred, repeatedly, over the course of January 2021. The Curling Plaintiffs introduced evidence of a serious security breach in Coffee County in the aftermath of the 2020 election, in which unauthorized individuals gained virtually unfettered access to Georgia's statewide voting system, including the election management server and numerous other components. *See, e.g.*, Dkt. 1838, at 56:7-59:23; *id.* at 212:11-214:18. One of the self-identified computer scientists involved in that breach spent several hours day-after-day over a week tinkering with, testing, and manipulating the election equipment in the Coffee County office. *See* Dkt. 1874-61; *see also* Dkt. 1822, at 99-101 ¶¶ 148(n)-(u). Data gathered from that breach—including the proprietary software used on the voting equipment that comprises Georgia's voting system—was then "distributed to unauthorized recipients both within the United States and abroad." Dkt. 1868, at 11; *see* Dkt. 1840, at 33:12-34:25. As Dr. Halderman explained, that breach and resultant distribution has

21

"increased the risk to future elections using the BMD system." Dkt. 1868, at 11; *see* Dkt. 1839, at 121:10-122:6; *id.* at 88:10-13. State-friendly witnesses agreed with Dr. Halderman's assessment. *See* Dkt. 1822, at 103 ¶¶ 155-157.

## III.    After trial, the district court dismisses Plaintiffs' claims on standing grounds.

The district court issued its opinion just over a year after trial, dismissing the Curling Plaintiffs' claims on standing grounds for lack of a "legally protected interest." Dkt. 1868, 24-26, 33. The court summarized Plaintiffs' evidence that the BMD system "(1) prevent[s] them from verifying that data in the QR code on their printed ballot … accurately reflects their vote; and (2) require[es] them to undertake the burdensome process of reviewing their selections on the BMD screen and again in the small, incomplete human-readable text on their printed ballot." *Id.* at 6, 23. But the court determined that those injuries could not support standing because they supposedly were not to any "legally protected interest." *Id.* at 23.

As for the QR-code related injury, the court determined that there is no "legally protected interest" in being able to "verify the contents of the[] BMD ballots' QR codes" (Dkt. 1868, at 24), despite previously recognizing that "the Constitution affords Plaintiffs an interest in transparent, fair, accurate, and verifiable election processes" (Dkt. 964, at 78). According to the court, Plaintiffs had not shown that "Georgia's use of a QR code for the

tabulation of BMD ballots prevents the individual Plaintiffs or the CGG members from voting," or "will prevent their vote from being accurately counted"—as the court apparently viewed to be necessary to establish an injury. Dkt. 1868, at 24. Instead, the court viewed Plaintiffs as pressing only the "more modest claim … that they are unable to verify the data in the QR codes on their printed ballots, which is scanned as their vote of record for tabulation." *Id.* Because the court saw that injury as "unlike any that the Supreme Court or the Eleventh Circuit have recognized as a legally cognizable harm to voting or associational rights," it determined that no legally protected interest was implicated. *Id.* at 25.

The court also found Plaintiffs' second theory of harm to be insufficient. Dkt. 1868, at 25. Under that theory, Plaintiffs assert injury from "having to go through the burdensome and difficult mandatory process of reviewing their BMD ballots twice, once on screen in the software application and again after the ballot is printed," with the paper-review stage of that process imposing additional obstacles. *Id.* at 25-26; p. 18, *supra*. The court insisted that injury is not "connect[ed]" to any "legally cognizable voting … right," because the evidence did not show the review process serves as "an obstacle to casting a vote" given that voters were still voting. *Id.* at 26.

## SUMMARY OF THE ARGUMENT

I.    The Court should vacate the district court's dismissal for lack of Article III standing.

A.    This Court has recently reiterated that the question of whether a plaintiff has a "legally protected interest" for standing purposes is not a difficult burden to meet.  All a plaintiff needs to do is "point[] to some *arguable* or *colorable* federal or constitutional interest." *Polelle*, 131 F.4th at 1212 (emphasis added).  Merely "asserting the deprivation of a constitutional interest normally" clears that "low bar," provided the asserted constitutional interest is not "wholly insubstantial or frivolous." *Id.* at 1211.

In dismissing the Curling Plaintiffs' claims for lack of a legally protected interest, the district court did not stay true to these principles. Skipping over whether Plaintiffs had at least presented an "arguable" or "colorable" constitutional interest, the district court faulted Plaintiffs for not identifying a pre-"established" interest, as the court conflated merits arguments with the threshold standing inquiry.

Faithfully applying this Court's standing jurisprudence, however, leads to the conclusion that the Curling Plaintiffs have a legally protected interest in a meaningful ballot review process and, in particular, confirming that the ballot they are required to cast accurately reflects their vote for tabulation

24

purposes.  Given the importance of the right to vote, which includes the right to have one's vote counted, Plaintiffs presented at least a substantial argument that the Constitution protects voters from having to cast their votes blind to whether their ballots correctly reflect their selections—especially in a voting system so readily susceptible to compromise that could affect ballots in future elections, as CISA warned.  The Curling Plaintiffs ultimately showed that Georgia's BMD system burdens that interest.  The district court accordingly erred in dismissing the Curling Plaintiffs' claims on standing grounds for lack of a legally protected interest.

B.      Because the district court dismissed on the basis that the Curling Plaintiffs lacked a legally protected interest, it did not address the other Article III standing requirements.  But the Curling Plaintiffs meet those here.

