No. 25–11320-JJ

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

DONNA CURLING, *et al.*,

*Plaintiffs–Appellants,*

**v.**

DAVID WORLEY, *et al.*,

*Defendants–Appellees.*

Consolidated Appeals From The United States District Court For The Northern District Of Georgia, Case No. 1:17–CV–02989–AT —Hon. Amy Totenberg

## APPELLANTS' BRIEF OF
## COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
## WILLIAM DIGGES III, & MEGAN MISSETT

ROBERT A. MCGUIRE, III
ROBERT MCGUIRE LAW FIRM
600 1st Avenue, Suite 330 PMB 86685
Seattle, WA 98104
T: (253) 267-8530

*Counsel for Plaintiff–Appellant Coalition for Good Governance*

| | |
|---|---|
| CARY ICHTER | BRUCE P. BROWN |
| ICHTER DAVIS LLC | BRUCE P. BROWN LAW LLC |
| 3340 Peachtree Road NE, Suite 1530 | 1123 Zonolite Road NE, Suite 6 |
| Atlanta, GA 30326 | Atlanta, GA 30306 |
| T: (404) 869-7600 | T: (404) 881-0700 |

*Counsel for Plaintiffs–Appellants Laura Digges, William Digges III, and Megan Missett*

JULY 9, 2025

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Cir. R. 26.1-1 through 26.1-3, undersigned counsel for these Plaintiffs-Appellants Coalition for Good Governance, Laura Digges, William Digges III, and Megan Missett certifies that below is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1.      Abney, Russell T.: Counsel for Amicus Electronic Privacy Information Center.

2.      Abrams for Governor: Objector in the underlying case.

3.      Adams, Kimberly M. Esmond: Fulton Superior Court, Judge.

4.      Alan Butler: Counsel for Amicus Electronic Privacy Information Center.

5.      Altshuler Berzon, LLP: Counsel for Amici Common Cause and Protect Democracy.

6.      American Civil Liberties Union: Former counsel  for certain Plaintiffs-Appellants, terminated on 1/08/2021.

7.      Anderson, Kimberly K.: Former counsel for certain Defendants-Appellees, terminated on 12/6/2019.

8.      Andreu-von Euw, Christian Gabriel: Counsel  for certain Plaintiffs-Appellants.

9.   Aiken, Fred: Former defendant in the underlying case, terminated on 6/13/2018.

10.  Ardoin, R. Kyle: Former Movant in the underlying case in his official capacity as Louisiana Secretary of State, terminated on 1/10/2022.

11.  Ascarrunz, Veronica: Former counsel  for certain Plaintiffs-Appellants, terminated on 12/1/2022.

12.  Babcock, Charles L.: Former counsel for former intervenor Fox News Network, LLC, terminated on 7/5/2022.

13.  Baconton Missionary Baptist Church, Inc.: Objector in the underlying case.

14.  Balli, James A.: Former counsel for certain Defendants-Appellees, terminated on 11/17/2022.

15.  Balli-Law LLC: Former counsel for certain Defendants-Appellees, terminated on 11/17/2022.

16.  Barnes: Roy E.: Former counsel for former defendant Secretary of State, Brian P. Kemp, and State Election Board Members, terminated on 2/15/2019.

17.  Barron, Richard: Defendant in underlying case in his individual capacity and his official capacity as Director of the Fulton County Board of Registration and Elections.

18.  Bedard, Edward: Counsel for certain Defendants-Appellees.

19.  Belinfante, Joshua Barrett: Counsel for certain Defendants-Appellees.

20.  Bentrott, Jane P.: Former counsel for certain Plaintiffs-Appellants, terminated on 8/28/2020.

21.  Berzon, Stephen P.: Former counsel for Amicus Common Cause, terminated on 10/01/2020.

22.  Blitch IV, Pierce Groover: Counsel for Movant in the underlying case Hancock County Board of Elections and Registration.

23.  Bondurant Mixson & Elmore, LLP: Former counsel for Plaintiffs-Appellees.

24.  Boyle, Donald P., Jr.: Counsel for certain Defendants-Appellees.

25.  Brady, Robert: Objector in the underlying case.

26.  Bridges, Agnes: Objector in the underlying case.

27.  Brimer, Marcie: Former counsel for certain Plaintiffs-Appellants, terminated on 8/28/2020.

28.  Brody, David R.: Former counsel for certain Plaintiffs-Appellants, terminated on 1/8/2021.

29.  Brogan, Eileen M.: Former counsel for certain Plaintiffs-Appellants, terminated on 7/9/2021.

30.  Brooks, Jessica: Former defendant in underlying case, terminated on 6/13/2018.

31.  Brown, Bruce P.: Counsel for Coalition Plaintiffs in this case.

32.  Bruce P. Brown Law: Counsel for plaintiffs in this case.

33.  Bryan, Bennett Davis: Former counsel for former defendant in underlying case, DeKalb County, terminated on 6/28/2018.

34.  Burge, David J.: Defendant in underlying case.

35.  Burton, Robert Dalrymple: Former counsel for certain Defendants-Appellees, terminated on 1/18/2022.

36.  Burwell, Kaye Woodard: Counsel for defendant Fulton County in underlying case.

37.  Butler, Alan Jay: Counsel for Amicus Electronic Privacy Information Center.

38.  Caldwell, Joe Robert, Jr.: Former counsel for certain Plaintiffs-Appellants, terminated on 1/18/2018.

39.  Campbell, Benjamin E: Counsel for certain Plaintiffs-Appellants.

40.  Capriola, Richard John: Counsel to Paul V. Maggio.

41.  40. Care in Action, Inc.: Objector in the underlying case.

42.  Carlin, John P.: Former counsel for certain Plaintiffs-Appellants, terminated on 1/11/2021.

43.  Chalmers, Adams, Backer & Kaufman LLC: Counsel for former intervenor My Pillow, Inc. and Michael J. Lindell.

44.    Chapple, Catherine L.: Former counsel for certain Plaintiffs-Appellants, terminated on 8/28/2020.

45.    Cheeley Law Group, LLC: Former counsel to Movant in the underlying case Cathleen Alston Latham, terminated on 9/5/2023.

46.    Cheeley, Robert David: Former counsel to Movant in the underlying case Cathleen Alston Latham, terminated on 9/5/2023.

47.    Cino, Jessica Gabel: Counsel for Plaintiff-Appellants.

48.    Clark, Bryan: Counsel for former intervenor Herring Networks, Inc.

49.    Clark Hill PLC: Counsel for certain Defendants-Appellees

50.    Coalition for Good Governance: Plaintiff-Appellants.

51.    Cobb County Attorney's Office: Former counsel for former defendants Cobb County in underlying case, terminated on 11/3/2017.

52.    Coffee County Board of Elections: Interested third party appearing below seeking to quash discovery requests.

53.    Coleman, Eric B.: Counsel to Paul V. Maggio.

54.    Common Cause: Amicus in the underlying case.

55.    Conarck, Jacob Paul: Former counsel for certain Plaintiffs-Appellants, terminated on 1/8/2021.

56.    Cooney, Mary Carole: Former defendant in the underlying case.

57. Correia, Cristina: Former counsel for former defendant Brain P. Kemp and State Election Board Members, terminated on 11/3/2017.

58. Coveny, Michael P.: Former defendant in the underlying case, terminated on 6/13/2018.

59. Crumly, Jonathan Dean, Sr.: Former counsel for certain Defendants-Appellees, terminated on 11/17/2022.

60. Curling, Donna: Plaintiff-Appellant.

61. Cross, David D.: Counsel for Plaintiffs-Appellant.

62. Daniell, Phil: Former defendant in the underlying case, terminated on 6/13/2018.

63. Daniels, Douglas A.: Former counsel for former intervenor Michael J. Lindell, terminated on 3/30/2022.

64. Daniels, Maxine: Former defendant in the underlying case, terminated on 6/13/2018.

65. Daniels & Tredennick PLLC: Former counsel for former intervenor Michael J. Lindell, terminated on 3/30/2022.

66. Davis, Deberah J.: Former pro se movant in the underlying case, terminated on 12/20/2023

67. Davis, Ricardo: Plaintiff.

68. Denton, Alexander Fraser: Counsel for certain Defendants-Appellees.

69.  DeKalb County District Attorney's Office: Former counsel for former defendant DeKalb County.

70.  Digges, Laura: Plaintiff.

71.  Digges, William, III: Plaintiff.

72.  Duffey, William: Former Member of State Election Board.

73.  Duane Morris LLP: Counsel for former intervenor Newsmax, Inc.

74.  Ebenezer Baptist Church of Atlanta, Georgia, Inc.: Objector in the underlying case.

75.  Edmondson, Anna Nicole: Counsel for certain Defendants-Appellees.

76.  Electronic Privacy Information Center: Amicus in the underlying case.

77.  Elson, Hannah Rose: Former counsel for certain Plaintiffs-Appellants, terminated on 11/27/2023.

78.  Eveler, Janine: Former defendant and Director of the Cobb County Board of Elections and Registration, terminated on 6/13/2018.

79.  Fair Fight Action, Inc.: Objector in the underlying case.

80.  Ferrer Poirot & Wansbrough-GA: Counsel for Amicus Electronic Privacy Information Center.

81.  Fervier, John: Chair of the State Election Board and Defendant-Appellee.

82.  Fisher, Ramsey W.: Former counsel for certain Plaintiffs-Appellants, terminated on 10/23/2024.

83.  Flores, Rommy L.: Former counsel  for certain Plaintiffs-Appellants, terminated on 12/10/2021.

84.  Fortalice Solutions, LLC: Respondent.

85.  Fox News Network, LLC: Former intervenor, terminated on 8/11/2022.

86.  Fuchs, Zachary D.: Former Counsel  for certain Plaintiffs-Appellants, terminated on 6/21/2022.

87.  Georgia Department of Law: Counsel for former Secretary of State, defendant Brain P. Kemp and State Election Board Members, terminated on 11/3/2017.

88.  Ghazal, Sara Tindall: Member of State Election Board and Defendant-Appellee.

89.  Glover, Joel Robert: Former counsel for former intervenor Fox News Network, LLC, terminated on 7/5/2022.

90.  Goodwin Procter, LLP: Counsel  for certain Plaintiffs-Appellants.

91.  Gwinnett County Department of Law: Counsel for Kristi L. Royston, Objector in the underlying case.

92.  Hancock County Board of Elections and Registration: Movant in underlying case.

93.  Handel, Karen C.: Former defendant in underlying case, terminated on 9/28/2017.

94.  Harding Law Firm, LLC: Former counsel for Plaintiff Ricardo Davis, terminated on 12/7/2023.

95.  Harding, Todd Andrew: Former counsel for Plaintiff Ricardo Davis, terminated on 12/7/2023.

96.  Harp, Seth: Former Member of the Georgia State Election Board.

97.  Havian, Eric R.: Counsel  for certain Plaintiffs-Appellants.

98.  Haynie, Litchfield & White PC: Former counsel for former defendant in underlying case, DeKalb County.

99.  Hedgecock, Lyle F.: Former counsel  for certain Plaintiffs-Appellants, terminated on 10/23/2024.

100.  Heidt, Josiah Benjamin: Former counsel for former Secretary of State, Brain P. Kemp and State Election Board Members, terminated on 11/3/2017.

101.  Hendrix, Barclay: Former counsel for former defendant in the underlying case, Karen C. Handel.

102.  Hernandez, Danielle Maria: Counsel for certain Defendants-Appellees.

103.  Herring Networks, Inc.: Former intervenor, terminated on 8/11/2022.

104.  Highsmith, Robert S.: Counsel for former defendant in the underlying case, Merle King.

105.  Hilbert, Kurt Robert: Counsel for former intervenor My Pillow, Inc. and Michael J. Lindell.

106.  Holcomb + Ward, LLP: Former counsel for certain Plaintiffs-Appellants, terminated on 2/5/2018.

107.  Holden, Deirde: Objector in the underlying case.

108.  Holland & Knight LLP: Former counsel for former defendant in the underlying case, Merle King.

109.  Ichter, Cary: Counsel for certain Plaintiffs-Appellants.

110.  Ichter Davis, LLC: Counsel for certain Plaintiffs-Appellants.

111.  Jackson-Fannin, Julian Antony: Counsel for former intervenor Newsmax, Inc.

112.  Jackson Walker, L.L.P.: Former Counsel for former intervenor Fox News Network, LLC, terminated on 7/5/2022.

113.  Jacoutot, Bryan Francis: Counsel for certain Defendants-Appellees.

114.  Jarrard & Davis, LLP: Counsel for Ameika Pitts, Objector in the underlying case.

115.  Jeffares, Rick: Member of State Election Board and Defendant-Appellee.

116.  Jihadi, Wail: Former counsel for certain Plaintiffs-Appellants, terminated on 10/23/2024.

117.  Johnson, Aaron: Former defendant in underlying case, terminated on 11/10/2023.

118.  Johnston, Janice: Member of State Election Board and Defendant-Appellee.

119. Johnson, Laura K.: Former counsel for former defendant DeKalb County, terminated on 6/28/2018.

120. Johnson, Melanie Leigh: Counsel for certain Defendants-Appellees.

121. Jon L. Schwartz, Attorney at Law, P.C.: Former Counsel for Amicus Common Cause, terminated 10/01/2020 and counsel for Amicus National Election Defense Coalition and Protect Democracy.

122. Jones Walker, LLP-ATL: Counsel to former movant in the underlying case R. Kyle Ardoin in his official capacity as Louisiana Secretary of State.

123. Joseph, Oluwasegun: Former counsel  for certain Plaintiffs-Appellants, terminated on 10/23/2024.

124. Kaiser, Mary G.: Counsel  for certain Plaintiffs-Appellants.

125. Kastorf, Kurt G.: Counsel for Objectors Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Fair Fight Action, Inc.; Sixth Episcopal District Inc.; Virginia Highland Church, Inc.; Abrams for Governor; and Baconton Missionary Baptist Church, Inc.

126. Keller, Scott Allen: Counsel for former intervenor Fox News Network, LLC.

127. Kemp, Brian P.: Former Secretary of State and defendant in the underlying case, terminated on 4/9/2019.

128.  Kidd, Milton: Objector in the underlying case in his official capacity as Director of Elections for the Douglas County Board of Elections and Registration.

129.  Kimrey, Blaine C.: Counsel for former intervenor Herring Networks, Inc.

130.  King, Janelle: Member of State Election Board and Defendant-Appellee.

131.  King, Merle: Executive Director of the Center for Election Systems at Kennesaw State-former defendant in the underlying case, terminated on 6/13/2018.

132.  Kinsley, Nicholas Andrew: Counsel for Coffee County Board of Elections.

133.  Kirk, Joseph: Objector in the underlying case.

134.  Knapp, Halsey G., Jr.: Counsel  for certain Plaintiffs-Appellants in proceedings below.

135.  Koechley, Julia L.: Counsel for former intervenor Herring Networks, Inc.

136.  Krevolin & Horst, LLC: Counsel  for certain Plaintiffs-Appellants.

137.  Lake, Brian Edward: Former counsel for certain Defendants-Appellees, terminated on 4/25/2023.

138.  LaRoss, Diane Festin: Counsel for certain Defendants-Appellees.

139.  Latham, Cathleen Alston: Movant in the underlying case.

140.  Lawyers' Committee for Civil Rights Under Law: Former counsel  for certain Plaintiffs-Appellants, terminated on 1/8/2021.