*First*, the Curling Plaintiffs' injuries are actual and imminent, concrete, and particularized.  The Curling Plaintiffs have already voted on the BMD system, and have therefore already been forced to cast ballots blindly and been subject to the burdens imposed by its futile two-step review system.  Those are prototypical past harms constituting actual injury, which the Curling Plaintiffs will suffer again when they vote in the next election if use of the BMD system is not enjoined.

The Curling Plaintiffs' injuries are also concrete. They are constitutional injuries, which "are prototypical concrete injuries." *Polelle*, 131 F.4th at 1209. Contrary to the district court's reasoning, Plaintiffs were not required to show the burden on the right to cast an effective ballot rose to the level of disenfranchisement merely to pursue judicial relief.

The Curling Plaintiffs' injuries are also particularized. Plaintiffs have identified actual and imminent injuries that have and will burden their *own* individual voting rights. That other voters have and will suffer similar harms does not make the Curling Plaintiffs' injuries generalized grievances.

*Second*, the Curling Plaintiffs' injuries are fairly traceable to the Defendants and redressable by Court order. Defendants are ultimately responsible for selecting, administering, and securing the voting system in Georgia. It is that very system that subjects the Curling Plaintiffs to their identified injuries. And a decision in the Curling Plaintiffs' favor is capable of redressing those State-created injuries. By enjoining use of the BMD system in future elections—as the district court did with Georgia's prior voting system in 2019—the Curling Plaintiffs will no longer be subject to the burdens that its lack of a meaningful review process imposes.

II.    This Court should follow its usual rule and remand to the district court to address the merits of the Curling Plaintiffs' claims, especially given

26

how little of the voluminous record the district court considered in its ruling and that the court made no findings of fact in reaching that narrow decision. In any event, the record shows that the Curling Plaintiffs should ultimately succeed on their claims.

A.    The Court generally does not consider issues on which the district court does not pass, especially where the district court did not make factual findings due to a threshold legal error. That is the case here. The district court took an erroneous legal view of the legally protected interest analysis; did not reach the *Anderson-Burdick* merits of the Curling Plaintiffs' claims; and did not make the factual findings that such an analysis entails at this stage. This Court should follow its usual rule and decline to answer those material factual questions for the first time on appeal.

B.    Although there is no basis for the Court to reach the merits, the record strongly supports the Curling Plaintiffs' claim that the BMD system unconstitutionally burdens their voting rights. Under the *Anderson-Burdick* balancing framework, the burdens imposed by the BMD system are severe, and do not serve any compelling State interest on the other side. Even under a less-demanding level of scrutiny, Defendants' asserted interests in the BMD system cannot justify the burdens imposed—indeed, the BMD system undercuts those interests rather than furthering them.

27

## STANDARDS OF REVIEW

This Court "review[s] *de novo* the threshold jurisdictional question of whether plaintiffs enjoy standing to sue in the federal courts." *Polelle*, 131 F.4th at 1207.  It also considers "*sua sponte* any issues related to standing that [it] spot[s]." *Id.*

"[R]eviewing a bench trial raises a mixed question of law and fact, and the relevant standard depends 'on whether answering it entails primarily legal or factual work.'" *Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1156 (11th Cir. 2024) (citation omitted).  "The district court's conclusions of law are reviewed de novo, but its findings of fact shall not be set aside unless clearly erroneous." *Id.* at 1155-56 (citation and quotation marks omitted). "[W]hen an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings." *Id.* at 1156 (citation and quotation marks omitted).

## ARGUMENT

### I.  The Curling Plaintiffs have Article III standing.

Plaintiffs have standing when they identify "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S.

330, 339 (2016) (citation omitted).   While the Supreme Court has not elaborated on what constitutes a "legally protected interest," *see Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 163 (3d Cir. 2017), this Court has.  A plaintiff has a legally protected interest for standing purposes if they "meet the 'low bar' of pointing to some arguable or colorable federal or constitutional interest"— one that is not "wholly insubstantial and frivolous."  *Polelle*, 131 F.4th at 1211-12.

In finding that the Curling Plaintiffs lack standing, the district court did not apply the correct standard.  Instead, the court raised the bar and conflated the threshold standing inquiry with merits-based analysis.  When the proper test is applied, the Curling Plaintiffs easily establish the existence of a legally protected interest burdened by the BMD system.

### A.   The district court erred in finding that the Curling Plaintiffs had not identified a legally protected interest.

The Curling Plaintiffs have suffered two injuries imposed by the BMD system:  (1) the inability "to verify the data in the QR codes on their printed ballots" for tabulation purposes and (2) being subject to a "burdensome and difficult" review process.  Dkt. 1868, at 24-25.  Yet the district court found that those injuries were not to interests that are legally protected because Plaintiffs purportedly had not shown their burdens rose to the level of disenfranchisement and did not identify precedent recognizing those precise

interests.  *See id.* at 4, 24-26.  But as recent precedent from this Court confirms, that analysis takes too cribbed a view of what constitutes a "legally protected interest."  Under the right analysis, the Curling Plaintiffs have identified a constitutional interest in a meaningful ballot review process that enables them to verify their respective ballots for tabulation and that serves as the legally protected interest sufficient to give them standing.

### 1.  *Asserting a legally protected interest is a low bar that is distinct from the merits.*

As this Court recently reiterated in *Polelle*, identifying a "legally protected interest" is a "low bar," which is distinct from proving success on the merits.  131 F.4th at 1211-12 & n.7; *see also Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016) ("in reviewing the standing question," courts "must be careful not to decide the questions on the merits for or against the plaintiff"); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) ("For purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional violation.  That is the issue on the merits.").  Instead, "[a] plaintiff alleges 'the invasion of a legally protected interest' when a 'plaintiff has a right to relief *if* the court accepts the plaintiff's interpretation of the constitutional or statutory laws on which the complaint relies.'"  *Polelle*, 131 F.4th at 1211 (emphasis added).