141.  Lehotsky Keller Cohn LLP: Counsel for former intervenor Fox News Network, LLC.

142.  Lewis, Anne Ware: Counsel for former defendant Karen C. Handel.

143.  Lewis, Anthony: Former defendant in the underlying case, terminated on 6/13/2018.

144.  Le, Anh: Member of the Georgia State Election Board and Defendant-Appellee.

145.  Leyton, Stacey M.: Former counsel for Amicus Common Cause, terminated on 10/01/2020.

146.  Lim, Marvin: Former counsel for certain Plaintiffs-Appellants, terminated on 12/21/2017.

147.  Lindell, Michael J.: Former intervenor, terminated on 8/11/2022.

148.  Lindenbaum, Dara: Counsel for Objectors Care in Action, Inc.; Ebenezer Baptist Church of Atlanta, Georgia, Inc.; Fair Fight Action, Inc.; Sixth Episcopal District Inc.; Virginia Highland Church, Inc.; Abrams for Governor; and Baconton Missionary Baptist Church, Inc.

149.  Lowman, David R.: Counsel for defendants Fulton County Board of Registration and Elections; Director Richard Barron; and Fulton County Board of Registration Members in underlying case.

150. Maggio, Paul V.: Interested third party appearing below seeking to quash discovery requests.

151. Maguire, Joseph Matthew, Jr.: Counsel for Respondent U.S. Dominion, Inc.

152. Manoso, Robert W.: Former counsel for certain Plaintiffs-Appellants, terminated on 10/23/2024.

153. Martino-Weinhardt, Matthaeus H.: Former counsel for certain Plaintiffs-Appellants, terminated on 3/18/2024.

154. Mashburn, Matthew: Defendant-Appellee.

155. Matarazzo, Stan: Former defendant in underlying case, terminated 09/15/2017.

156. McGuire III, Robert Alexander: Counsel for Plaintiff-Appellant Coalition for Good Governance.

157. Middleton, Caroline L.: Former counsel for certain Plaintiffs-Appellants, terminated on 11/27/2023.

158. Miller, Carey Allen: Counsel for certain Defendants-Appellees.

159. Miller, J. Britten, Jr.: Pro Se Amicus.

160. Missett, Megan: Plaintiff- Appellant.

161. Monyak, Elizabeth Ahern: Former counsel for former Defendant Brian P. Kemb; current Defendants David J. Worley, Rebecca N. Sullivan, Ralph F.

Simpson, Seth Harp, and the State Election Board; and objector Janine Eveler, terminated on 11/3/2017.

162. Morrison & Foerster, LLP-DC: Former counsel for certain Plaintiffs-Appellants, terminated on 10/23/2024.

163. Murray, Matthew J.: Former counsel for Amicus Common Cause, terminated on 10/1/2020.

164. My Pillow Inc.: Former intervenor, terminated on 8/11/2022.

165. Nally, Paul L.: Pro Se Amicus Curiae.

166. National Election Defense Coalition: Amicus in the underlying case.

167. Newsmax, Inc.: Former Intervenor, terminated on 8/11/2022.

168. Ney Rhein Williams, LLC: Counsel for certain Plaintiffs-Appellants.

169. Ney, William Brent: Counsel for certain Plaintiffs-Appellants.

170. Novosad, Heath A.: Former counsel for former intervenor Michael J. Lindell, terminated on 3/30/2022.

171. Nuriddin, Vernetta: Former defendant in the underlying case, terminated on 11/10/2023.

172. Office of Fulton County Attorney: Counsel for Defendant-Appellees in underlying case.

173. Oles, David Edward, Sr.: Counsel for Plaintiff-Appellant Ricardo Davis.

174.  Ossoff, Thomas Jonathan: Former interested party in underlying case, terminated 09/28/2017.

175.  Paradise, Loree Anne: Former counsel for certain Defendants-Appellees, terminated on 10/3/2022.

176.  Park, Jeanah: Counsel for former intervenor Herring Networks, Inc.

177.  Parker, Andrew D.: Counsel for former intervenors My Pillow, Inc. and Michael J. Lindell.

178.  Parker Daniels Kibort, LLC: Counsel for former intervenor My Pillow, Inc. and Michael J. Lindell.

179.  Parker, Hudson, Rainer & Dobbs LLP: Former counsel for certain Defendants-Appellees, terminated on 8/27/2024.

180.  Parker Poe Adams & Bernstein, LLP-GA: Former counsel for former Defendants-Appellees, terminated on 6/28/2018.

181.  Parks Chesin & Walbert, P.C.: Counsel for U.S. Dominion, Inc.

182.  Peeler, Charles E.: Counsel for former intervenor Fox News Network, LLC.

183.  Perry, Leona: Former defendant in underlying case, terminated on 6/13/2018.

184.  Pettit, Joe: Former defendant in underlying case, terminated on 6/13/2018.

185.  Phillips, James Jayson: Counsel for Objectors Joseph Kirk and Deidre Holden.

186. Phillips, Terry G.: Former counsel for former defendants Maxine Daniels, Michael P. Coveny, Anthony Lewis, Leona Perry, Samuel Tillman, Baoky N. Vu, and the Dekalb County Board of Registrations and Elections in underlying case, terminated on 6/28/2018.

187. Pierson, Holly Anne: Former counsel to Movant in the underlying case Cathleen Alston Latham, terminated on 8/31/2023.

188. Pierson Law LLC: Former counsel to Movant in the underlying case Cathleen Alston Latham, terminated on 8/31/2023.

189. Pico-Pratts, Javier: Counsel for certain Defendants-Appellees.

190. Pitts, Ameika: Objector in the underlying case.

191. Porter, Reiley Jo: Former counsel  for certain Plaintiffs-Appellants, terminated on 10/23/2024.

192. Powers, John Michael: Former counsel  for certain Plaintiffs-Appellants, terminated on 1/8/2021.

193. Price, Donna: Plaintiff-Appellant.

194. Protect Democracy: Amicus in the underlying case.

195. Pull, Joseph A.: Counsel for former intervenor My Pillow, Inc. and Michael J. Lindell.

196. Raffensperger, Brad: Secretary of State and Defendant-Appellee.

197. Ringer, Cheryl: Counsel for certain Defendants-Appellees in underlying case.

198. Robbins Ross Alloy Belinfante Littlefield LLC: Counsel for certain Defendants-Appellees.

199. Robert McGuire Law Firm: Counsel for certain Plaintiffs-Appellants.

200. Robin, Kenneth Paul: Counsel for Ameika Pitts, objector in the underlying case.

201. Rockdale County Board of Elections and Registration: Objector in the underlying case.

202. Rosenberg, Ezra David: Former counsel for certain Plaintiffs-Appellants, terminated on 1/8/2021.

203. Rowan, Nancy Ladson: Former counsel for certain Defendants-Appellees in underlying case, terminated on 9/13/2023.

204. Royston, Kristi L.: Objector in the underlying case.

205. Russo, Vincent Robert, Jr.: Counsel for certain Defendants-Appellees.

206. Ruth, Kathleen D.: Former defendant in the underlying case, terminated on 11/10/2023.

207. Salter, John Frank, Jr.: Former counsel for former Secretary of State, Brain P. Kemp and State Election Board Members, terminated on 2/15/2019.

208. Sandler Reiff Lamb Rosenstein & Birkenstock, P.C.: Counsel for Objector Care in Action, Inc.

209. Scheinman, Aaron Heath: Former counsel for certain Plaintiffs-Appellants, terminated on 10/23/2024.

210. Schnell, Grant Edward: Counsel for former defendant in the underlying case, Merle King.

211. Schoenberg, Jeffrey: Plaintiff-Appellant.

212. Schwartz, Edward Bruce: Former counsel for Plaintiffs- Appellants, terminated on 1/18/2018.

213. Schwartz, Jonathan Lee: Former Counsel for Amicus Common Cause, terminated 10/01/2020, and counsel for Amicus National Election Defense Coalition and Protect Democracy.

214. Simpson, Ralph F.: Former Member of the Georgia State Election Board and Defendant-Appellee.

215. Sixth Episcopal District, Inc.: Objector in the underlying case.

216. Smith, Gambrell & Ruseell, LLP: Counsel for former intervenor Fox News Network, LLC.

217. Sparks, Adam Martin: Counsel for certain Plaintiffs-Appellants.

218. Squire Patton Boggs: Former counsel for defendant Richard Barron in underlying case, terminated on 9/13/2023.

219. Steptoe & Johnson-DC: Former counsel for Appellant-Plaintiff, Donna Curling and Coalition for Good Governance, terminated on 11/29/2017 and 1/18/2018.

220. Stillman Welch, LLC: Counsel for former intervenor Herring Networks, Inc.

221. Strickland Brockington Lewis, LLP: Former counsel for former defendant Karen C. Handel.

222. Strickland, Frank B.: Counsel for former defendant Karen C. Handel.

223. Sugarman, F. Skip: Counsel for Amicus Common Cause.

224. Sugarman Law LLP: Counsel for Amicus Common Cause.

225. Sullivan, Rebecca N.: Member of the Georgia State Election Board and Defendant-Appellee.

226. Swanbeck, Sonja N.: Former counsel for certain Plaintiffs-Appellants, terminated on 10/23/2024.

227. Talley Richardson & Cable, P.A.: Counsel for Objector Joseph Kirk.

228. Talmor, Kate: Counsel for United States Cybersecurity and Infrastructure Security Agency.

229. Taylor English Duma LLP: Counsel for certain Defendants-Appellees.

230. Tepfer, Cameron A.: Former counsel for certain Plaintiffs-Appellants, terminated on 9/3/2019.

231.  Terry, Edward Curtis: Former pro se plaintiff in the underlying case, terminated on 3/20/2018.

232.  The Barnes Law Group, LLC: Former counsel for former Secretary of State, Brain P. Kemp and State Election Board Members, terminated on 2/15/2019.

233.  The Center for Election Systems at Kennesaw State University: Former defendant in the underlying case, terminated on 9/15/2017.

234.  The Cobb County Board of Elections and Registration: Former defendant in the underlying case, terminated on 6/13/2018.

235.  The Dekalb County Board of Registrations and Elections: Former defendants in the underlying case, terminated on 6/13/2018.

236.  The Fulton County Board of Registration and Elections: former defendant in the underlying case.

237.  The Nelson Law Group: Counsel for Movant in the underlying case Hancock County Board of Elections and Registration.

238.  The State Election Board: Defendant-Appellee in the underlying case.

239.  Theriot, Chad V.: Counsel to former movant in the underlying case R. Kyle Ardoin in his official capacity as Louisiana Secretary of State.

240.  Tillman, Samuel E.: Former defendant in the underlying case, terminated on 6/13/2018.

241.  Totenberg, Hon. Amy: Judge in underlying case, United States District Court for the Northern District of Georgia.

242.  Troutman Pepper Locke LLP: Counsel for former intervenor Fox News Network, LLC.

243.  Tyson, Bryan P.: Counsel for certain Defendants-Appellees.

244.  U.S. Dominion, Inc.: Respondent in underlying case.

245.  Vallotton, Barclay: Counsel for former defendant Karen C. Handel.

246.  Vedder Price, P.C.: Counsel for former intervenor Herring Networks, Inc.

247.  Virginia-Highland Church, Inc.: Objector in the underlying case.

248.  Vu, Baoky N.: Former defendant in the underlying case, terminated on 6/13/2018.

249.  Waldon Adelman Castilla Hiestand & Prout: Counsel for former interested party Thomas Jonathan Ossoff.

250.  Waldon, Russell Dunn: Counsel for former interested party Thomas Jonathan Ossoff.

251.  Ward, Bryan Myerson: Former counsel  for certain Plaintiffs-Appellants, terminated on 2/5/2018.

252.  Webb, Wheaton: Counsel for former intervenor Fox News Network, LLC.

253.  Weigel, Daniel H.: Former counsel for certain Defendants-Appellees, terminated on 8/27/2024.

254.   Welch, T. Brandon: Counsel for former intervenor Herring Networks, Inc.

255.   White, Daniel Walter: Counsel for former Defendants-Appellees.

256.   White-Davis, Angela: Objector in the underlying case.

257.   Wilson, Darryl O.: Former defendant in the underlying case, terminated on 6/13/2018.

258.   Wilson Elser Moskowitz Edelman & Dicker LLP: Former counsel for certain Defendants-Appellees, terminated on 1/18/2022.

259.   Wilson, Melanie Felicia: Counsel for Kristi L. Royston, objector in the underlying case.

260.   Wingate, Mark: Former defendant in the underlying case, terminated on 11/10/2023.

261.   Winter Capriola Zenner, LLC: Counsel to Paul V. Maggio.

262.   Whistleblower Partners LLP: Counsel for certain Plaintiffs-Appellants.

263.   Wiesebron, Tamara Raquel: Former counsel for certain Plaintiffs-Appellants, terminated on 10/23/2024.

264.   Worley, David J.: Member of the Georgia State Election Board and Defendant-Appellee.

265.   Wright, Aaron: Former counsel for certain Plaintiffs-Appellants, terminated on 12/21/2017.

Dated: July 9, 2025                    /s/ Robert A. McGuire, III

Dated: July 9, 2025                         /s/ Bruce P. Brown

Dated: July 9, 2025                         /s/ Cary Ichter

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1(a) and pursuant to 11th Cir. R. 26.1-1 and 11th Cir. R. 26-2, Plaintiff-Appellant Coalition for Good Governance states that it is a nongovernmental corporate party, that it has no parent corporation, and that there is no publicly held corporation that owns 10% or more of its stock.