30

In short, merely "asserting the deprivation of a constitutional interest normally satisfies standing's injury-in-fact requirement." *Polelle*, 131 F.4th at 1211. Conversely, dismissal on standing grounds for lack of a legally protected interest is improper unless the lack of constitutional protection is apparent—the claim is "wholly insubstantial and frivolous." *Id.* (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)); *accord CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021)*; Initiative & Referendum Inst.*, 450 F.3d at 1093.

The Court's decision in *Polelle* illustrates how the analysis is supposed to proceed. There, the plaintiff challenged Florida's closed primary system on the basis that it "excludes him, a political-party non-affiliate, from participating in partisan primary elections that effectively determine the [winner of] certain public offices." 131 F.4th at 1208. The exclusion, he claimed, "burdens a constellation of related constitutional rights—his right to a meaningful vote, his right not to associate with political groups and messages, and his right to the equal protection of the laws." *Id.* Countering, the defendants claimed the plaintiff lacked a "legally protected interest" because he supposedly had "no 'constitutional right' to or 'interest' in 'selecting the candidate of a group to which one does not belong,'" meaning the plaintiff lacked standing. *See id.* at 1211.

31

But the Court disagreed, explaining that the defendants' position "conflat[es] the merits with standing." 131 F.4th at 1211. The plaintiff alleged that he had "to either register with a political party … or forfeit his ability to cast a meaningful ballot," which "places him at a conceivable disadvantage compared to other voters who affiliate with political parties," and "does so potentially in violation of the Equal Protection Clause." *See id.* at 1213. That "conceivable disadvantage" and "potential[]" constitutional violation, the Court held, is all that is required for purposes of standing. *See id.*

*Polelle* reiterates that clearing the legally protected interest bar does not require resolving whether the Constitution ultimately does, or does not, protect the asserted interest. That is the ultimate merits question, and one here that must be answered under *Anderson-Burdick* only after the necessary factual findings are made.

### 2. *The district court erred by imposing too high of a legally protected interest burden.*

The district court's legally protected interest analysis did not adhere to the principles reiterated in *Polelle*. While properly acknowledging that the Curling Plaintiffs assert two injuries stemming from the BMD system, the court strayed in its analysis of whether those injuries were to legally protected interests. Dkt. 1868, at 20-22. Rather than asking, for purposes of standing, whether the Curling Plaintiffs had identified "arguable" or

32

"colorable" constitutional interests, the court required identification of interests already firmly "established" in case law. *Id.* at 4, 24-26. In doing so, the district court held the Curling Plaintiffs to too high a burden. Under the right test, the Curling Plaintiffs' have identified a legally protected interest—that is, an "arguable" or "colorable" constitutional interest—in a meaningful ballot-review process that Georgia's BMD system unquestionably burdens.

a.    In finding that the Curling Plaintiffs had not identified injuries to any legally protected interests, the court improperly entwined merits considerations into the standing analysis.

Starting with the QR code, for example, the court found it significant that the Curling Plaintiffs had "no case supporting a judicially enforceable interest in their ability to verify the contents of their BMD ballots' QR codes." Dkt. 1868, at 24. But the purported absence of controlling case law does not render an asserted interest "wholly insubstantial and frivolous"; if it did, the law could not move forward, and plaintiffs would lack the ability to challenge novel burdens on their fundamental rights, as reflected in something like the BMD voting system and unreadable QR codes. A constitutional interest can be arguable even if its existence as a matter of law "has never been specifically decided." *See Bell*, 327 U.S. at 684*; cf. Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 89 (1998) (claim must be "so insubstantial, implausible, foreclosed by prior decisions …, or otherwise completely devoid of merit as not to involve a federal controversy").

The district court likewise went astray in concluding that Plaintiffs' undisputed inability to review the QR code "does not implicate th[e] well-established principle" that the right to vote includes the right to have one's vote counted since the Curling Plaintiffs have not claimed that the QR code "prevents" them from voting or "will prevent their vote from being accurately counted." *See* Dkt. 1868, at 24. But standing law plainly does not require use of the QR codes to be so burdensome that it *prevents* the Curling Plaintiffs from voting or *prevents* their votes from being counted. The extent of the burden or injury is a *merits* consideration, not a standing test. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer [Article III] injury."). And even on the merits, establishing a constitutionally problematic burden on the right to vote does not require proof of certain disenfranchisement. *See* pp. 49-56, *infra*.

Similar errors infected the district court's analysis of the unnecessarily burdensome and ultimately futile ballot-review process. The court determined that this theory of injury was not connected to "a legally

34

cognizable voting or associational right," since the evidence "regarding the alleged burdens of the BMD system's multi-step review process reflects that, although some find the process challenging, they do not claim that it is an obstacle to casting a vote." Dkt. 1868, at 26. But the evidence cited did not suggest there was no "obstacle"—it merely referenced testimony that the Plaintiffs were committed voters who would not stay home in future elections despite being "very reluctant" to use the BMD system. *See* Dkt. 1833, at 58:3-5 ("Q. So for elections coming up in 2024, will you again vote by BMD if you have difficulty getting an absentee ballot? A. I'll be very reluctant to, but I will, yes."); Dkt. 1839, at 155:4-156:23. Once again, the Curling Plaintiffs were not required to show the BMD system results in their disenfranchisement merely to establish a cognizable constitutional injury.

b.    Applying the framework reiterated by this Court in *Polelle*, the Curling Plaintiffs' have sufficiently shown that their claimed injuries are to a legally protected intertest. It is at least "arguable" that the Constitution protects one's right to meaningfully review their ballot prior to casting it.