Plaintiffs-Appellants Laura Digges, William Digges III, and Megan Missett are individuals.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs-Appellants Coalition for Good Governance, Laura Digges, William Digges III, and Megan Missett respectfully request oral argument. This appeal involves an exceptionally large record spanning eight years of district-court litigation and two interlocutory appeals. Oral argument will enable the parties to assist the Court in situating issues, arguments, and evidence within the procedural history of this very large record, as well as permit them to answer the Court's post-briefing questions about the important public issues raised by the case.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

CORPORATE DISCLOSURE STATEMENT ..................................................C-25

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS........................................................................ ii

TABLE OF CITATIONS ....................................................................... vii

STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER
    PARTIES ......................................................................... xii

STATEMENT OF JURISDICTION....................................................... xiii

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE.................................................................2

    I.    Nature Of The Case..............................................................2

    II.    Course of Proceedings And Dispositions In The Court Below ...........3

        A.    Proceedings Against The DRE System .....................................3

            1.    August 2019: DRE Injunction Granted ..........................4

            2.    Prolonged Consideration of DRE Fee Motions...............5

        B.    Proceedings Against The BMD System ...................................7

            1.    2023 Summary Judgment ...............................................8

            2.    2024 Trial of the BMD Claims........................................8

            3.    2025 Rulings and Appeal ...............................................9

    III.    Statement Of The Facts .......................................................10

        A.    Georgia's BMD Voting System Requirements .......................10

B.      Individual Plaintiffs And CGG Members' Voting Experiences And Injuries ...........................................11

        1.    Inability to Verify QR Code Accuracy...........................11

        2.    Burden of Mandatory Two-Step Verification Process ...............................................................13

        3.    Forced Performance of State's Security Function..........13

        4.    Lack of Permanent Trustworthy Vote Records..............14

        5.    Ballot Secrecy Violations ................................................14

        6.    HAVA Violations .............................................................14

        7.    Burden of Avoiding BMDs Through Absentee Voting .............................................................................15

C.      Defendants' Evidence and Positions.........................................15

D.      CGG's Organizational Activities And Resource Diversions .................................................................15

        1.    Executive Director Marilyn Marks' Testimony .............15

        2.    Board Member Rhonda Martin's Testimony .................16

        3.    Additional Documented Diversions ...............................16

E.      Prior Proceedings On Standing...................................................17

IV.    Standard Or Scope Of Review For Each Contention..........................17

SUMMARY OF ARGUMENT ...............................................................18

ARGUMENT AND CITATIONS TO AUTHORITY .........................................20

I.     THE DISTRICT COURT ERRED IN DENYING ATTORNEY'S FEES TO COALITION PLAINTIFFS AFTER THEY OBTAINED SUBSTANTIVELY PERMANENT RELIEF ON THE DRE CLAIMS........................................................20

A.    The District Court Erred By Denying Severance And
      Final Judgment On The DRE Claims .......................................21

      1.    The DRE Injunction Granted Substantively
            Permanent Relief ...........................................................21

      2.    Rule 21's Severance Requirements Were Satisfied .......22

      3.    The District Court's Denial Violated Rule 1 And
            Constituted Abuse Of Discretion...................................23

B.    Over Four Years After The Continued Use Of DREs Was
      Enjoined, Summary Judgment On The DRE Claims
      Should Have Been *For* Coalition Plaintiffs, Not Against
      Them .......................................................................................25

      1.    The District Court's Approach Contradicted
            Established Precedent On Successful Injunctive
            Relief.............................................................................25

      2.    Coalition Plaintiffs' DRE Victory Warranted
            Favorable Judgment.......................................................26

      3.    The Proper Disposition Should Have Been
            Summary Judgment For Coalition Plaintiffs.................27

C.    The Substantively Permanent Relief Plaintiffs Obtained
      Against DREs Is Distinguishable From The Injunction In
      *Lackey v. Stinnie* .....................................................................29

      1.    The District Court's Own Findings Confirm That
            Coalition Plaintiffs Obtained Permanent Judicial
            Relief, Not Temporary Status Quo Preservation...........29

      2.    The Judicial Order Itself Created Permanence—
            External Events Played No Role ....................................31

      3.    Coalition Plaintiffs' DRE Victory Satisfies
            *Lackey*'s Own Standard for Prevailing Party Status ......31

II.   THE DISTRICT COURT ERRED IN DISMISSING
      COALITION PLAINTIFFS' BMD CLAIMS FOR LACK OF
      INDIVIDUAL STANDING.................................................................33

A.    Plaintiffs Satisfied the Injury-in-Fact Requirement for Individual Standing in Voting Rights Cases ............................ 33

1.    Plaintiffs' Proven Injuries Are Legally Cognizable Injuries-In-Fact As A Matter Of Law ............................ 34

2.    The District Court Erred By Disregarding Uncontroverted Evidence Of Plaintiffs' Injuries ............ 38

3.    The District Court Erroneously Barred Evidence Of Further Cognizable Injuries In The Form Of Ballot-Secrecy Violations And HAVA Violations ........ 42

B.    Plaintiffs Also Established Causation and Redressability ........ 44

1.    Plaintiffs Established Causation ..................................... 45

2.    Plaintiffs Established Redressability ............................. 46

C.    The District Court Applied An Overly Restrictive Legal Framework For Standing In Voting Rights Cases ................... 47

III.    THE DISTRICT COURT ERRED IN DISMISSING COALITION PLAINTIFFS FOR LACK OF ORGANIZATIONAL STANDING ................................................... 48

A.    CGG Established Cognizable Organizational Injury Through Diversion Of Resources To Address Legally Sufficient Member Injuries ..................................................... 49

1.    CGG Proved Actual Diversion Of Resources From Its Organizational Mission And Priorities ..................... 49

2.    The Underlying Member Injuries Were Legally Cognizable Under Voting Rights Precedent ................. 50

3.    The Resource Diversion Was Causally Connected To Defendants' Unconstitutional Conduct .................... 51

B.    The District Court Erroneously Declined To Apply Law-Of-The-Case Doctrine Regarding CGG's Previously Established Standing ................................................................. 53

1.    The Eleventh Circuit Definitively Established CGG's Organizational Standing ....................................53

2.    Only The Evidentiary Standard Changes At Successive Litigation Stages ...........................................54

3.    Law-Of-The-Case Still Controls ...................................55

C.    The District Court Misapplied The Eleventh Circuit's Standard For Organizational Standing......................................58

1.    The District Court's Restrictive Framework Would Eliminate Organizational Standing As A Viable Theory ..............................................................................58

2.    Circuit Precedent Supports Preserving Both Doctrines..........................................................................59

3.    The One-Plaintiff Rule Provides An Alternative Basis For Reaching The Merits .....................................61

CONCLUSION .......................................................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*A.A. Profiles, Inc. v. City of Fort Lauderdale*,
253 F.3d 576 (11th Cir. 2001) ...................................................54, 55

*ACLU of Fla., Inc. v. Miami-Dade Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ..........................................................61

*Allen v. Wright*,
468 U.S. 737 (1984)...............................................................39, 47

*Ameritas Variable Life Ins. Co. v. Roach*,
411 F.3d 1328 (11th Cir. 2005) ...........................................18, 23, 25

*Anderson v. Celebrezze*,
460 U.S. 780 (1983)..............................................................47

*Arcia v. Sec'y of Fla.*,
772 F.3d 1335 (11th Cir. 2014) .........................................................43

*Artistic Ent., Inc. v. City of Warner Robins*,
331 F.3d 1196 (11th Cir. 2003) .........................................................28

*Baughcum v. Jackson*,
92 F.4th 1024 (11th Cir. 2024) .........................................................17

*Bourgeois v. Peters*,
387 F.3d 1303 (11th Cir. 2004) .........................................................38

*Burdick v. Takushi*,
504 U.S. 428 (1992)..............................................................47

*City of S. Miami v. Governor of Fla.*,
65 F.4th 631 (11th Cir. 2023) ...................................50, 56, 57, 58, 60

*Common Cause Ga. v. Sec'y*,
17 F.4th 102 (11th Cir. 2021) ......................................................25, 28

*Corley v. Long-Lewis, Inc.*,
  965 F.3d 1222 (11th Cir. 2020) ...................................................22, 23

*Curling v. Raffensperger*,
  397 F. Supp. 3d 1334 (N.D. Ga. 2019)..................................................4

*Curling v. Raffensperger*,
  50 F.4th 1114 (11th Cir. 2022) ................................................7, 17, 52, 53, 54, 57

*Curling v. Raffensperger*,
  702 F. Supp. 3d 1303 (N.D. Ga. 2023)..................................................8

*Curling v. Worley*,
  761 F. Appx. 927 (11th Cir. 2019) ........................................................4

*Elend v. Basham*,
  471 F.3d 1199 (11th Cir. 2006) ..........................................................17

*FDA v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024)..........................................................................45

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) .............................................51, 59, 60

*Ga. Ass'n of Latino Elected Offs., Inc. (GALEO) v. Gwinnett Cnty. Bd.
  of Registration & Elections*,
  36 F.4th 1100 (11th Cir. 2022) ........................... 45, 49, 50, 51, 52, 58

*Garcia-Bengochea v. Carnival Corp.*,
  57 F.4th 916 (11th Cir. 2023) ............................................................45

*Grayson v. Comm'r*,
  121 F.4th 894 (11th Cir. 2024) ..........................................................26

*Jackson v. State of Ala. State Tenure Comm'n*,
  405 F.3d 1276 (11th Cir. 2005) .............................................55, 56, 58

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236, 1245 (11th Cir. 2020) .............................................55

*Lackey v. Stinnie*,
  145 S. Ct. 659 (2025).................................. 9, 10, 17, 18, 20, 29, 30, 31, 32, 33

*Made in the USA Found. v. U.S.*,
   242 F.3d 1300 (11th Cir. 2001) ...........................................................46

*Mills v. Hamm*,
   102 F.4th 1245 (11th Cir. 2024) .........................................................17

*Polelle v. Fla. Sec'y of State*,
   131 F.4th 1201 (11th Cir. 2025) ...................................................42, 47

*Reeves v. Comm'r*,
   23 F.4th 1308 (11th Cir. 2022) ...........................................................46

*Schiavo ex rel. Schindler v. Schiavo*,
   403 F.3d 1289 (11th Cir. 2005) .............................................53, 54, 57

*Taylor v. Ft. Lauderdale*,
   810 F.2d 1551 (1987)...........................................................................30

*U.S. v. Brown*,
   996 F.3d 1171 (11th Cir. 2021) ...................................................17, 41

*U.S. v. Students Challenging Regulatory Agency Procedures
   (SCRAP)*,
   412 U.S. 669 (1973)..............................................................................41

*Vessels v. Atlanta Indep. Sch. Sys.*,
   408 F.3d 763 (11th Cir. 2005) .............................................................17

*Weatherly v. Ala. State Univ.*,
   728 F.3d 1263 (11th Cir. 2013) ...........................................................18

*Wexler v. Anderson*,
   452 F.3d 1226 (11th Cir. 2006) ...........................................................34

*Wreal, Ltd. Liab. Co. v. Amazon.com, Inc.*,
   38 F.4th 114 (11th Cir. 2022) ..............................................................27

**Statutes**

28 U.S.C. § 1291 .......................................................................................... xiii

28 U.S.C. § 1331 .......................................................................................... xiii

28 U.S.C. § 1343 .......................................................................................... xiii

28 U.S.C. § 1367 ............................................................................. xiii

28 U.S.C. § 2201 ............................................................................. xiii

28 U.S.C. § 2202 ............................................................................. xiii

42 U.S.C. § 1983 .........................................................................2, 3, 44

42 U.S.C. § 1988 .........................................................1, 4, 28, 31, 33

52 U.S.C. § 21081(a)(1)(A)(i) .....................................................14, 37, 44

52 U.S.C. § 21081(a)(1)(A)(ii) .....................................................14, 37, 44

Help America Vote Act of 2002,
   Pub. L. No. 107-252, 116 Stat. 1666
   (codified as amended at 52 U.S.C. §§ 20901–21145)
   .................................................. 14, 19, 34, 37, 38, 42, 43, 44

O.C.G.A. § 21-2-70(13) ...............................................................37, 43

O.C.G.A. § 21-2-300(a)(2) ...........................................................10, 31

O.C.G.A. §§ 21-2-300(a)(2), 21-2-383(c) .........................................45

O.C.G.A. § 21-2-322 ....................................................................37, 43

O.C.G.A. § 21-2-365 ....................................................................37, 43

O.C.G.A. § 21-2-373 ....................................................................37, 43

O.C.G.A. § 21-2-379.1 .................................................................37, 43

O.C.G.A. § 21-2-379.22(5) ...........................................................37, 43

O.C.G.A. § 21-2-386(5) ...............................................................37, 43

**Other Authorities**

11th Cir. R. 28-5 ...............................................................................3

Fed. R. Civ. P. 1 .........................................................................23, 24

Fed. R. Civ. P. 15(d) .........................................................................22

Fed. R. Civ. P. 21 ..................................................................22, 23

Fed. R. Civ. P. 54 .......................................................................22

Fed. R. Civ. P. 56(f)(3) ..............................................................27

Fed. R. Civ. P. 65(a)(2) .........................................................23, 27

Ga. Comp. R. & Regs. 183-1-12-.11 ........................................10

Ga. Comp. R. & Regs. 183-1-12-.11(2)(b) .........................11, 46

Ga. Const. art. II, § 1, ¶ I .....................................................37, 43

House Bill 316, 2019–2020 Reg. Sess. (Ga. 2019) .................31

Rule 65(a)(2) ...............................................................................27

U.S. Const. amend. XI ............................................................3, 4

U.S. Const. amend. XIV ..............................................................3

U.S. Const. art. III .................... xii, 17, 39, 42, 44, 47, 48, 50, 51, 55, 61

xi

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

Plaintiffs-Appellants Coalition for Good Governance, Laura Digges, William Digges III, and Megan Missett adopt and incorporate from the Opening Brief Of Appellants Donna Curling, Jeffrey Schoenberg, And Donna Price (the "Curling Plaintiffs") filed on July 9, 2025, the following sections:

- **Argument Sections I, I.A., and I.B.**, which collectively argue that the Curling Plaintiffs have Article III standing. If the Curling Plaintiffs have standing for the BMD claims, then so too do the Coalition Plaintiffs under the One-Plaintiff Rule, for reasons explained in Section III.C.3, *infra*.

- **Argument Section II.A.**, which argues for this case to be remanded to the district court to make merits findings in the first instance. The same outcome is warranted for the Coalition Plaintiffs' BMD claims.

- **Argument Section II.B.**, which argues that, if the Court does not follow its typical rule and remand for the district court to address the merits, then the *Anderson-Burdick* applies and the Curling Plaintiffs should prevail. If a remand for merits findings is not ordered by this Court, the Coalition Plaintiffs also prevail on their BMD claims for the same reasons as the Curling Plaintiffs.

## STATEMENT OF JURISDICTION

The district court exercised subject-matter jurisdiction over both the Coalition Plaintiffs' 2017 DRE claims (raised in Coalition Plaintiffs' Third Amended Complaint, Doc. 226) and the Coalition Plaintiffs' 2019 BMD claims (raised in Coalition Plaintiffs' First Supplemental Complaint, Doc. 628) pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201, and 2202.

The district court entered its final judgment on March 31, 2025. Doc. 1868. Coalition Plaintiffs timely filed their Notice of Appeal on April 28, 2025. Doc. 1883. This appeal is from a final order that disposes of all parties' claims. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the district court erred in denying attorney's fees under 42 U.S.C. § 1988(b) to plaintiffs who obtained a preliminary injunction that permanently prohibited defendants' use of the unconstitutional Direct Recording Electronic (DRE) voting system, where the injunction provided enduring judicial relief on the merits that materially altered the legal relationship between the parties.

2.      Whether the district court erred in dismissing plaintiffs' constitutional challenge to defendants' use of a Ballot Marking Device (BMD) voting system for lack of individual standing where extensive uncontroverted trial evidence established plaintiffs' concrete, particularized injuries from defendants' threatened enforcement of state laws and rules requiring plaintiffs to use BMDs for in-person voting.

3.      Whether the district court erred in also dismissing plaintiffs' BMD claims for lack of organizational standing where uncontroverted trial evidence demonstrated the organizational plaintiff's concrete resource diversions caused by defendants' challenged conduct, and where the Eleventh Circuit previously determined that the organization has standing based on these same resource diversions under binding law-of-the-case.

1

## STATEMENT OF THE CASE

### I.    Nature Of The Case

Coalition Plaintiffs[1] sought under 42 U.S.C. § 1983 to enjoin the State of Georgia from compelling in-person voters to use two different unconstitutional voting systems. Through their Third Amended Complaint, Coalition Plaintiffs successfully challenged Georgia's paperless touchscreen Direct Recording Electronic (DRE) voting system, obtaining a preliminary injunction in August 2019 that permanently prohibited any continued use of the DRE system based on constitutional violations. Through their First Supplemental Complaint, Coalition Plaintiffs challenged Georgia's subsequent Ballot Marking Device (BMD) system that replaced the DREs, alleging that mandatory BMD use for in-person voting violates the fundamental right to vote and equal protection by forcing in-person voters to use machines that create a variety of constitutional harms. This appeal arises from the district court's denial of attorney's fees despite Coalition Plaintiffs' complete DRE victory and its dismissal of the BMD claims for lack of standing notwithstanding extensive trial evidence of concrete injuries-in-fact.