Voters "unquestionabl[y]" have "the right to have [their] vote[s] counted," *Reynolds v. Sims*, 377 U.S. 533, 554 (1964), and to have them "*correctly* counted and reported," *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (emphasis added). *See Touchston v. McDermott*, 234 F.3d 1133, 1151 (11th

35

Cir. 2000) ("Qualified citizens not only have a constitutionally protected right to vote, but also the right to have their votes counted."). As that right is "fundamental" and "form[s] the bedrock of our democracy," *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006), it follows readily that voters have a constitutional interest in ensuring its preservation with a meaningful ability to confirm a ballot's accuracy for tabulation before submission. *See Bush v. Gore*, 531 U.S. 98, 104 (2000) ("The right to vote is protected in more than the initial allocation of the franchise."). Such a meaningful review process is the only means voters have to check against the risk that their votes will not be "correctly counted." *See Gray*, 372 U.S. at 380. Even the district court recognized this point at an earlier stage of the proceedings, when it held that "the Constitution affords Plaintiffs an interest in ... *verifiable* election processes," because such verification helps "guarantee each citizen's fundamental right to cast an accountable vote." Dkt. 964, at 78.

Moreover, the facts of this case show why the right to an effective vote logically encompasses a right to meaningful review for accuracy, rather than requiring blind trust that a voter's selections were properly recorded. As the Curling Plaintiffs have shown, there are demonstrated vulnerabilities with Georgia's BMD system that readily allow ill-intentioned individuals to gain unrestricted access to BMDs—indeed, an unprecedented breach already has

36

occurred. *See* pp. 21-22, *supra*. Those vulnerabilities allow for "alter[ing] ballot QR codes to modify voter selections," Dkt. 1868, at 9, meaning that what is ultimately counted "may not accurately capture a voter's selections." Dkt. 1822, at 51 ¶ 77. As a result, the BMD system permits the counting of votes that are not, in reality, the voter's.

There is therefore nothing insubstantial about the contention that voters have a legally protected interest in being able to meaningfully review their ballots; it is a contention that has arisen in connection with a real-world problem that needs to be addressed. At a minimum, the Curling Plaintiffs' asserted interest in meaningful review of their ballot for accuracy certainly is not "foreclosed" by established precedent or otherwise "implausible" or insubstantial. *See Steel Co.*, 523 U.S. at 89; *Bell*, 327 U.S. at 683-85.

c.    The dual injuries the Curling Plaintiffs have identified fit within this "legally protected interest" in meaningful ballot review for accuracy. Georgia's use of a QR code as the sole method of vote counting for in-person voting (and for at least some absentee ballots) results in a system under which voters cannot know what their actual votes are on their individual ballots. Indeed, where it is *only* the QR code that is counted as one's vote of record and where human voters cannot ascertain what those QR codes say, there is effectively *no* review process at all.

37

The only aspect of the ballot that voters like the Curling Plaintiffs are theoretically able to review under Georgia's system is the readable text purporting to reflect the choices the voters made. But that review process falls short of being meaningful or verifiable.

Not only does the limited review exclude the QR code, but it is burdensome, imposing a two-step process on voters to review their selections once on the BMD screen and then again on paper. Dkt. 1822, at 51 ¶ 77; *see* Dkt. 1833, at 51:9-15, 57:4-58:2. The written text only reveals the selections purportedly made, without listing other selections available for each of several contests. Dkt. 1839, at 155:10-156:14. This requires voters to memorize everything that they were shown on the BMD screen along with who or what among the many potential choices they actually selected there— making it "challenging and even impossible for Plaintiffs to ensure the text summary on the ballot of record accurately reflects their selections." Dkt. 1822, at 62 ¶ 94(b); *see* Dkt. 1840, at 139:7-14. Ballots in Georgia can be multiple pages with dense text and numerous candidates listed across numerous races plus certain questions for voters to vote on "yes" or "no." Dkt. 1839, at 155:8-156:14.

The step-two paper review process is also ultimately futile since the written-text selections do not count as the voter's votes—only the QR code

38

does—and the BMD system's vulnerabilities allow for the changing of QR code data without affecting the written text. *See* Dkt. 1838, at 185:20-188:22. Moreover, several studies and even one of Defendants' own experts established that voters are largely incapable of reliably identifying errors among the human readable text on their ballots. Dkt. 1840, at 137:11-140:14; *see* Dkt. 1843, at 269:15-270:1.

*     *     *     *     *

In sum, in dismissing the Curling Plaintiffs' claims for lack of a legally protected interest, the district imposed a greater standing burden than the "low bar" it was supposed to apply. Under the correct test, the Curling Plaintiffs have sufficiently identified a legally protected interest and burdens upon it. The district court accordingly erred in dismissing the Curling Plaintiffs' claims for lack of a legally protected interest.

### B. Plaintiffs proved sufficiently concrete and particularized injuries that are fairly traceable to and redressable by Defendants.