---

[1] Initially, the "Coalition Plaintiffs" were Coalition for Good Governance ("CGG"), Laura Digges, William Digges III, Megan Missett, and Ricardo Davis. Davis obtained separate counsel in January 2024 at the start of trial.

## II.    Course of Proceedings And Dispositions In The Court Below

### A.    Proceedings Against The DRE System

Within six weeks after the July 3, 2017, filing of this case in Georgia state court, the initial claims were amended twice, and Defendants removed the case to federal district court. By mid-September 2017, Plaintiffs were proceeding under their Second Amended Complaint. Doc. 70.

Plaintiffs split into two groups—Coalition Plaintiffs and Curling Plaintiffs—to pursue their different priorities in seeking similar relief, after which Coalition Plaintiffs were granted leave to docket their own Third Amended Complaint (the "Coalition TAC"). Doc. 226.

The Coalition TAC, filed June 13, 2018, focused on enjoining requirements for voters to use the paperless touchscreen DRE voting machines, along with electronic pollbooks and all related software applications and databases. The Coalition TAC asserted two claims under 42 U.S.C. § 1983—a fundamental right to vote claim (Count I) and a Fourteenth Amendment equal-protection claim (Count II), both seeking only prospective relief against only official-capacity defendants. The Coalition TAC withstood a motion to dismiss on all grounds, including standing and Eleventh Amendment immunity. Doc. 309 at 16–31;[2] Doc. 375.

_____

[2] Page references herein comply with 11th Cir. R. 28-5 unless otherwise stated.

### 1.    August 2019: DRE Injunction Granted

In 2018, the district court found Plaintiffs "substantially likely to succeed on the merits" but denied injunctive relief for timing reasons in 2018. Doc. 309 at 38. Defendants appealed standing and Eleventh Amendment immunity, but lost in *Curling v. Worley*, 761 F. Appx. 927 (11th Cir. 2019). In June 2019, Coalition Plaintiffs again moved to enjoin the DRE system. Doc. 419.

This time, on August 15, 2019, the district court issued a comprehensive 153-page order barring the use of DREs beyond 2019 and awarding relief directed at pollbook and voter registration problems. *Curling v. Raffensperger*, 397 F. Supp. 3d 1334 (N.D. Ga. 2019) (Doc. 579 at 149-50). The injunction "PROHIBITS any use of the GEMS/DRE system after 2019," creating substantively permanent relief. *Id.* at 152. Defendants sought clarification, Doc. 584, but did not appeal. The resulting clarification order confirmed the injunction's reach beyond DRE touchscreens themselves, requiring systemic voting system remediation of voter registration data vulnerabilities to prevent problems from persisting in new systems. Doc. 598 at 4. Defendants complied, installing a new state voter registration system.

Two weeks after obtaining the injunction, Coalition Plaintiffs timely filed motions for attorney fees under 42 U.S.C. § 1988 for their work obtaining the DRE victory. Docs. 595, 632, 705.

### 2.    Prolonged Consideration of DRE Fee Motions

The district court's handling of the DRE fee motions over five and a half years reveals a pattern of acknowledging Coalition Plaintiffs' substantive victory while maintaining procedural barriers preventing fee awards.

In October 2021, recognizing their DRE and voter registration database claims had been fully resolved, Coalition Plaintiffs moved to sever these claims to obtain finality and facilitate a ruling on their pending fee motions. Doc. 1182. At the hearing, the court revealed having "concerns from the start" about consolidating BMD claims with the DRE claims and acknowledged "we could have closed the other case" after the DRE injunction but orally denied severance as "too much of a jump." Doc. 1232 Tr. (11/19/2021) at 55:8-57:10.

The district court's subsequent actions demonstrated intent to award fees while maintaining the procedural posture that would ultimately prevent doing so. During 2022 hearings, the court discussed "the proposal that I appoint a special master relative to the fee amount if I determine that there was an eligibility for fees." *Id.* at 72:5-7. This discussion of implementation mechanisms strongly indicated the court viewed Coalition Plaintiffs as prevailing parties entitled to compensation.

In June 2023, the court's intent to award fees became explicit when, discussing both plaintiff groups' combined fee requests, the court stated it would

5

be "next to impossible for me to grant anywhere near" the full amount but assured Plaintiffs' counsel "I'm not going to give you as little as the State would like." Doc. 1684 [Sealed] Tr. (6/16/2023) at 21:24-23:8. The court requested detailed DRE fee itemizations, acknowledging "productive but duplicative work." Id. Coalition Plaintiffs provided responses. Docs. 1685, 1688.

On September 1, 2023, the court stated it had "done an enormous amount of work on the fees" and had "a draft fee order" that still needed additional work. Doc. 1695 Tr. (9/1/2023) at 4:3-7. The court elaborated: "And there isn't that much on the fees more, but it's complicated because I have reductions, and it's a lot of math" though the award was "largely written." *Id*. at 80:15-21. These statements suggested the court had resolved fees entitlement and was only working to finalize the amount.

Throughout this period, the district court's actions consistently recognized that Coalition Plaintiffs had achieved lasting relief—a recognition the court would later make explicit in its March 2025 order, acknowledging the relief was "more than a 'transient' or 'temporary success'" and was of "lasting, material value." Doc. 1869 at 6. Yet the court's persistent refusal to sever the resolved DRE claims or enter a final judgment recognizing Coalition Plaintiffs' victory created artificial procedural barriers preventing Plaintiffs from receiving earned fees.

6

**B.    Proceedings Against The BMD System**

Following Georgia's April 2019 decision to replace the DRE system,
Coalition Plaintiffs' First Supplemental Complaint ("FSC") was docketed on
October 15, 2019, raising voting and equal-protection claims against the new BMD
system. Doc. 628. The FSC supplemented rather than replaced the Coalition TAC.
*Id.* at 6.

After multiple 2020 preliminary injunction proceedings, the district court
granted relief regarding electronic pollbooks, Doc. 918, and partially granted relief
regarding BMDs and scanners, Doc. 964. State Defendants appealed to the
Eleventh Circuit.

In the resulting interlocutory appeals (Nos. 20-13730, 20-14067), the
Eleventh Circuit made a critical finding regarding Coalition for Good Governance.
The Circuit held CGG made a credible assertion of organizational standing through
resource diversion:

> We have recognized that voting advocacy organizations
> like the Coalition have standing to sue when a policy will
> force them "to divert personnel and time to educating
> volunteers and voters" and to resolving problems that the
> policy presents "on election day." ... Because the
> Coalition credibly made that assertion, the district court
> had jurisdiction to hear the Coalition's and its members'
> requests for injunctive relief.

*Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022) (Doc. 1502 at 12).

During oral argument, Judge Luck told Coalition Plaintiffs' counsel "I think you

7

have standing," and Judge Grant stated "We are not talking about standing. Standing is over." Doc. 1388-2 at 26:11-12, 28:4. Despite recognizing CGG's standing assertion, the Eleventh Circuit reversed the preliminary injunctions on other grounds.

### 1.    2023 Summary Judgment

On November 17, 2023, following remand, the district court entered partial summary judgment, dismissing the DRE claims as moot due to Georgia's transition to BMDs. *Curling v. Raffensperger*, 702 F. Supp. 3d 1303 (N.D. Ga. 2023) (Doc. 1705 at 108-10). Rather than recognizing Coalition Plaintiffs as prevailing parties for obtaining permanent relief from unconstitutional voting machines and voter registration deficiencies, the court granted judgment against them—treating litigation success as a defeat. The court also held the "ballot secrecy component" of the BMD claims did not "support a legally viable burden" and could not go to trial as part of the BMD claims. Doc. 1705 at 126-27.

### 2.    2024 Trial of the BMD Claims

The district court held a four-week bench trial on Coalition Plaintiffs' BMD claims from January 8 through February 1, 2024. (Docs. 1778-81, 1783, 1785, 1789, 1791, 1796, 1798-99, 1801, 1804-05, 1807, 1810, 1812.)

### 3.    2025 Rulings and Appeal

After trial, the district court did not rule for over a year. In early 2025, the court requested briefing on how *Lackey v. Stinnie*, 145 S. Ct. 659 (2025), affected the DRE fee claims. Doc. 1860. Coalition Plaintiffs provided briefing. (Docs. 1862, 1863, 1867.)

On March 31, 2025, the court entered judgment against Coalition Plaintiffs for lack of standing, Doc. 1868, and denied attorney fees, Doc. 1869.

In denying fees, the court acknowledged Coalition Plaintiffs' August 2019 victory was indeed substantively permanent: "the 2019 Preliminary Injunction— despite its 'preliminary' label—will never be revisited, reversed, or disturbed. It was therefore more than a 'transient' or 'temporary success' for Plaintiffs—it was of lasting, material value." Doc. 1869 at 6. The court further acknowledged the injunction "effectively resolve[d]" the DRE claims in Coalition Plaintiffs' favor. *Id*. Nevertheless, the court held that *Lackey* compelled it to deny fees.

This denial came after more than five years during which the court repeatedly signaled intent to grant fees, requested detailed calculations, and revealed it had already drafted a fee order that was "largely written." Doc. 1695 Tr. (9/1/2023) at 80:15-21. The court's acknowledgment that Coalition Plaintiffs achieved lasting victory through judicial relief, combined with years of preparation for a fee award, highlights the disconnect between recognizing Coalition Plaintiffs'

9

success and the ultimate denial based on the court's mistaken reading of *Lackey*—a reading Coalition Plaintiffs contend fails to recognize distinctions between truly temporary relief and the substantively permanent judicial relief they obtained.

Coalition Plaintiffs timely appealed. Doc. 1883.

## III.    Statement Of The Facts

The district court dismissed Coalition Plaintiffs' BMD claims for lack of standing without reaching the merits or making factual findings. As the court explicitly noted, its opinion "constitutes a recitation of the relevant procedural history, trial evidence, and legal arguments" and "should not be construed as findings of fact." Doc. 1868 at 5 n.1. Following a four-week bench trial, Coalition Plaintiffs presented extensive evidence—much of it uncontroverted—demonstrating concrete injuries from Georgia's BMD voting system sufficient to establish standing and support their constitutional claims.

The trial evidence established the following:

### A.    Georgia's BMD Voting System Requirements

Georgia mandates in-person BMD use. O.C.G.A. § 21-2-300(a)(2); Ga. Comp. R. & Regs. 183-1-12-.11. The BMD system requires voters to make selections on a touchscreen, then prints a paper ballot containing both an abbreviated text summary of the voter's recorded selections and a humanly unreadable QR code meant to encode those selections. The scanner reads only the

10

QR code votes, not the human-readable text of selections, when tabulating votes.
Doc. 1822 at 47-51 ¶¶ 76a-76k (citing testimony).  Doc. 1838 (Vol. 7B) at 156-58.

Georgia election rules require voters to verify their printed BMD votes
before casting them. Ga. Comp. R. & Regs. 183-1-12-.11(2)(b). Absentee voters
who use hand-marked paper ballots are not subject to this BMD verification
requirement.

**B.    Individual Plaintiffs And CGG Members' Voting Experiences
And Injuries**

Individual Plaintiffs and CGG members testified about seven categories of
concrete harms they experience when voting on BMDs, each sufficient to confer
standing:

**1.    Inability to Verify QR Code Accuracy**

Voters use a BMD by touching a screen to make selections, then reviewing
and submitting their votes. They receive a printed ballot card, filled-out by
software, that shows an unreadable QR code containing their official votes along
with an abbreviated text summary of the vote selections. Voters must review the
ballot card text (and must trust that the QR code matches) and then cast the ballot
into a scanner, which counts only the votes in the QR code. Doc. 1822 ¶ 88.

An example:

**OCONEE COUNTY**

**OFFICIAL BALLOT**

**GENERAL AND SPECIAL ELECTION**
**OF THE STATE OF GEORGIA**
**NOVEMBER 3, 2020**

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of or voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

101-Antioch



For President of the United States (Vote for One) (NP)
 Vote for Donald J. Trump (I) (Rep)

For United States Senate (Perdue) (Vote for One) (NP)
 Vote for David A. Perdue (I) (Rep)

For United States Senate (Loeffler) - Special (Vote for One) (NP)
 Vote for Doug Collins (Rep)

For Public Service Commissioner (Vote for One) (NP)
 Vote for Jason Shaw (I) (Rep)

For Public Service Commissioner (Vote for One) (NP)
 Vote for Lauren Bubba McDonald, Jr. (I) (Rep)

For U.S. Representative in 117th Congress From the 10th Congressional District of Georgia (Vote for One) (NP)
 Vote for Jody Hice (I) (Rep)

For State Senator From 46th District (Vote for One) (NP)
 Vote for Bill Cowsert (I) (Rep)

For State Representative In the General Assembly From 119th District (Vote for One) (NP)
 Vote for Marcus A. Wiedower (I) (Rep)

For District Attorney of the Western Judicial Circuit (Vote for One) (NP)
 Vote for James Chafin

For Clerk of Superior Court (Vote for One) (NP)
 Vote for Angela C. Elder-Johnson (I) (Rep)

For Sheriff (Vote for One) (NP)
 Vote for James A. Hale, Jr. (Rep)

For Tax Commissioner (Vote for One) (NP)
 Vote for Jennifer T. Riddle (I) (Rep)

For Coroner (Vote for One) (NP)
 Vote for Ed Carson (I) (Rep)

For County Commission Chairman (Vote for One) (NP)
 Vote for John E. Daniell (I) (Rep)

For County Commissioner Post 1 (Vote for One) (NP)
 Vote for Mark H. Thomas (I) (Rep)

For County Commissioner Post 3 (Vote for One) (NP)
 Vote for Amrey Harden (Rep)

For County Commissioner Post 4 (Vote for One) (NP)
 Vote for Mark T. Saxon (I) (Rep)

For County Board of Education Chairman Post 1 (Vote for One) (NP)
 Vote for Tom Odom (I) (Rep)

For County Board of Education Post 4 (Vote for One) (NP)
 Vote for Tim Burgess (I) (Rep)

For County Board of Education Post 5 (Vote for One) (NP)
 Vote for Michael D. Ransom (Rep)

Constitutional Amendment #1 (NP)
 Vote for NO

Constitutional Amendment #2 (NP)
 Vote for NO

1/2

Doc. 1304-4 at 5.

Evidence showed Plaintiffs cannot verify whether their ballot's QR code contains their correct vote selections, depriving them of the ability to verify their votes directly. Doc. 1822 ¶¶ 76 & a-k, 173 (citing testimony).

### 2.    Burden of Mandatory Two-Step Verification Process

The BMD system imposes a burdensome two-step verification process. Voters must first review their selections on the touchscreen, then review them again on the printed ballot. Doc. 1822 ¶¶ 77. This second review is cognitively challenging and must be conducted from memory because the BMD touchscreen goes dark after printing, preventing voters from comparing the printed ballot to their on-screen candidate options and ultimate selections. Doc. 1822 ¶ 174. Voters cannot reliably verify their text printouts. Dox. 1822 ¶ 94 & a-j.