Because the district court determined that the Curling Plaintiffs had not sufficiently identified a legally protected interest, it did not address the other Article III standing requirements. But Plaintiffs meet those, too. First, Plaintiffs proved at trial that they have suffered concrete particularized injuries that they are imminently likely to suffer again. And they also proved

39

that those injuries are traceable to these Defendants, and redressable by court order. The Curling Plaintiffs therefore have Article III standing.

### 1. *Plaintiffs' injuries are actual and imminent, concrete, and particularized.*

To show an "injury in fact," the Curling Plaintiffs must demonstrate that the injuries to their interest in a meaningful ballot review process are "concrete," "particularized," and "actual or imminent." *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1329 (11th Cir. 2025) (quotation marks omitted). They have done so here.

*First*, the Curling Plaintiffs' asserted injuries are imminent, rather than hypothetical or speculative. They have already suffered the injuries of being unable to review what will be tabulated as their vote of record and being subject to a burdensome and ultimately futile review process. Each of them has voted using the BMD system and testified that they were unable to verify that the QR code to be counted accurately reflected their selections. *See* pp. 17-18, *supra*. They also testified to having to undertake the burdensome, difficult, and ultimately futile ballot review process. *See* p. 18, *supra*. And they testified, without rebuttal, as to their strong intentions to vote in future Georgia elections. Dkt. 1832, at 69:19-22, 71:6-8 (Schoenberg); Dkt. 1833, at 28:4-7, 43:8-11 (Price); Dkt. 1836, at 9:2-18 (Curling). Thus, absent court intervention, Plaintiffs will suffer the same injuries in each and every future

election conducted under Georgia's current system, making them "certainly impending"—precisely as the district court had recognized in prior rulings. *See* Dkt. 751, at 38 ("injury is not speculative; it is 'certainly impending,' since Plaintiffs intend to vote in person in each upcoming election in Georgia").

Defendants argued in the district court that the Curling Plaintiffs' injuries are "speculative" and "hypothetical," but their position mischaracterized Plaintiffs' claims as depending on the premise that their ballots will not be counted. *See* Dkt. 1821, at 173-174 ¶¶ 716-721. As discussed, pp. 37-38, *supra*, the Curling Plaintiffs are injured from the BMD system because they are deprived of the opportunity to meaningfully review their ballots for accuracy prior to casting them. The Curling Plaintiffs will suffer that injury in each and every election conducted using the BMD system. Therefore, "[w]ithout declaratory or 'injunctive relief,'" they will continue to suffer the very same harms, again and again. *See Polelle*, 131 F.4th at 1209 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) ("a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring").

*Second*, the Curling Plaintiffs' injuries are concrete. Defendants did not claim otherwise after trial, for good reason. *See* Dkt. 1821, at 173-174

41

¶¶ 716-721.  As *Polelle* reaffirms, "Constitutional injuries are prototypical concrete injuries."  131 F.4th at 1209.  "So the [Constitution's] possible protection of [the Curling Plaintiffs'] asserted rights render[] [their] injuries concrete." *Id.* at 1209-10.

*Finally*, the Curling Plaintiffs' injuries are particularized.  As this Court has explained, "voters assert a 'particular injury' ... when some government action undermines ... *their* vote."  *Polelle*, 131 F.4th at 1209 (citation omitted).  That is because "a person's right to vote is 'individual and personal in nature.'" *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (quoting *Reynolds*, 377 U.S. at 561).  Thus, "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* at 65-66 (citation omitted).

Here, Georgia's BMD system undermines the Curling Plaintiffs' voting rights by preventing *them* from being able to meaningfully review for accuracy the only aspect of *their* ballots that will be recorded as *their* votes of record. *See* pp. 17-18, *supra*.  It does not matter if, as Defendants pressed below, the Curling Plaintiffs have not suffered a "unique" harm different from other voters. *See* Dkt. 1821, at 173-174 ¶¶ 716-721.  "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 578 U.S. at 339

n.7 (2016); *see also Schuchardt v. President of the United States*, 839 F.3d 336, 346 (3d Cir. 2016) ("[T]hat a large percentage of the population may share a similar interest 'does not change [its] individualized nature' [where plaintiffs are] among the persons" harmed. (citation omitted)). For example, "[r]equiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing"—even though all voters are impacted by voter ID laws. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (holding individuals had standing "[e]ven if [they] possessed an acceptable form of photo identification"). At bottom, the Curling Plaintiffs have identified imminent injuries to their own voting rights; that other voters' rights might be undermined in the same ways does not make those injuries generalized grievances. *See Cawthorn v. Amalfi*, 35 F.4th 245, 253 n.5 (4th Cir. 2022).

## 2. *Plaintiffs' injuries are traceable to Defendants and redressable by court order.*

The Curling Plaintiffs have also demonstrated that their injuries are "fairly traceable to the [State's] allegedly unlawful conduct," and that a decision in their favor would be capable of redressing their injuries. *See Maron*, 136 F.4th at 1331.

43

*First*, Plaintiffs' injuries are traceable to Defendants—as the district court previously found. *See* Dkt. 1705, at 97-98; Dkt. 751, at 41-43. Traceability exists where a "plaintiff's injury [is] 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"—that is, where "the injury was likely caused by the defendant." *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1239 (11th Cir. 2023) (citation omitted).