Multiple Plaintiffs and experts testified memory-based verification is difficult or impossible with long ballots. Doc. 1822 ¶¶ 94, 174-75. Voters also experience "pressure and anxiety" not to delay other voters in line to vote by taking time for thorough review. Doc. 1822 ¶ 176. Coalition Plaintiffs' expert Dr. Philip Stark testified that the mandatory verification burden is a difficult cognitive task. Doc. 1840 (Vol. 9) at 139:6-14.

### 3.    Forced Performance of State's Security Function

Defendants require voters to verify BMD accuracy not merely for individual voting purposes, but as a "critical" mechanism to "make the system reliable," create public confidence, and ensure auditability. Doc. 1822 ¶¶ 180-182; Doc. 1843 (Vol. 12) at 235:12-20, 236:17-237:6; Doc. 1845 (Vol. 14A) at 105:10-108:21; Doc. 1844 (Vol. 13) at 155:22-157:17, 163:9-17. The burden of

monitoring correct BMD functioning is placed on voters. Doc. 1832 (Vol. 1) at 143:9-147:7. Defense expert Dr. Ben Adida confirmed that voter verification serves as a "critical" mechanism that "makes the system reliable." Doc. 1843 (Vol. 12) at 235:12-237:6.

### 4. Lack of Permanent Trustworthy Vote Records

Unlike hand-marked paper ballots that provide permanent, voter-verified records of the voters' directly expressed choices, BMD-printed ballots with unverifiable QR codes fail to provide trustworthy evidence of voter intent. Doc. 1822 ¶¶ 85, 92, 94.

### 5. Ballot Secrecy Violations

Plaintiffs testified about ballot secrecy violations when using BMDs, including visibility of selections on large touchscreens to poll workers and other voters. Doc. 1822 ¶¶ 78 & a-c.

### 6. HAVA Violations

The BMD system denies voters any opportunity to verify and privately correct their ballots as required by Sections 21081(a)(1)(A)(i)-(ii) of the Help America Vote Act (HAVA). Any detected errors must be reported to poll workers, compromising the private correction process, which can also be viewed by others in the polling place. Doc. 1822 ¶ 80.

### 7.    Burden of Avoiding BMDs Through Absentee Voting

To avoid BMD-related harms, some Plaintiffs vote absentee, which requires additional steps including obtaining and completing applications, delivering voted ballots, and risking ballot rejection. Doc. 1822 ¶¶ 79 & a-f; (citing testimony).

### C.    Defendants' Evidence and Positions

Defendants' witness Gabriel Sterling acknowledged BMD voters "often" hurry and do not correct problems from embarrassment or time constraints. Doc. 1822 ¶ 176. Defendants presented no evidence disputing Plaintiffs' testimony about their individual experiences with BMDs or the burdens imposed by the verification requirements.

### D.    CGG's Organizational Activities And Resource Diversions

Coalition for Good Governance is a non-partisan organization  "focused on constitutional liberties and individual rights specifically in terms of the First Amendment, due process, and equal protection under the law" with a "focus[] on elections as well as Government transparency". Doc. 1822 ¶¶ 48, 50-51.

### 1.    Executive Director Marilyn Marks' Testimony

CGG's Executive Director Marilyn Marks testified CGG diverted resources from: ranked choice voting education, fighting internet voting initiatives, educational webinars, and rule change petitions to combat Georgia's BMD

15

requirements, both in and outside of this litigation. Doc. 1822 ¶¶ 53 n.6, 54, 57; Doc. 1846 (Vol. 15) at 162:8-163:23.

### 2.    Board Member Rhonda Martin's Testimony

CGG Board member Rhonda Martin corroborated these diversions, testifying that CGG has been forced to divert resources to oppose the requirement to use BMDs and has spent a "huge amount of [its] time" opposing BMD voting requirements. Doc. 1822 ¶¶ 48, 49 n.4, 53-56.

### 3.    Additional Documented Diversions

Prior summary judgment proceedings documented additional concrete diversions, including CGG's inability to: participate in the Election Assistance Commission's standards process; continue active involvement in the Election Verification Network; pursue planned North Carolina litigation on BMDs; and conduct voter education efforts. Doc. 1705 at 77-80.

At summary judgment, the district court found that, Coalition Plaintiffs "have 'credibly' asserted that CGG has diverted resources in response to Defendants' conduct" and "have provided sufficient evidence that CGG's 'actual ability to conduct specific projects' not only will be, but in fact, has been 'frustrated.'" Doc. 1705 at 80-81.

16

### E.    Prior Proceedings On Standing

The Circuit determined in 2022 that CGG's diversions were legally

sufficient injuries for organizational standing. *Curling*, 50 F.4th at 1121; Doc. 1705

at 75-81.

### IV.    Standard Or Scope Of Review For Each Contention

Questions of Coalition Plaintiffs' Article III standing to bring the BMD

claims are reviewed de novo, whether for individual standing, *Elend v. Basham*,

471 F.3d 1199, 1204 (11th Cir. 2006), or organizational standing, *Baughcum v.*

*Jackson*, 92 F.4th 1024, 1030-31 (11th Cir. 2024). For underlying evidentiary

matters related to standing, "Clear error exists if after reviewing the entire record,

we are 'left with the definite and firm conviction that a mistake has been

committed.'" *U.S. v. Brown*, 996 F.3d 1171, 1182 (11th Cir. 2021).

The district court's grant of summary judgment against Coalition Plaintiffs

on the DRE claims is reviewed de novo, viewing all the evidence, and drawing all

reasonable inferences, in favor of Coalition Plaintiffs  as the non-moving party.

*Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).

The district court's legal conclusions applying Supreme Court precedent,

including its application of *Lackey v. Stinnie* to Coalition Plaintiffs' attorney's fees

request, is reviewed de novo. *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir.

2024).

17

Severance denials are reviewed for abuse of discretion. *Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1269-70 (11th Cir. 2013). Abuse occurs when courts ignore relevant factors, consider improper factors, or commit clear judgment errors. *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005).

## SUMMARY OF ARGUMENT

The district court committed multiple reversible errors by denying Coalition Plaintiffs' motion for attorney's fees from the DRE injunction granted over five years earlier and dismissing their BMD claims for lack of individual and organizational standing.

The court erroneously denied attorney's fees to Coalition Plaintiffs despite their complete victory on the DRE claims. Coalition Plaintiffs obtained substantively permanent relief through the August 2019 preliminary injunction, which prohibited any future use of Georgia's unconstitutional DRE system based on detailed constitutional findings. The court compounded this error by refusing to sever and enter final judgment on the fully resolved DRE claims, then granting summary judgment against rather than for the successful plaintiffs four years later, and finally misapplying *Lackey v. Stinnie* to deny the fees Coalition Plaintiffs earned through their permanent victory. Unlike *Lackey*'s temporary status quo

18

preservation, Coalition Plaintiffs obtained enduring judicial relief that materially altered the legal relationship between the parties.

The court dismissed for lack of individual standing despite evidence of at least seven harm categories: unverifiable QR code votes, burdensome reviews, forced system accuracy responsibility, no permanent records of voter intent, secrecy violations, HAVA violations, and absentee burdens. The court committed legal error by analyzing only two injury categories while ignoring five others, applying an overly restrictive framework requiring precedential matching of injury types, and excluding evidence of ballot secrecy and HAVA violations. These concrete harms satisfy Article III's injury-in-fact requirement and establish both causation and redressability.

The court erroneously dismissed for lack of organizational standing despite CGG's proven diversions from educational and advocacy priorities to combat BMD harms. The district court violated the law-of-the-case doctrine by refusing to apply the Eleventh Circuit's binding 2022 determination that CGG has organizational standing for exactly these types of resource diversions. The court further erred by misapplying the Circuit's legal framework in ways that would effectively eliminate organizational standing as a viable theory.

These errors require reversal. The attorney's fees error independently requires reversal of the fee denial and recognition of Coalition Plaintiffs as the

prevailing parties on their DRE claims. Either the individual standing error or the

organizational standing error independently requires reversal of the BMD claims

dismissal and remand for adjudication on the merits.

## ARGUMENT AND CITATIONS TO AUTHORITY

## I.   THE DISTRICT COURT ERRED IN DENYING ATTORNEY'S FEES TO COALITION PLAINTIFFS AFTER THEY OBTAINED SUBSTANTIVELY PERMANENT RELIEF ON THE DRE CLAIMS

The court mischaracterized the August 2019 injunction as "preliminary"

when it was substantively permanent relief definitively resolving the DRE

challenge. The court compounded this error through a series of rulings that failed

to recognize Coalition Plaintiffs as the prevailing parties they had become: first, by

refusing for over four years to enter any judgment and formally recognize the

permanence of Plaintiffs' victory on their DRE claims (Section I.A); second, by

ultimately granting summary judgment *against* rather than *for* Coalition Plaintiffs,

after finally acknowledging in late 2023 that the DRE claims were moot due to

Plaintiffs' August 2019 victory (Section I.B); and third, by misapplying *Lackey v.

Stinnie*, 145 S. Ct. at 659, to deny fees, despite the permanent, merit-based nature

of the relief Coalition Plaintiffs actually obtained (Section I.C). These errors

prevented Coalition Plaintiffs from obtaining the long overdue fee award earned

when they secured elimination of the unconstitutional DRE system in 2019.

## A.    The District Court Erred By Denying Severance And Final Judgment On The DRE Claims

Coalition Plaintiffs preserved severance arguments through their motion and briefs, Docs. 1182, 1182-1, 1216, and hearing argument, Doc. 1232 Tr. (11/19/2021).

### 1.    The DRE Injunction Granted Substantively Permanent Relief

The district court's extensive 153-page August 15, 2019, preliminary injunction order, Doc. 579, against the DRE system constituted substantively permanent relief that definitively resolved the constitutional violations alleged in the DRE claims. Unlike typical preliminary relief that merely maintains the status quo pending further proceedings, this order provided complete resolution of the underlying constitutional dispute. The court's explicit ruling that it "PROHIBITS any use of the GEMS/DRE system after 2019" permanently eliminated the DRE voting system. Doc. 579 at 152. This prohibition was not temporary relief pending final adjudication but rather a permanent remedy that required Georgia to abandon its DRE system entirely and implement different voting and registration technology.

The DRE injunction left no claims to litigate under the Coalition TAC. The order barred DREs as "unsecure, unreliable and grossly outdated technology that jeopardizes [voters'] ability to cast votes that reliably and accurately will be

21

counted," resolving the merits for Coalition Plaintiffs. *Id*. at 132-33. Defendants' compliance without appealing ensured finality.

## 2.    Rule 21's Severance Requirements Were Satisfied

The district court should have severed the DRE claims under Federal Rule of Civil Procedure 21 in response to Coalition Plaintiffs' request for this relief. Coalition Plaintiffs brought their DRE claims under their Third Amended Complaint. Doc. 226. The merits of the DRE claims were wholly resolved by the 2019 preliminary injunction, especially once Defendants complied with the injunction, waived their right to immediately appeal it, and abandoned further defense of the DRE system on the merits. Coalition Plaintiffs' BMD claims, by contrast, involved a different voting system, different challenged conduct, different standing injuries, and different factual predicates. The BMD claims were asserted through an entirely separate First Supplemental Complaint docketed in 2020, which did not relate back to the date of the Third Amended Complaint and the DRE claims. Doc. 628 at 6; Fed. R. Civ. P. 15(d).

Federal Rule of Civil Procedure 21 permits severing claims. Like Rule 54, it secures finality and thus "can form the basis of an appeal." *Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1237 (11th Cir. 2020) (Prior, W. and Luck, JJ. concurring). The Circuit favors litigants' use of these rules as "ways … to secure appellate review" when some claims are resolved. *Id.* at 1236.

22

This result is exactly what Coalition Plaintiffs sought to accomplish with their October 2021 motion for severance and judgment. Doc. 1182. Combined with Federal Rule of Civil Procedure 65(a)(2), which allows district courts to "advance the trial on the merits and consolidate it with the [preliminary injunction] hearing" and to treat admissible hearing evidence as "part of the trial record," Rule 21 fully empowered the district court to grant severance and enter judgment on the DRE claims.

Severance was warranted. The court recognized that Coalition Plaintiffs' BMD claims required new analysis, being "additional to, and do not supersede or replace" the DRE claims. Doc. 751 at 14 n.7. The appropriateness of severance was reinforced by Defendants' repeated assertions by late 2021 that the DRE claims were moot. *E.g.*, Doc. 1066 at 5 n.3. With the opposing parties agreeing the DRE claims were resolved, severance and final disposition should have been granted. *See Corley*, 965 F.3d at 1236-37.

### 3.    The District Court's Denial Violated Rule 1 And Constituted Abuse Of Discretion

The district court abused its discretion in three ways: by ignoring relevant factors, by giving significant weight to irrelevant and improper factors, and by committing "a clear error of judgment.'" *Roach*, 411 F.3d at 1330.

Denying severance violated Rule 1's mandate for "just, speedy, and inexpensive" resolutions. Severance would have provided immediate DRE victory

23

recognition, eliminated delay, and avoided duplicative proceedings. Instead, the years-long delay in resolving the DRE claims prejudiced Coalition Plaintiffs by preventing them from seeking attorney's fees for their successful challenge to an unconstitutional voting system and by forcing them to continue litigating their prevailing party status through summary judgment proceedings, despite having obtained permanent relief in August 2019. This delay violated fundamental fairness principles and deters private civil rights enforcement.

At the same time as it disregarded Rule 1's mandatory considerations, the district court gave undue weight to a subjective conclusory impression that it was "too much of a jump" to sever the resolved DRE claims now. Doc. 1232 Tr. (11/19/2021) at 57:8. This vague conclusion was either irrelevant, improper, or an error of judgment. It followed immediately after the trial judge acknowledged "concerns from the start" about bringing the newer BMD claims into the DRE case. The court admitted not understanding "why did we need to merge the cases" and said, "I thought we could have closed the other case" after the DRE preliminary injunction was entered. *Id.* at 55:8-25. Plainly the court understood its nominally "preliminary" relief to be permanent in substance.

While district courts possess discretion when determining whether severance is appropriate, their discretion still must be exercised using "proper factors," such as legal principles and factual realities, "and no improper ones," like arbitrary

impressions. *Roach*, 411 F.3d at 1330. The 2023 mootness ruling confirmed the DRE claims were long resolved, vindicating Coalition Plaintiffs' 2021 severance request.

### B. Over Four Years After The Continued Use Of DREs Was Enjoined, Summary Judgment On The DRE Claims Should Have Been *For* Coalition Plaintiffs, Not Against Them

Coalition Plaintiffs preserved their entitlement to favorable judgment on their DRE claims when they agreed the claims were moot but argued for severance and prevailing party status, not adverse summary judgment. Doc. 1624 at 79-80.

### 1. The District Court's Approach Contradicted Established Precedent On Successful Injunctive Relief

Coalition Plaintiffs' position was correct under then-controlling Eleventh Circuit precedent. At the time of the district court's November 2023 summary judgment ruling, *Common Cause Ga. v. Sec'y* mandated that plaintiffs who obtained a preliminary injunction providing "merits-based relief" that "materially altered the parties' legal relationship" were entitled to prevailing party status, not dismissal as unsuccessful parties due to resulting mootness. 17 F.4th 102, 107-08 (11th Cir. 2021). Coalition Plaintiffs' 2019 relief was more significant than Common Cause's narrow relief, satisfying Circuit standards. Yet the district court's November 2023 ruling granted "summary judgment in favor of the State Defendants on … the DRE claims." Doc. 1705 at 110. This decision penalized Coalition Plaintiffs for their litigation success, contrary to circuit precedent, both

25

by ignoring aspects of the 2019 order that had lasting effects and by treating

mootness arising from a substantive victory as grounds for entering judgment

against rather than for Plaintiffs.