Here, Georgia law puts it on the Secretary of State—a Defendant here— to select the State's voting equipment: "[t]he equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State." O.C.G.A. § 21-2-300(a)(1). As the district court explained, this means that Defendants are ultimately "responsible for selecting the voting system, maintaining its functionality, and for the overall responsibility for management and mitigation of any system cybersecurity vulnerabilities." Dkt. 1705, at 98. It is that Secretary-of-State-selected-and-run system that subjects the Curling Plaintiffs to a voting regime in which they lack any ability to meaningfully review their ballots for accuracy. That injury flows directly from "[t]he equipment used for casting and counting votes ... as determined by the Secretary of State."

44

O.C.G.A. § 21-2-300(a)(1).  It is therefore "fairly traceable" to Defendants' selection and implementation of the BMD system.  *See Charles H. Wesley Educ. Found.*, 408 F.3d at 1352.

*Second*, a decision in the Curling Plaintiffs' favor enjoining use of the BMD system "would amount to a significant increase in the likelihood that [they will] obtain relief that directly redresses the injury suffered."  *Maron*, 136 F.4th at 1331 (quoting *S. River Watershed All., Inc. v. Dekalb County, Georgia*, 69 F.4th 809, 820 (11th Cir. 2023)).

Resisting that conclusion, Defendants have previously argued that the only way the Curling Plaintiffs can be afforded effective relief is through ordering a particular voting method, one requiring hand marked paper ballots, which Defendants argue the court lacks authority to mandate.  Dkt. 1821, at 181-182 ¶ 748.  But neither the district court nor this Court need order the use of a particular voting method to redress the injuries imposed by the BMD system.  By enjoining the use of that system and unreadable QR codes to tabulate votes, such an order would ensure that the Curling Plaintiffs will no longer be subject to the practice of counting unreliable and unreadable QR codes as a voter's votes or to Georgia's unnecessarily difficult and ultimately futile two-step review process.  *See* Dkt. 1705, at 102 (recognizing that the court could fashion "meaningful relief to redress the

45

challenged ... conduct, practices, and associated harms at issue" without "invading the legislature's sphere").

Further confirming that an order in the Curling Plaintiffs' favor would not invade the legislature's sphere, the evidence at trial showed that it was the Secretary of State, not the legislature, who selected Georgia's BMD system.  Dkt. 1822, at 37 ¶ 60; *see* Dkt. 1874-10.  The legislature did not require the Secretary of State to select the particular BMD system that he did, and did not mandate the use of unreadable QR codes to tabulate ballots.  *See* O.C.G.A.  § 21-2-300(a)(2).    Even if it had, this Court has rightly acknowledged that it is well "within the judicial power to enjoin the use of a[n] ... election practice." *See Polelle*, 131 F.4th at 1227.

## II.    There is no basis for this Court to decide in the first instance the merits of the Curling Plaintiffs' claims, which are amply supported in the record.

The Court should follow its usual rule and remand for the district court to address the merits of the Curling Plaintiffs' claims, especially given how little of the voluminous record the district court addressed.  In particular, the district court did not address, and made no findings relevant to, the merits of the Curling Plaintiffs' claims under the *Anderson-Burdick* framework.

If the Court were to review the trial record in the first instance, it would find that the Curling Plaintiffs have proven that Georgia's BMD system

unlawfully burdens their voting rights and that Defendants have not shown that those burdens are justified by any countervailing State interest.

### A. This Court should follow its general rule and decline to address issues that the district court did not reach.

This Court "generally won't consider issues the district court did not decide." *Obadiah v. United States*, No. 23-10817, 2024 WL 1928370, at *2 (11th Cir. May 2, 2024) (citing *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1306 (11th Cir. 2022)). That is especially true where, as here, "a district court has failed to make a finding because of an erroneous view of the law." *Compulife Software*, 111 F.4th at 1156 (citation omitted). In that case, "the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings." *Id.*

The Court should follow its usual rule here. Because the district court wrongly found no standing by applying an erroneous test, it failed to make any factual findings after the bench trial relevant to the *Anderson-Burdick* merits questions surrounding the Curling Plaintiff's claims. That is significant because *Anderson-Burdick* has "factual dimensions." *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 547 (6th Cir. 2014). Courts must evaluate "evidence of the real impact the restriction has on the process," before balancing those real-word impacts against the State's asserted

justifications.  *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 587 (6th Cir. 2006).  As this Court has explained, although the *Anderson-Burdick* balancing question is "not a pure question of fact," it contains factual elements and is therefore one "that the district court is better equipped to address with testimony and other direct evidence" in the first instance.  *See Cowen v. Georgia Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020) (explaining that "the *Anderson* test emphasizes the relevance of context and specific circumstances").

But the district court made no factual findings relevant to the *Anderson-Burdick* question, including about the "real impact[s]" on the voting process that the Curling Plaintiffs have identified.  *Libertarian Party of Ohio*, 462 F.3d at 587.  The district court did not, for example, consider the significance of the serious vulnerabilities with the BMD system and the substantial risk they present for counting the Curling Plaintiffs' individual votes in future elections—despite Dr. Halderman's testimony about the significance and accelerating nature of that risk and the unprecedented breach of that system that already occurred over the course of a month in 2021.  *See* Dkt. 1839, at 99:22-100:17.  Nor did the district court make findings about the magnitude of the burden of the BMD system on voter review—including the inability to verify ballot accuracy for tabulation—

because the court improperly dismissed the question as legally irrelevant based on misunderstanding what may qualify as a legally protected interest. Dkt. 1868, at 5 n.1 ("Because the Court ultimately concludes that Plaintiffs have not established that they have standing to pursue their claims, it lacks jurisdiction to consider the merits of their claims—including by engaging in fact finding."). That is an important omission, as the district court had declined to award summary judgment to Defendants because there was a disputed "question of material fact regarding the magnitude of the burden imposed by Georgia's BMD voting system." Dkt. 1705, at 113. And the district court made no post-trial findings about the nature of the State's interest and whether the BMD system was necessary to further those interests. Indeed, it cautioned that its recitation of the background of the case "should not be construed as findings of fact." Dkt. 1868, at 5 n.1.