### 2. Coalition Plaintiffs' DRE Victory Warranted Favorable Judgment

The August 2019 preliminary injunction prohibited the use of

unconstitutional DREs and mandated changes to Georgia's voter registration

system. This represented a complete victory for Coalition Plaintiffs on the merits

that rendered further litigation of DRE claims unnecessary. The Defendants

themselves repeatedly acknowledged resolution of these claims in Plaintiffs' favor,

conceding that, "[Plaintiffs' DRE Claims] are moot." Doc. 1066 at 5 n.3; Doc. 779

at 3 (Ninth Affirmative Defense).

The "extraordinary remedy" of a preliminary injunction requires showing

"substantial likelihood of success on the merits." *Grayson v. Comm'r*, 121 F.4th

894, 896-97 (11th Cir. 2024). Plaintiffs met this standard based on the "extensive

record." Doc. 579 at 75. Crucially, Defendants *complied* with the resulting

injunction, unequivocally establishing its relief as permanent. Defendants' choice

not to appeal the injunction but instead comply with its requirements comprises

acceptance of Plaintiffs' likely success and acquiescence in the mandate to

discontinue using DREs and overhaul the voter registration system.

In circumstances where the core injunctive relief has been implemented and where the preliminary injunction process itself served as a robust adjudication of the merits resulting in no further contestation by Defendants, the purpose of further litigation for injunctive relief is fulfilled. Rule 65(a)(2) expressly allows district courts to "advance the trial on the merits and consolidate it with the [preliminary injunction] hearing," recognizing that extensive preliminary proceedings can sometimes obviate the need for a separate trial. *See* Fed. R. Civ. P. 65(a)(2); *see also Wreal, Ltd. Liab. Co. v. Amazon.com, Inc.*, 38 F.4th 114, 123 n.5 (11th Cir. 2022) ("Evidence introduced at a preliminary injunction hearing … may be considered when ruling on motions for summary judgment.").

After Defendants complied with the 2019 preliminary injunction, waived their right to immediately appeal it, and repeatedly acknowledged that the DRE claims were moot, these circumstances *required* the district court to deny summary judgment for Defendants on the DRE claims. Granting judgment to Defendants was legal error.

### 3.    The Proper Disposition Should Have Been Summary Judgment For Coalition Plaintiffs

The only permissible option for summary judgment that the district court could have granted was a judgment in favor of Plaintiffs, making the nominally preliminary relief formally permanent where it was already substantively permanent. Rule 56(f)(3) authorizes sua sponte summary judgment on an existing

record. *See Artistic Ent., Inc. v. City of Warner Robins*, 331 F.3d 1196, 1202 (11th Cir. 2003) (when "a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate *even if no formal notice has been provided*.") (emphasis added).

In late 2023, the only resolution of the DRE claims that could be consistent with then-controlling Eleventh Circuit precedent under *Common Cause Ga.* was entry of a judgment recognizing Coalition Plaintiffs as the prevailing party—certainly not an *adverse* summary judgment that treated them as if they had lost on the DRE claims. Principles of judicial economy and finality, coupled with the strong evidentiary posture established by the preliminary injunction, all favored this result. As Coalition Plaintiffs had already explained in their severance motion briefing two years earlier, "there will be no further need for any substantive adjudication of the DRE Claims (whether severed or not), apart from resolving the ancillary motions for fees and sanctions." Doc. 1182-1 at 6. The district court should have simply acknowledged Plaintiffs' victory achieved years earlier by entering judgment in their favor, with or without severance.

Failing to apply *Common Cause Ga.*'s binding authority misapplied the law existing at the time of the decision. Had the district court not erroneously granted summary judgment for Defendants, Coalition Plaintiffs would have been entitled to attorney fees under 42 U.S.C. § 1988 as prevailing parties after a final judgment.

### C.   The Substantively Permanent Relief Plaintiffs Obtained Against DREs Is Distinguishable From The Injunction In *Lackey v. Stinnie*

Regardless of its abuse of discretion in not severing the DRE claims and its error of law in granting summary judgment against rather than for Coalition Plaintiffs, the district court *still* could have awarded attorney's fees to Plaintiffs for their DRE victory in early 2025. Instead, the district court erred again, this time by misapplying *Lackey* as authority requiring the belated denial of Plaintiffs' over-four-year-old pending motions for attorney fees. Coalition Plaintiffs preserved this issue through briefing. Docs. 1865, 1867.

#### 1.   The District Court's Own Findings Confirm That Coalition Plaintiffs Obtained Permanent Judicial Relief, Not Temporary Status Quo Preservation

The district court itself recognized the permanent nature of Coalition Plaintiffs' victory, acknowledging that "the 2019 Preliminary Injunction—despite its 'preliminary' label—will never be revisited, reversed, or disturbed. It was therefore more than a 'transient' or 'temporary success' for Plaintiffs—it was of lasting, material value." Doc. 1869 at 6. The court further admitted that Coalition Plaintiffs "secured an injunction barring further use of the DRE system, which ensured Georgia's full, timely, and permanent transition to the BMD system" and "'effectively resolve[d]' Plaintiffs' DRE claims in their favor." *Id*.

These judicial findings demonstrate that Coalition Plaintiffs obtained exactly what *Lackey* requires: "conclusive" "enduring judicial relief on the merits that

materially alters the legal relationship between the parties." *Lackey*, 145 S. Ct. at 669. The August 2019 injunction explicitly "PROHIBITS any use of the GEMS/DRE system after 2019" based on thorough factual findings that the system "operate[s] on unsecure, unreliable and grossly outdated technology that jeopardizes [voters'] ability to cast votes that reliably and accurately will be counted." Doc. 579 at 152, 132-33.

Unlike *Lackey*'s temporary injunction that merely preserved the status quo pending legislative action, the 2019 order effected a "judicially sanctioned," "enduring," and "material" "alteration of the legal relationship" between Plaintiffs and the State Defendants that is permanent—not a mere "fleeting success." *Lackey,* 145 S. Ct. at 668-69. The court declared that "[c]ontinued use of the GEMS/DRE system past this 2019 cycle of elections is indefensible," providing definitive merits-based resolution after detailed constitutional analysis. Doc. 579 at 146. *Lackey*'s recognition of the distinction between mere preservation of the status quo and the granting substantive relief on the merits is consistent with the Eleventh Circuit's long-standing recognition of the same principle. *See Taylor v. Ft. Lauderdale*, 810 F.2d 1551, 1558 (1987) ("a preliminary injunction on the merits, as opposed to a merely temporary order which decides no substantive issues but merely maintains the status quo, entitles one to prevailing party status and an award of attorney's fees").

### 2. The Judicial Order Itself Created Permanence—External Events Played No Role

*Lackey* applies when "external events" "moot the action and prevent the court from conclusively adjudicating the claim," thus converting temporary relief into lasting relief. *Lackey*, 145 S. Ct. at 671. Here, relief was permanent from its judicial inception. External events did not make an otherwise temporary order irreversible; instead, permanence was conferred the injunction's own requirements and Defendants' compliance with them.

Nor was House Bill 316 a subsequent event that created permanence; the court discussed it in the injunction, Doc. 579 at 114 n.78, 139-47, and expressed "doubt" that Defendants would replace DREs for 2020. *Id*. at 142. This doubt is supported by the statute's plain text, which does not terminate DRE use on any timeframe, but merely authorizes the purchase of a new system and empowers the Defendant Secretary to determine whether and when any replacement system is "safe and practicable for use." O.C.G.A. § 21-2-300(a)(2). In other words, only the district court's judicial order "prohibit[ed] any continued use of the GEMS/DRE system past the completion of the 2019 election cycle." Doc. 579 at 142.

### 3. Coalition Plaintiffs' DRE Victory Satisfies *Lackey*'s Own Standard for Prevailing Party Status

The court acknowledged all eleven Circuits previously agreed preliminary injunctions can trigger § 1988(b) fees, and Coalition Plaintiffs' counsel "relied on

this consensus." Doc. 1869 at 6. More importantly, the court recognized that Coalition Plaintiffs achieved a lasting victory as a result of the court's order.

Even as it relied upon *Lackey* to deny the fee motions, the district court in its fees order acknowledged that the DRE injunction was "more than a 'transient' or 'temporary success' for Plaintiffs," but was instead an achievement of "lasting, material value." *Id*. The court recognized that form was trumping substance: "Binding precedent requires the denial of Plaintiff's Motions, even if the 2019 Preliminary Injunction 'effectively resolve[d]' Plaintiffs' DRE claims in their favor." *Id*. (citing *Lackey*).

But the district court erred in interpreting *Lackey* to impose a "categorical preclusion of fee awards for any plaintiff who successfully obtains preliminary injunctive relief." *Id*. On the contrary, *Lackey* itself contemplates that "attorney's fees may be awarded when conclusive, enduring judicial relief is meted out on an incremental basis." 145 S. Ct. at 670. The Supreme Court emphasized that a prevailing party need not "prevail on its central claim," *id*. at 671, or on every claim, but merely on "a claim" through a court "granting enduring judicial relief on the merits that materially alters the legal relationship between the parties," *id*. at 669.

Coalition Plaintiffs achieved precisely this when they obtained the Order prohibiting any use of the GEMS/DRE system in Georgia after 2019. The

nominally "preliminary" injunction granted, in substance, enduring relief on the merits of Plaintiffs' DRE claims, altering the legal relationship between the parties. Indeed, the lasting relief granted to Coalition Plaintiffs by the district court on the DRE claims greatly exceeds the incremental "judicially sanctioned" and "enduring" change in legal relationship that *Lackey* describes as being sufficient for prevailing party status and *pendente lite* fee awards. Because Coalition Plaintiffs obtained exactly the kind of relief that *Lackey* identifies as being sufficient for prevailing party status—not just relief limited to temporary status quo preservation—they satisfy *Lackey*'s requirements and are entitled to their attorney's fees for prevailing on the DRE claims under 42 U.S.C. § 1988(b).

## II.    THE DISTRICT COURT ERRED IN DISMISSING COALITION PLAINTIFFS' BMD CLAIMS FOR LACK OF INDIVIDUAL STANDING

Coalition Plaintiffs preserved individual standing arguments through summary judgment briefing, Doc. 1624 at 18-43, trial testimony, Doc. 1832 (Vol. 1) at 141:10-25, and closing arguments, Doc. 1848 (Vol. 17) at 53-57.

### A.    Plaintiffs Satisfied the Injury-in-Fact Requirement for Individual Standing in Voting Rights Cases

The district court's finding that Plaintiffs lack individual standing rests on three fundamental categories of error in analyzing the injury-in-fact requirement. First, the court failed to recognize that Plaintiffs' seven proven concrete harms constitute legally cognizable injuries-in-fact as a matter of law (Section II.A.1).

33

Second, the court committed multiple errors of law and clear error in rejecting these proven injuries (Section II.A.2). Third, the court compounded these errors by improperly excluding evidence of cognizable ballot secrecy and HAVA violations through its summary judgment ruling, thus artificially constraining its injury analysis by conflating standing with the merits (Section II.A.3). Each category of error independently requires reversal of the individual standing determination.

### 1. Plaintiffs' Proven Injuries Are Legally Cognizable Injuries-In-Fact As A Matter Of Law

Plaintiffs proved at least seven discrete kinds of injuries to individual voters that are caused by their required use of the BMD system for in-person voting. Each of these harms, proved by uncontroverted testimony, is an injury-in-fact that independently supports Plaintiffs' individual standing.

First, Plaintiffs cannot verify QR codes containing official vote selections. Multiple plaintiffs testified QR codes are unreadable, preventing confirmation of accurate vote recording. This inability to verify the vote of record constitutes an invasion of in-person voters' legally protected interest in knowing the votes they are actually casting—a concrete, particularized injury that occurs each time Plaintiffs and CGG members vote in person, which makes them "less likely to cast an effective vote than voters" casting absentee ballots. *Wexler v. Anderson*, 452 F.3d 1226, 1231 (11th Cir. 2006).

Second, Plaintiffs proved they suffer concrete harm from the burdensome mandatory two-step ballot review process required when using BMDs. Individual Plaintiffs and CGG members testified they must review their selections twice— once on screen and again after printing—which requires memorizing entire ballot content that is not feasible with Georgia's long, dense ballots. Doc. 1822 ¶ 77 (citing testimony). The burden is compounded because voters must review the printed selections from memory since BMD touchscreens go dark after printing, and the printed text is often small and illegible. Doc. 1822 ¶ 174 (citing testimony). This mandatory duplicative review process invades voters' legally protected interest in casting their votes without unnecessary procedural burdens, imposing concrete, particularized harm each time Plaintiffs and CGG members vote in person.

Third, voters must verify BMD operational accuracy for election security— the State's responsibility. This forced responsibility for equipment verification has nothing to do with the individual exercise of the right to vote, and forcing in-person voters to bear it thus constitutes an invasion of their legally protected interest in casting votes without bearing any of the State's responsibilities for monitoring voting system functionality. These burdens are concrete, experienced individually by each voter, and certainly impending each time Plaintiffs and CGG members vote in person.

Fourth, BMDs lack permanent, trustworthy vote records. Voters select on touchscreens, but official ballot cards are computer authored. Software interprets what the voter did on the touchscreen and encodes those choices into a humanly unreadable digital format—meaning the resulting record is only as trustworthy as the software installed on each particular touchscreen. Dr. Philip Stark testified that when BMDs place "technology between the voter and the record of the vote, you kind of lose the guarantee that the record of the vote accurately reflects what the voter did." Doc. 1840 (Vol. 9) at 136:3-5. Depriving voters of their ability to directly author the official record of their own vote selections invades the voters' legally protected interest in creating a record of their vote choices that is capable of being meaningfully counted or audited. (In the case of hand marked absentee ballots, voters directly express their selections making a permanent trustworthy record with ink on paper.) Plaintiffs and CGG members suffer this concrete, particularized harm each time they vote in person.

Fifth, Plaintiffs proved they suffer concrete harm from ballot secrecy violations caused by BMD touchscreens with large displays that make voters' selections visible to others. Individual Plaintiffs and CGG members testified about their inability to protect the privacy and secrecy of their votes when using BMDs. Doc. 1822 ¶¶ 78 & a-c. Some plaintiffs have particular concerns due to past experiences with political retaliation. For example, Aileen Nakamura testified she

has experienced violation of ballot secrecy because of the large touchscreen displays, and her apprehension at being deprived of secrecy is reasonably based on past experience of vandalism when she put up a political yard sign. Doc. 1833 (Vol. 2) at 51:1-5, 54:6-55:7. This invasion of ballot secrecy constitutes a violation of voters' legally protected interests in voting "by secret ballot" under Georgia's Constitution, Ga. Const. art. II, § 1, ¶ I, and in "absolute secrecy" as guaranteed by multiple statutory provisions, O.C.G.A. § 21-2-70(13) (conduct of elections must guarantee secrecy); § 21-2-322(9) (voting machines must provide "absolute secrecy"); § 21-2-365(6) (same); § 21-2-379.1(6) (same); § 21-2-373 (requiring secrecy for write-in votes); § 21-2-386(a)(5) (requiring absentee ballot secrecy), including specifically for BMD voting, O.C.G.A. § 21-2-379.22(5) (requiring "absolute secrecy" for BMD voting);. Plaintiffs and CGG members are threatened with deprivation of these legal protections each time they are required to use BMDs.