Because this Court is one of review, and not first view, it should follow its usual rule and decline to answer those material factual questions in the first instance.

### B.    The Curling Plaintiffs should prevail on the merits under the *Anderson-Burdick* framework.

If the Court were to proceed to consider the merits of the Curling Plaintiffs' claims despite the narrow ruling and findings on appeal, it would see that the trial record compels the conclusion that the BMD voting system

substantially burdens their voting rights without furthering significant governmental interests.

Under the *Anderson-Burdick* framework, when assessing a regulation that imposes some burden on the right to vote, courts are to "weigh the 'character and magnitude' of the burden that the State's rule imposes ... against the interests that the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (citing *Burdick*, 504 U.S. at 434). "[T]he level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights." *Stein v. Alabama Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014). Laws that impose severe burdens "must be narrowly drawn to serve a compelling state interest." *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1318 (11th Cir. 2019). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Id.* at 1318-19.

The burdens here are severe, and Georgia's BMD system is not narrowly tailored to meet any compelling interest. But even if the burdens imposed by the BMD system were considered less cumbersome, Georgia's interests still would not justify them.

### 1.   *The Curling Plaintiffs proved substantial burdens on their voting rights that Defendants have not justified with any compelling interest.*

Laws that "make it more difficult for individuals ... to choose the candidate of their choice," or that "create the risk that some votes will ... be improperly counted," burden voting rights.  S*ee Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261-62 (11th Cir. 2020).  Georgia's system does both here.  The BMD system's significant security vulnerabilities, verified by CISA, "create the risk" that votes will be counted "improperly," and its use of QR Codes for tabulating the votes prevents voters from verifying that they are casting a ballot that accurately reflects their selections.  Such "burden[s] on the fundamental right to vote" are subject to *Anderson-Burdick*, and the severity of those burdens depends "[o]n the[] facts."  *See Lee*, 915 F.3d at 1319, 1321.  Burdens in this domain that "represent a significant increase over the usual burdens of voting" are severe.  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion); *see also id.* at 205 (Scalia, J., concurring in the judgment) ("Burdens are severe if they go beyond the merely inconvenient.").

Here, the record shows that the Curling Plaintiffs and other Georgia voters suffer more than just a slight increase in the burdens associated with voting.  The BMD system prevents the Curling Plaintiffs from confirming the

accuracy of the votes contained on their ballots, which are recorded only in the QR Code.  And as the district court noted at summary judgment, "Plaintiffs have presented specific evidence of data exposure events and unaddressed system vulnerabilities" creating a real risk that their "votes will go uncounted or be improperly counted."  Dkt. 1705, at 115.  That evidence included Dr. Halderman's findings about the vulnerabilities with the BMD system, "CISA's … corroborat[ion] of [his report], and the revelations regarding the 2021 Coffee County voting system breach."  *Id.* at 112-113.  Dr. Halderman then testified to these facts at trial, explaining that voters have "substantial reason to doubt their vote[s] [will be] counted correctly" given the system's vulnerabilities to vote changing, with that risk now having increased for all "future elections" using the BMD system after Coffee County.  Dkt. 1839, at 88:10-13; 100:5-17, 121:10-122:6.  Defendants' refusal to implement the critical mitigation measures that CISA recommended they should promptly adopt years ago exacerbates the risks the Curling Plaintiffs face when voting in Georgia's BMD system and highlights the need for them to be able to verify that their ballot accurately reflects their selections for tabulation.  *See* Dkt. 1822, at 68-73 ¶ 105; *id.* at 117 ¶ 160; *see also* Dkt. 1839, at 116:10-119:25.

Defendants argued before the district court that Plaintiffs can avoid any BMD-related burdens by voting absentee. But the court disagreed, and for good reason: "because courts ... routinely find that burdens have been imposed on one method of voting despite the existence of other voting methods." Dkt. 1705, at 117-20. Moreover, the evidence at trial showed that Georgia's absentee voting system does not allow Georgia voters to avoid the burdens imposed by the BMD system, since mail-in ballots can be converted to a BMD paper ballot with a QR code. *E.g.*, Dkt. 1832, at 91:20-92:6; Dkt. 1842, at 198:17-21; Dkt. 1844, at 53:2-54:10. Georgia's absentee system, moreover, is itself burdensome—requiring significant, early preparation that in-person voters do not face. Dkt. 1832, at 74:9-21; Dkt. 1832, at 149:18-150:6. And that system has disenfranchised these Plaintiffs more than once. Dkt. 1833, at 25:18-27:11; Dkt. 1836, at 11:13-12:5 Thus, as the district court has explained, all the existence of Georgia's absentee voting system does is force "Plaintiffs [to] trade one unfavorable burden for another." *See* Dkt. No. 964, at 83. Such "a choice between two evils is no choice at all." *Id.*

In short, the nature of the risks imposed by the BMD system, coupled with the now increased likelihood that those risks will materialize, supports a conclusion that the burdens imposed by the lack of a meaningful ballot-review process are severe, triggering strict scrutiny. *See Lee*, 915 F.3d at

1318; *see also Stewart v. Blackwell*, 444 F.3d 843, 868 (6th Cir. 2006) (applying strict scrutiny to similar burdens because "[a]ll of the precedent indicates that having one's vote properly counted is fundamental to the franchise."), *vacated* (July 21, 2006), *superseded*, 473 F.3d 692 (6th Cir. 2007), *pursuant to United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).