Sixth, BMDs violate HAVA rights to privately verify and correct votes before casting. 52 U.S.C. § 21081(a)(1)(A)(i)-(ii). The BMD system's violations of HAVA invade voters' legally cognizable interests in enjoying the benefits of the statute's voter protections. These harms are concrete, particularized, and occur each time Plaintiffs and CGG members vote using BMDs.

37

Seventh, avoiding BMD harms through absentee voting imposes different harms: ballot application and tracking burdens, postal issues, no Election Day voting, lost community engagement, even disenfranchisement. Doc. 1822 ¶¶ 79 & a-f (citing testimony). Conditioning alternative voting methods on accepting burdens violates the unconstitutional-conditions doctrine. *See Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004). This forced choice between BMD harms and absentee-voting burdens invades the fundamental right to vote without undue impediments and comprises unequal treatment.

None of Plaintiffs' proof of the foregoing burdens on voting was disputed by contrary defense evidence. Instead, many of these burdens were substantiated by testimony from Defendants' witnesses. The trial record contains overwhelming, uncontroverted evidence of a variety of individual standing injuries.

### 2. The District Court Erred By Disregarding Uncontroverted Evidence Of Plaintiffs' Injuries

The district court committed multiple errors of law and clear error in rejecting Plaintiffs' individual standing for lack of injury-in-fact. These errors independently require reversal.

First, the court analyzed only two of seven injury categories—QR code inability and review burden, Doc. 1868 at 23—ignoring ballot secrecy violations, HAVA violations, security function burden, lack of trustworthy vote records, and absentee voting burdens. This selective analysis violated the court's duty to

consider all evidence supporting standing and cannot be reconciled with the requirement that courts conduct a fact-specific inquiry into whether plaintiffs have suffered concrete invasions of legally protected interests.

Second, the district court erroneously refused to find that proven harms constituted injuries unless those specific harms were previously recognized by higher courts. Doc. 1868 at 24-26 (rejecting injuries as "unlike any that the Supreme Court or the Eleventh Circuit have recognized as a legally cognizable harm to voting or associational rights"). This approach fundamentally misapplies Article III standing doctrine, which requires assessment of whether plaintiffs suffered concrete invasions of legally protected interests, not pattern-matching to identical previously adjudicated harms. The Supreme Court has expressly cautioned that standing determinations "cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Third, the district court clearly erred by inexplicably reversing its own previous findings that the very same types of BMD-related injuries constitute cognizable harms, without receiving any contradictory evidence from Defendants. The court had previously recognized fundamental concerns about BMD ballot verification, finding that the BMD system "precludes direct voter verification of the QR barcode of votes cast on the ballot" and that this verification defect created

constitutional problems. Doc. 964 at 5. The court specifically acknowledged that voters face "immediate and irreparable harm" when "required by the State to cast a ballot on the BMD system that cannot be confirmed or verified as reflecting their actual vote choices because the votes are tabulated solely from a computer generated QR barcode that is not human-readable." Id. at 78-79.

The court also previously held as a matter of law that forcing voters to choose absentee voting to avoid the constitutional harms imposed by an in-person voting system constituted "unequal treatment" requiring voters to "undergo the inconveniences" of mail voting, including "costs of postage," timing constraints, and loss of "political association" from in-person voting—a "Hobbesian choice." Doc. 375 at 44-47. The district court failed to credit the very same forced choice between harms as a cognizable injury of the BMD system, despite previously recognizing it and despite the complete absence of any contradictory evidence from Defendants.

Fourth, with respect to the only two injuries that it expressly considered, the district court clearly erred by disregarding extensive uncontroverted evidence establishing these concrete, particularized injuries to individual voters. The evidence of these two types of injuries was overwhelming and undisputed. Multiple plaintiffs testified they cannot verify their QR-encoded votes. Plaintiffs detailed cognitive burdens from two-step review. Expert testimony confirmed

40

these harms, with Dr. Halderman explaining that "the only part of the ballot that is tabulated by the kind of ballot scanners used in Georgia is the contents -- the digital contents of the QR code." Doc. 1838 (Vol. 7B) at 157:3-9. Defendants presented no evidence disputing that QR codes are unreadable or that Plaintiffs cannot verify their actual votes.

Disregarding uncontroverted evidence is a mistake that constitutes clear error. *Brown*, 996 F.3d at 1182. Here, the court acknowledged the existence of Plaintiffs' evidence for the two harms it expressly considered, but then improperly dismissed those harms not because any opposing evidence existed, but through legal analysis that effectively makes standing impossible to establish for any new voting rights injury. The district court's rigid approach contradicts the Supreme Court's guidance that "an identifiable trifle is enough for standing to fight out a question of principle," *U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973), and imposes a heightened evidentiary standard inconsistent with established doctrine.

All these errors in the individual standing analysis ultimately led the district court to deny its own jurisdiction—after presiding over more than seven years of litigation—based on a fundamentally flawed legal framework rather than appropriate reliance on the extensive and uncontroverted factual record, which

41

established concrete, particularized injuries to individual voters. These errors require reversal of the individual standing determination.

### 3.    The District Court Erroneously Barred Evidence Of Further Cognizable Injuries In The Form Of Ballot-Secrecy Violations And HAVA Violations

The court compounded errors by excluding ballot secrecy and HAVA injuries from standing analysis after barring these merits claims. Doc. 1705 at 124-27 & nn.71-74; Doc. 1868 at 15 nn.11, 12. Excluding concrete constitutional injuries is reversible error.

The district court's summary judgment ruling improperly conflated standing with the merits by barring evidence relevant to injury-in-fact based on merits determinations. Standing and the merits are distinct inquiries, *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1211, 1221 (11th Cir. 2025) ("standing in no way depends on the merits"), and courts must consider all evidence of concrete injuries when assessing Article III standing, regardless of whether those injuries ultimately support viable claims on the merits. The court's categorical exclusion of ballot secrecy and HAVA evidence from the standing inquiry constrained the analysis by removing entire types of cognizable injuries from consideration, preventing appropriate assessment of whether Plaintiffs suffered concrete invasions of legally protected interests. The court justified excluding the "ballot secrecy component" because it saw no evidence that harms consequent to secrecy violations had

occurred, and it was unwilling to treat the violation itself as an injury. But the court did recognize "the reality that the large, bright screens can be seen by other voters and poll workers." Doc. 1705 at 126-27 & nn.72-73. This reality creates a "realistic probability" of harm resulting from the denial of secrecy, and "probabilistic harm is enough" for standing. *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341 (11th Cir. 2014).

Georgia constitutionally guarantees secret-ballot voting, Ga. Const. art. II, § 1, ¶ I, and statutorily requires "absolute secrecy" throughout voting. O.C.G.A. §§ 21-2-70(13), 21-2-322, 21-2-365, 21-2-373, 21-2-379.1, 21-2-379.22(5), 21-2-386(5). The trial record established that BMDs violate these state-law rights by displaying voters' selections on large touchscreens visible to poll workers, other voters, and observers. Individual Plaintiffs testified about their personal experiences with these privacy violations and their concrete concerns about political retaliation. Violations of state constitutional and statutory rights to ballot secrecy plainly constitute concrete, particularized injuries that independently support standing. The district court should have considered them in its standing analysis.

Similarly, Plaintiffs suffer cognizable injuries from violations of their federal statutory rights under HAVA. HAVA requires that voters be able to "verify (in a private and independent manner) the votes selected by the voter on the

43

ballot," 52 U.S.C. § 21081(a)(1)(A)(i), and to privately and independently "change the ballot or correct any error before the ballot is cast and counted," 52 U.S.C. § 21081(a)(1)(A)(ii). Evidence showed the BMD system invades these rights because voters cannot verify the QR-encoded portions of their ballots that are actually tabulated, and any detected errors must be reported to poll workers, compromising the private correction process, as does the publicly displayed action of correcting a touchscreen error. While HAVA may not create a private cause of action, as the district court noted, HAVA's requirements nevertheless still give individual voters a cognizable interest in the benefits of the statute's protections, and depriving voters of these benefits invades that interest, conferring Article III standing to challenge the deprivation under § 1983.

Excluding evidence violates the principle that standing requires considering all alleged injuries. When BMDs with large, visible touchscreens systematically violate pervasive state-law secrecy guarantees, voters suffer precisely the type of concrete, particularized injury that Article III recognizes. The district court's refusal to exclude these sorts of injuries from its standing analysis requires reversal.

### B.    Plaintiffs Also Established Causation and Redressability

Plaintiffs satisfied the remaining elements of Article III standing through extensive trial evidence establishing both causation and redressability. Once the

44

district court's errors in failing to find injury-in-fact are resolved in Plaintiffs'

favor, these other elements of standing will present no barrier to standing.

### 1.    Plaintiffs Established Causation

Plaintiffs readily satisfy the causation requirement because their injuries

flow directly from Defendants' intended enforcement of the legal mandate for in-

person voters to use BMDs. Causation requires injuries "fairly traceable" to

Defendants' actions. *Ga. Ass'n of Latino Elected Offs., Inc. (GALEO) v. Gwinnett*

*Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1116 (11th Cir. 2022).

Importantly, "[a] showing that an injury is fairly traceable requires less than a

showing of proximate cause," and "[t]he presence of multiple actors in a chain of

events that lead to the plaintiff's injury does not mean that traceability is lacking

with respect to the conduct of a particular defendant." *Garcia-Bengochea v.*

*Carnival Corp.*, 57 F.4th 916, 926, 927 (11th Cir. 2023). Even BMD injuries

dependent on malicious third-parties (like hackers) satisfy causation if they are

"sufficiently predictable." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367,

383 (2024).

Here, Plaintiffs' inability to verify QR-coded votes and their burden from

mandatory ballot review stem directly from the Secretary of State's and State

Election Board's statutory and regulatory requirements that in-person voters use

BMD systems. Georgia law mandates BMD use for in-person voting, O.C.G.A.

§§ 21-2-300(a)(2), 21-2-383(c), and Defendant Secretary selected Georgia's BMD system. SEB regulations—promulgated by SEB Defendants—require in-person voting on BMDs and specific verification procedures that burden Plaintiffs. Ga. Comp. R. & Regs. 183-1-12-.11(2)(b). Each Plaintiff will individually experience—and individually be harmed by—Defendants' enforcement of BMD-voting mandates and resulting unequal treatment of in-person and absentee voters. The causal chain is direct and unbroken: Plaintiffs' injures are caused by BMD use, which the Secretary of State and State Election Board require.

### 2.    Plaintiffs Established Redressability

Plaintiffs also satisfy the redressability requirement because judicial relief prohibiting mandatory BMD use would eliminate their constitutional injuries. Redressability requires "a remedy that is likely to redress the injury which is fairly traceable to the challenged conduct." *Reeves v. Comm'r*, 23 F.4th 1308, 1318 (11th Cir. 2022) (cleaned up). "[P]artial relief is sufficient for standing purposes." *Made in the USA Found. v. U.S.*, 242 F.3d 1300, 1310 (11th Cir. 2001). Injunctive relief against mandatory BMD use would redress injuries by allowing hand-marked ballots or alternatives without unverifiable QR codes or burdensome reviews, as well as avoiding other proved harms.

### C.      The District Court Applied An Overly Restrictive Legal Framework For Standing In Voting Rights Cases

The district court misunderstood the framework for voting rights injuries by applying restrictive categorical analysis rather than fact-specific inquiry. As the Eleventh Circuit recently emphasized in *Polelle*, 131 F.4th at 1221, "standing in no way depends on the merits" of constitutional claims subject to the *Anderson-Burdick* test. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). The threshold question of whether Coalition Plaintiffs suffered concrete harm sufficient for Article III jurisdiction operates under entirely different legal standards than the merits inquiry of whether particular burdens on voting rights violate the Constitution.

The district court's most significant error was dismissing Plaintiffs' proven harms because they were "unlike any that the Supreme Court or the Eleventh Circuit have recognized as a legally cognizable harm to voting or associational rights." Doc. 1868 at 25. This categorical approach fundamentally misapplies Article III standing doctrine, which requires assessment of whether plaintiffs suffered concrete invasions of legally protected interests. Applying standing requirements is not "a mechanical exercise." *Allen*, 468 U.S. at 751. Yet the district court's rigid requirement that injury types match previously recognized categories transforms standing analysis into exactly such a mechanical pattern-matching exercise. Voting rights injuries particularly resist such rigid classification because

47

electoral systems continually evolve, creating new potential harms to fundamental constitutional rights. The district court's approach effectively prevents standing doctrine from addressing novel governmental conduct that invades legally protected interests, contrary to Article III's purpose of ensuring federal courts remain available to vindicate constitutional rights.

The district court's overly restrictive legal framework constitutes reversible error that prevents the vindication of federal rights. Its logic would insulate new voting technology burdens from review. Standing doctrine demands fact-specific inquiry into concrete harm, and when plaintiffs suffer concrete, particularized injuries from voting system requirements—as the extensive trial evidence establishes here—Article III standing exists. The district court's ruling to the contrary should be reversed.

## III.   THE DISTRICT COURT ERRED IN DISMISSING COALITION PLAINTIFFS FOR LACK OF ORGANIZATIONAL STANDING

The district court's denial of organizational standing to CGG constitutes reversible error on multiple independent grounds. CGG established concrete organizational injury through extensive resource diversions necessitated by Defendants' unconstitutional BMD requirements. The court compounded this error by refusing to apply the law-of-the-case doctrine to the Eleventh Circuit's binding 2022 determination that CGG has organizational standing, and by misapplying the

Circuit's legal framework in ways that would effectively eliminate organizational

standing as a viable theory. Each error independently requires reversal.

Coalition Plaintiffs preserved organizational standing and law-of-the-case

arguments through summary judgment briefing, Doc. 1624 at 18-51, 25 & n.4,

mid-trial argument, Doc. 1841 (Vol. 10A) at 95:10-97:1, closing argument, Doc.

1848 (Vol. 17) at 53-57, and proposed findings, Doc. 1822 ¶¶ 24-29, 48-82, 57 n.7,

and post-trial briefing, Doc. 1855 at 8-12.

### A.   CGG Established Cognizable Organizational Injury Through Diversion Of Resources To Address Legally Sufficient Member Injuries

An organization establishes standing under the diversion-of-resources theory

when "the defendant's illegal acts impair its ability to engage in its projects by

forcing the organization to divert resources to counteract those illegal acts."

*GALEO*, 36 F.4th at 1114.The organizational plaintiff must demonstrate "(1) an

injury in fact that (2) is fairly traceable to the challenged action of the defendant

and (3) is likely to be redressed by a favorable decision." *Id.*. CGG satisfied each

element through concrete evidence of resource diversions necessitated by

Defendants' unconstitutional BMD requirements

### 1.   CGG Proved Actual Diversion Of Resources From Its Organizational Mission And Priorities

CGG established concrete organizational injury by demonstrating it

"diverted resources away from in order to spend additional resources" combating

49

Defendants' BMD system. *GALEO*, 36 F.4th at 1114. Uncontradicted evidence showed CGG diverted resources from ranked choice voting education, fighting internet voting, county official webinars, and rule change petitions. Doc. 1846 (Vol. 15) at 161-63.