Under that level of scrutiny, Georgia's BMD system must be "narrowly drawn to serve a compelling state interest." *See Lee*, 915 F.3d at 1318-19 (citation omitted). But it is not. Defendants have not identified a compelling interest and did not even attempt to argue the existence of a compelling interest in post-trial briefing. *See* Dkt. 1821, at 191-194 ¶¶ 780-796.

Rather, Defendants simply explained why they do not want to have a hand marked paper ballot system. Dkt. 1821, at 191-192 ¶¶ 783-788. But that desire to avoid a single election method does not mean they have an interest—compelling or otherwise—in using the flawed BMD system. Defendants have also argued that there is an "ease of review of ballots for voters" inherent "in the use of QR codes." *Id.* at 192 ¶ 788. But the record shows there is no such "ease"—voters cannot review their ballots for accuracy when their vote is encompassed within an unreadable QR code. *E.g.*, Dkt. 1832, at 73:20-25 ("I can't read the QR code"). And the minimal (and futile)

54

review the system does allow is cognitively demanding for voters and ultimately impractical. *E.g.*, Dkt. 1840, at 139:7-14.

The BMD system thus cannot survive under strict scrutiny, since Defendants cannot show that its selected system is "necessary" to, or either in furtherance of, Defendants' asserted interest. *See Lee*, 915 F.3d at 1324 (holding state's asserted interests actually "befell Plaintiffs" based on "[a] realistic assessment of the facts").

### 2.   *Defendants have not justified the burdens the BMD system places on the Curling Plaintiffs' voting rights under lesser scrutiny.*

Defendants would still lose even under less demanding scrutiny applicable to less burdensome voting restrictions, because "even if the BMD voting system only imposes a slight burden on Plaintiffs' voting rights," Defendants' "regulatory interests" do not "sufficiently justify the imposition of those burdens." *See* Dkt. 1705, at 120-121. Plaintiffs explained at trial why a generic interest in orderly elections does not justify the BMD system—because it creates disorderly ones. The system as designed and implemented is easily hackable. *See* pp. 19-21, *supra*. The system makes it difficult or impossible to catch and correct miscounted votes, even in the face of a known hack. Dkt. 1839, at 129:5-9, 130:2-6, 133:6-14. The system imposes a burdensome two-step review process that takes time to do properly, helping

to contribute to election-day delays.  *See* Dkt. 1839, at 156:15-158:12; *see also* Dkt. 1874-12.  And the system requires maintaining, transporting, setting up, supporting, and storing literally tens of thousands of complex computer devices on which thousands of election workers must be trained and which frequently fail, including during elections.  Dkt. 1822, at 139-141 ¶ 200; *see* Dkt. 1833, at 184:4-6; Dkt. 1842, at 187:21-188:2; Dkt. 1843, at 39:8-14, 57:13-58:4.

Thus, in reality, Defendants' selected system does not serve the interest in avoiding election-day disorder—it contributes to it.  Laws like that do not survive *Anderson-Burdick*.  *See Duke v. Smith*, 13 F.3d 388, 395 & n.14 (11th Cir. 1994) (restrictions on ballot access failed under any applicable standard of review).

*****

In all, the district court erred in determining that the Curling Plaintiffs lack a legally protected interest.  The Curling Plaintiffs have identified at least an arguable constitutional interest as well as imminent, concrete, and particularized injuries to it that are traceable to the Defendants and redressable by court order.  The Court should accordingly vacate and remand so that the district court can address the *Anderson-Burdick* merits—and make related factual findings—in the first instance.

## **CONCLUSION**

For the foregoing reasons, the Court should vacate and remand for the district court to address the merits of the Curling Plaintiffs' claims.

Date:  July 9, 2025

Respectfully submitted,

Adam M. Sparks
Jessica G. Cino
GA Bar No. 577837
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3500
Atlanta, GA 30309
Tel.: (404) 888-9700
Fax: (404) 888-9577
sparks@khlawfirm.com
cino@khlaw.com

Christian G. Andreu-von Euw
THE BUSINESS LITIGATION GROUP, PC
150 Spear Street
San Francisco, CA 94105
Tel.: (415) 765-6633
christian@blgrp.com

*/s/ Brian T. Burgess*
Brian T. Burgess
David D. Cross
GOODWIN PROCTER LLP
1900 N St., NW
Washington, D.C. 20036
(202) 346-4000
bburgess@goodwinlaw.com
dcross@goodwinlaw.com

Christopher J. C. Herbert
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
cherbert@goodwinlaw.com

*Counsel for Appellants Donna Curling, Donna Price, and Jeffrey Schoenberg*

**CERTIFICATE OF COMPLIANCE**

This document complies with the word limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,459 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), as counted by the word-processing system used to prepare the document.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in 14-point Georgia, a proportionally spaced font, using Microsoft Word.

*/s/ Brian T. Burgess*
Brian T. Burgess

**CERTIFICATE OF SERVICE**

I certify that on July 9, 2025, I filed the foregoing with the Clerk of the Court by using the ECF system.  I also certify that the foregoing document is being served this day via transmission of Notices of Electronic Filing generated by ECF to all counsel of record.

*/s/ Brian T. Burgess*
Brian T. Burgess