Board member Rhonda Martin corroborated this evidence, testifying that CGG has spent a "huge amount of [its] time" educating people about and opposing the requirement to use BMD. Doc. 1832 (Vol. 1) at 152:12. Martin confirmed that the State of Georgia's enforcement of legal requirements for all in-person voters to vote on BMDs has "absolutely" impacted how CGG has allocated its resources. *Id.* at 120:9-13.

Prior proceedings documented CGG's inability to participate in EAC standards, continue Election Verification Network involvement, pursue North Carolina BMD litigation, and conduct voter education. Doc. 1705 at 78-80, and the district court previously found these to be "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources." *Id.* at 81.

## 2. The Underlying Member Injuries Were Legally Cognizable Under Voting Rights Precedent

To establish organizational standing, CGG must prove "that the injury to the identifiable community that the organization seeks to protect is itself a legally cognizable Article III injury that is closely connected to the diversion." *City of S.*

*Miami v. Governor of Fla.*, 65 F.4th 631, 638-39 (11th Cir. 2023). CGG's resource

diversions aim to protect its members from concrete voting rights injuries imposed

by the BMD system.

As explained in Section II, *supra*, CGG members suffer a number of legally

cognizable injuries from BMDs, including but not limited to: (1) inability to verify

that their printed ballot's QR code accurately reflects their selections; and (2) the

burden of the BMD system's mandatory two-step ballot review procedure. These

harms to CGG members satisfy Article III requirements because they constitute

concrete burdens on the fundamental right to vote.

Circuit precedent recognizes standing when voting advocacy organizations

divert resources to address harms, whether to members or non-members, caused by

things like new voting rules. *Fla. State Conf. of NAACP v. Browning*, 522 F.3d

1153, 1165-66 (11th Cir. 2008); *GALEO*, 36 F.4th at 1114. CGG's mission

includes protecting its members' and the public's constitutional rights exercised

through voting. CGG members' injuries directly implicate this mission,

establishing the requisite connection between CGG's diversions and legally

cognizable harms.

### 3. The Resource Diversion Was Causally Connected To Defendants' Unconstitutional Conduct

CGG's standing is firmly established through the causal nexus between

Defendants' BMD requirements and the organization's resource diversions. To

establish causation, an organization need only demonstrate a "drain on [the] organization's resources" that "arises from the organization's need to counteract the defendants' assertedly illegal practices." *GALEO*, 36 F.4th at 1116.

Uncontroverted evidence establishes this causal connection. CGG's diversions stem directly from Defendants' mandate that in-person voters use BMDs. The organization has been forced to prioritize its anti-BMD efforts at the expense of other mission-consistent activities due to the concrete harms the BMD system imposes on CGG members.

The district court previously recognized this causal connection, finding that CGG "credibly asserted" resource diversions in response to Defendants' conduct. Doc. 1705 at 80-81. The Eleventh Circuit itself confirmed that CGG's allegation of diversions arising from policies that forced the organization "to divert personnel and time to educating volunteers and voters" about problems presented by BMDs was sufficient for organizational standing. *Curling*, 50 F.4th at 1121.

The State offered no contrary evidence. Uncontradicted evidence thus firmly establishes the requisite causal nexus for organizational standing. CGG has therefore satisfied all elements of organizational standing under the diversion-of-resources theory through concrete evidence of resource diversions necessitated by Defendants' unconstitutional conduct.

**B.     The District Court Erroneously Declined To Apply Law-Of-The-Case Doctrine Regarding CGG's Previously Established Standing**

Given the uncontroverted trial proof of CGG's resource diversions discussed in subsection III.A. *supra*, the district court's post-trial refusal to apply law-of-the-case doctrine to the Eleventh Circuit's prior standing determination constitutes a reversible error of law. The law-of-the-case doctrine requires that "an issue decided at one stage of a case is binding at later stages of the same case." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005). The Eleventh Circuit definitively resolved the legal question of CGG's organizational standing, leaving only future evidence-sufficiency questions for the district court's further resolution.

**1.     The Eleventh Circuit Definitively Established CGG's Organizational Standing**

The Eleventh Circuit's 2022 ruling conclusively determined that CGG has organizational standing under the diversion-of-resources theory. The Circuit explained: "We have recognized that voting advocacy organizations like the Coalition have standing to sue when a policy will force them 'to divert personnel and time to educating volunteers and voters' and to resolving problems that the policy presents 'on election day.'" *Curling*, 50 F.4th at 1121. The Circuit expressly concluded: "Because the Coalition credibly made that assertion, the district court

53

had jurisdiction to hear the Coalition's and its members' requests for injunctive relief." *Id.*

At argument, the panel credited CGG's organizational standing. Doc. 1388-2 at 5:21-9:17. "At least under the allegations and the affidavit presented … there is evidence of diversion of resources." *Id.* at 7:8-12 (Luck, J.). Judge Grant pointedly asked Defendants' counsel: "What do you identify specifically as different between this set of -- this organizational plaintiff versus the dozens that we found standing for in other election cases?" *Id.* at 8:18-22. The panel directed Coalition Plaintiffs to focus on merits. *Id.*at 21:1-6 ("I think there's standing.") (Luck, J.), 28:4 ("We are not talking about standing. Standing is over." ) (Grant, J.).

Law-of-the-case requires following prior appellate decisions. *A.A. Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 582 & n.5 (11th Cir. 2001). The district court here "was not free … to revisit" the Circuit's legal conclusion that CGG's asserted diversions suffice for standing. *Id*. Indeed, the 2022 standing determination "binds not only the trial court" but the appellate court as well "in all subsequent proceedings in the same case in the trial or on a later appeal." *Schiavo*, 403 F.3d at 1291.

## 2.    Only The Evidentiary Standard Changes At Successive Litigation Stages

CGG's changing burden to prove diversions "with the manner and degree of evidence required at the successive stages," only raises the evidentiary standards to

*prove* a diversion, not the legal standard for what *constitutes* a diversion. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). The Eleventh Circuit already established as a matter of law that CGG's resource diversions from education efforts, advocacy activities, and organizational priorities are legally sufficient to confer organizational standing. This determination cannot be revisited by the district court simply because the case proceeds to trial. *A.A. Profiles*, 253 F.3d at 582 & n.5.

In its 2023 summary judgment order, the district court acknowledged the law-of-the-case doctrine and properly followed the Eleventh Circuit's interlocutory ruling that CGG's asserted diversions were sufficient for standing on the BMD claims as a matter of law, if proved. Doc. 1705 at 74-94. The court found that "CGG has continued to satisfy [its evidentiary] burden for purposes of summary judgment." Doc. 1705 at 77. This summary-judgment ruling was correct.

### 3.    Law-Of-The-Case Still Controls

At trial, CGG added new evidence of its diversions. Doc. 1868 at 15-16. Rather than credit this new evidence, the district court abandoned its summary-judgment conclusion that law-of-the-case governs. Instead, it misapplied *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1283 (11th Cir. 2005), as grounds to revisit the sufficiency of CGG's diversions because "the prior ruling was made at an earlier stage in the litigation" and the Circuit "never addressed

Plaintiffs' current theories of injury." *Id.* at 27-28. After dispensing with law-of-the-case, the court focused on the two individual harms discussed *supra*, not all seven, and erroneously concluded they were not "legally cognizable" underlying injuries under *City of S. Miami*, 65 F.4th at 638-39, thus CGG lacked organizational standing..Doc. 1868 at 30. Both steps of the court's ruling were error.

First, the district court misapplied *Jackson*, which held that a prior appeal focusing on one element of a constitutional claim neither created implicit law-of-the-case as to other elements, nor precluded reconsideration of the "dispositive question" based on a fuller record. *Id.* at 1283-85. These holdings are inapposite here, where the Circuit explicitly addressed the legal issue of whether CGG's diversions sufficed for organizational standing, if proved, and where all the diversion evidence newly introduced at trial was both uncontroverted and substantiated CGG's diversions to address member harms.

The district court was simply wrong to say CGG's diversions considered by the Circuit in 2022 were different than CGG's diversions presented at trial in 2024. While the trial evidence certainly expanded proof of the harms *causing* CGG's diversions, the diversions are literally the same—redirecting time and money from education efforts, advocacy activities, and organizational priorities to combat harms that BMDs cause CGG members. The Eleventh Circuit established that

these *types* of resource diversions are cognizable. The only question left for the

district court is whether the diversions are proved.  Since Coalition Plaintiffs'

evidence was uncontroverted, their proof should have sufficed.

Second, the district court misapplied *City of South Miami*, by citing it to

conclude that, because the BMD injuries affecting the "identifiable community" of

CGG members "the organization seeks to protect" were not cognizable, CGG's

resulting diversions were therefore not cognizable either. 65 F.4th at 638-39. On

the contrary, CGG satisfies *City of South Miami*'s requirements. CGG's trial

evidence showed that it diverted resources in numerous ways to address numerous

non-speculative, concrete harms that BMDs impose on its members, including

(among other things) that members cannot verify QR-encoded votes and must

perform challenging two-step BMD accuracy checks. CGG also expends resources

helping members navigate the difficulties of mail ballot voting to avoid BMD

harms. These diversions confer organizational standing.

The law-of-the-case doctrine requires the district court to follow the

Circuit's 2022 determination that CGG's specific types of resource diversions

confer organizational standing for their BMD claims. *Curling*, 50 F.4th at 1121. As

the district court correctly recognized was true at summary judgment, no

recognized exception to applying law-of-the-case doctrine was present after trial.

Doc. 1705 at 76-77 (citing *Schiavo*, 403 F.3d at 1292). The district court legally

erred by ignoring the undisputed evidence of CGG's diversions and choosing instead to revisit the Circuit's legal conclusion based on misapplying *Jackson* and *City of S. Miami*.

### C.    The District Court Misapplied The Eleventh Circuit's Standard For Organizational Standing

Beyond the evidentiary and law-of-the-case errors above, the district court fundamentally misapplied the Eleventh Circuit's legal framework for organizational standing. The court's unduly restrictive interpretation of *City of South Miami* would effectively collapse the established distinction between organizational standing and associational standing, contrary to decades of Circuit precedent recognizing these as separate viable theories. Moreover, even if standing questions remained, the One-Plaintiff Rule provides an alternative basis for proceeding to the merits.

### 1.    The District Court's Restrictive Framework Would Eliminate Organizational Standing As A Viable Theory

Organizations establish standing through members (associational standing) or their own injury satisfying traceability and redressability. *GALEO*, 36 F.4th at 1114. These represent distinct theories with different requirements and purposes. Associational standing allows organizations to bring suit "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit."
*Browning*, 522 F.3d at 1160.

Organizational standing, by contrast, permits organizations to sue based on their own institutional injuries, primarily through resource diversions necessary to combat defendants' unlawful conduct. The district court's interpretation would make organizational standing virtually impossible by requiring organizations to prove not only concrete resource diversions (which CGG established) but also that the underlying member injuries meet the same strict standards required for individual standing. This collapses the two doctrines into one.

Under the district court's framework, organizations could never establish standing in their own right for resource diversions because they would always need to first prove their members have individual standing—making associational standing the only viable theory. This result contradicts the Circuit's recognition of organizational standing as an independent basis for jurisdiction and undermines the practical benefits of allowing organizations to sue based on their own institutional injuries.

### 2.    Circuit Precedent Supports Preserving Both Doctrines

The Eleventh Circuit's organizational standing jurisprudence demonstrates that while organizations must show "concrete evidence" of harms to an identifiable community rather than reacting to "mere conjecture about possible governmental

actions," *City of S. Miami*, 65 F.4th at 639 (cleaned up), this standard does not require the strict individualized proof the district court demanded. In *Browning*, the NAACP established organizational standing by showing it reasonably anticipated it would have to "divert personnel and time" from "registration drives and election-day education and monitoring" to "educating volunteers and voters on compliance with" new voting requirements. 522 F.3d at 1165-66. What *Browning* did not require was proving each member's concrete harm; the Circuit focused on whether the community served by the organization faced "illegal acts" and whether the organization's diversion of resources "to counteract those illegal acts" would "impair its ability to engage in its projects." *Id.* at 1165. This approach preserves organizational standing as a meaningful alternative to associational standing while ensuring organizations cannot manufacture jurisdiction through speculative resource commitments.

CGG's situation closely parallels the NAACP's position in *Browning*. Like the NAACP responding to constitutionally burdensome new voting rules that went into effect before an election, 522 F.3d at 1165, CGG responds to concrete, mandatory BMD requirements affecting all its members who wish to be in-person voters. CGG has diverted resources from education efforts, advocacy activities, and organizational priorities to combat a voting system that imposes specific, demonstrable burdens on its members and the voting public generally.

60

### 3.    The One-Plaintiff Rule Provides An Alternative Basis For Reaching The Merits

Even if organizational standing questions remained unresolved, the One-Plaintiff Rule demonstrates why the district court's analysis was fundamentally flawed. One party with standing is enough to satisfy Article III for all parties bringing the same claims. *ACLU of Fla., Inc. v. Miami-Dade Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009).

Rather than applying an unduly demanding standard that would eliminate organizational standing as a viable doctrine, the district court should have recognized that multiple theories of standing provide alternative paths to establish jurisdiction. If individual Plaintiffs can demonstrate concrete injuries from mandatory BMD use, CGG's organizational standing becomes unnecessary, and vice versa.

The district court's misapplication of organizational standing doctrine requires reversal and proper application of the Eleventh Circuit's established framework.

## <u>CONCLUSION</u>

This Court should (1) reverse the attorney's fees denial and instruct the district court to award judgment and fees to Coalition Plaintiffs for prevailing on their DRE claims and (2) reverse the jurisdictional dismissal of the BMD claims and remand for merits adjudication.

Respectfully submitted on July 9, 2025.

By:    *S/ Robert A. McGuire, III*
Robert A. McGuire, III
ROBERT MCGUIRE LAW FIRM
600 1st Avenue, Suite 330 PMB 86685
Seattle, Washington 98104
T/F: (253) 267-8530
ram@lawram.com

*Attorney for Plaintiff–Appellant Coalition for Good Governance*

Bruce P. Brown
BRUCE P. BROWN LAW LLC
1123 Zonolite Road NE, Suite 6
Atlanta, GA 30306
T/F: (404) 881-0700
bbrown@brucepbrownlaw.com

Cary Ichter
ICHTER DAVIS LLC
3340 Peachtree Road NE, Suite 1530
Atlanta, GA 30326
T: (404) 869-7600 F: (404) 869-7610
cichter@ichterdavis.com

*Attorney for Plaintiffs–Appellants Laura Digges, William Digges III, and Megan Missett*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **<u>12,450</u>** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(i) and 11th Cir. R. 32-4; and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

DATED this 9th day of July 2025.

By:     <u>*S/ Robert A. McGuire, III*</u>
        Robert A. McGuire, III

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2025, I filed the foregoing Appellants' Brief Of Coalition For Good Governance, Laura Digges, William Digges III, and Megan Missett electronically using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

By:    <u>*S/ Robert A. McGuire, III*</u>
Robert A. McGuire, III